CASE NO. _____08 cv 3131_____

ATTACHMENT NO. _____1_____

EXHIBIT _____B part 2_____

TAB (DESCRIPTION) _____

1    needed to walk east?

2        A.    Because that's closer, you know, closer to

3    the, you know, destination we were trying to get

4    to.

5        Q.    And then how did you know you needed to go

6    further south once got to the Lake Shore Drive

7    area?

8        A.    Because like when you get there it's --

9    you don't see Soldier Field, so you know it's

10   south.  It's just common knowledge.

11       Q.    Did anyone else you know see you -- strike

12   that.

13             Did you see anyone else that you knew

14   while you were meeting with Mr. Ames at the Taco

15   Burrito King parking lot?

16       A.    No, ma'am.

17       Q.    Do you have any idea if any of your

18   friends ever saw you with Mr. Ames at the Taco

19   Burrito King parking lot?

20       A.    No, ma'am.

21       Q.    Okay.  No one came up to you and said,

22   hey, I saw you with Ryan the other day at the

23   parking lot?

24       A.    No, ma'am.

                                                    51

1    Q.    About how long -- strike that.

2          Do you know about what time you actually

3    arrived at the game?

4    A.    6:45, 7:00, around then.

5    Q.    When you arrived at the game did you see

6    anyone else you knew there?

7    A.    No, ma'am.

8    Q.    From the time that you met up with Ryan

9    Ames at the Taco Burrito King parking lot until the

10   time you arrived at Soldier Field, did you see or

11   speak with anyone else that you know?

12   A.    No, ma'am.

13   Q.    Did you receive any telephone calls?

14   A.    I cannot recall.

15   Q.    Did Mr. Ames indicate that he knew anybody

16   from the time that you met up with him at the Taco

17   Burrito King parking lot until the time you arrived

18   at Soldier Field?

19   A.    No, ma'am.

20   Q.    Had you been to a preseason game before?

21   A.    Yes, ma'am.

22   Q.    Are those the full four quarters like

23   every other football game?

24   A.    Yes, ma'am.

52

```
 1        Q.    And on August 30, 2007, you were wearing a

 2   Bears jersey?

 3        A.    Yes, ma'am.

 4        Q.    You were wearing a white T-shirt

 5   underneath that?

 6        A.    Yes, ma'am.

 7        Q.    You were wearing kind of a khaki -- light

 8   khaki-colored pants?

 9        A.    Yes, ma'am.

10        Q.    What kind of shoes were you wearing?

11        A.    Nike.

12        Q.    Lace up?

13        A.    Yes.

14        Q.    Were they just regular tennis shoes?  Were

15   they some sort of hiking boot?

16        A.    Tennis shoes.

17        Q.    All right.  So once you and Mr. Ames

18   reached Soldier Field, you two made your way to

19   your seats?

20        A.    Yes, ma'am.

21        Q.    Okay.  Once you made your way to your

22   seats -- strike that.

23              While you were at Soldier Field did you

24   have anything to eat?
```
                                                    53

1  A. No, ma'am.

2  Q. While you were at Soldier Field did you

3 have anything of an alcoholic nature to drink?

4  A. No, ma'am.

5  Q. While you were at Soldier Field did you

6 have anything of a nonalcoholic nature to drink?

7  A. No, ma'am.

8  Q. At any time from the time you met up with

9 Mr. Ames to the time that you arrived at Soldier

10 Field, did you have any plan as to how you were

11 going to get home from the game?

12  A. Yes.

13  Q. Okay. What was that plan?

14  A. The same way back most likely.

15  Q. You say most likely. Do you actually

16 remember that you planned to get back by using the

17 same -- like the reverse route of the way --

18  A. At the time, yes.

19  Q. Okay. So it was your -- strike that.

20   Once you were at the game -- strike that,

21 too.

22   Did you and Mr. Ames originally plan to

23 leave the game together?

24  A. Yes.

54

```
 1      Q.   All right.  I think you had said that you

 2  had taken the Blue Line southbound before?

 3      A.   Yes.

 4      Q.   Okay.  Have you ever gotten off the Blue

 5  Line in the Loop area prior to August 30, 2007?

 6      A.   Yes.

 7      Q.   About how many times?

 8      A.   I cannot recall.

 9      Q.   More than once?

10      A.   Yes.

11      Q.   More than a dozen times?

12      A.   Yes, ma'am.

13      Q.   And on those occasions had you been by

14  yourself?

15      A.   Yes, ma'am.

16      Q.   Do you know where Michigan Avenue is in

17  relation to the Blue Line stops in the Loop?

18      A.   Now I do, yes.

19      Q.   Okay.  At the time did you have -- strike

20  that.

21           Prior to August 30, 2007, did you know

22  where Michigan Avenue was in relation to the

23  Blue Line?

24      A.   I knew it was a few blocks.
```

                                                            55

1      Q.   Did you know whether or not Michigan

2   Avenue was east or west of the Blue Line back

3   before August 30, 2007?

4      A.   East.

5      Q.   All right.  And just so I'm clear, you and

6   Mr. Ames had originally planned on leaving the game

7   together.  Would that have been at the conclusion

8   of the game?

9      A.   Yes.

10      Q.   All right.  And once the game would reach

11   its conclusion, you and Mr. Ames had the plan that

12   you would then walk south to the Lake Shore

13   Drive/Jackson area and then west to the Blue Line;

14   is that accurate?

15      A.   It would be north.

16      Q.   I'm sorry.  Let me rephrase that.

17           It was originally your and Mr. Ames' plan

18   to leave the game together at its conclusion, walk

19   north to the Lake Shore Drive and Jackson area,

20   then west to the Blue Line stop?

21      A.   Yes, ma'am.

22      Q.   Okay.  So you planned on getting back on

23   the Blue Line at Jackson where you originally got

24   off?

56

1    A.   Yes, ma'am.

2    Q.   Did you and Mr. Ames do any tailgating

3  when you reached Soldier Field prior to taking your

4  seats?

5    A.   No, ma'am.

6    Q.   You know what tailgating is?

7    A.   Yes, ma'am.

8    Q.   From the time that you actually left work

9  at approximately 1:30 to the time that you actually

10  left Soldier Field, did you have anything to eat?

11    A.   No, ma'am.

12    Q.   You're approximately 5'11"?

13    A.   Back to that question, you asked from the

14  time I left my house?

15    Q.   Let me ask the question again.

16       From the time you left work at

17  approximately 1:30 to the time you ended up leaving

18  Soldier Field, did you have anything to eat?

19    A.   Yes, ma'am.

20    Q.   Okay.  What did you have to eat?

21    A.   I cannot recall.

22    Q.   Approximately when did you eat?

23    A.   2:45, 3:00, as soon as I got home.

24    Q.   So basically you got off work.  Once you

57

1    got home you made yourself something to eat?

2       A.   Yes.

3       Q.   You just don't remember what it was?

4       A.   No, ma'am.

5       Q.   Is that the only time that you ate

6    anything, from the time you got off of work until

7    the time you ultimately left Soldier Field?

8       A.   Yes, ma'am.

9       Q.   And back to my other question, you're

10   approximately 5'11"?

11       A.   Yes, ma'am.

12       Q.   And back on August 30, 2007, how much did

13   you weigh approximately?

14       A.   160.

15       Q.   Okay.  Did you have a watch on August 30,

16   2007?

17       A.   I cannot recall.

18       Q.   How much of the game did you actually see

19   prior to leaving Soldier Field?

20       A.   Most of the first quarter almost.

21       Q.   So the first quarter actually was not over

22   by the time you left Soldier Field?

23       A.   No.

24       Q.   You left Soldier Field alone?

58

1      A.   Yes, ma'am.

2      Q.   Did you leave before or after Mr. Ames?

3      A.   After.

4      Q.   At about what point did Mr. Ames leave

5  Soldier Field?

6      A.   I cannot recall.

7      Q.   Did you stay and watch some of the game

8  after Mr. Ames left?

9      A.   No, ma'am.

10     Q.   Okay.  So Mr. Ames left, and then you

11  pretty much right then got up and left yourself?

12     A.   No, ma'am.

13     Q.   Okay.  So what did you do after Mr. Ames

14  left?

15     A.   Walked, walked back towards Lake Shore

16  Drive.

17     Q.   Let me ask it this way.  Maybe my question

18  was a little confusing, and I just want to make

19  sure.

20          Mr. Ames actually got up and left where

21  you two were seated at Soldier Field before you

22  did?

23     A.   After I did.

24     Q.   Okay.  So you left the game before

                                                      59

1    Mr. Ames?

2        A.    No.

3        Q.    Okay.  Who left the game first or did you

4    leave about the same time?

5        A.    He left --

6        MR. FITZSIMMONS:  Well, I'm going to object to

7    the form of the question.  You're asking him who

8    left the seat, and you're implying in that that

9    leaving the seat is the same as leaving the game.

10   I think that the manner of your phraseology is

11   confusing.

12       MS. MAYHEW:  Fair enough.  I'll ask it this

13   way.

14   BY MS. MAYHEW:

15       Q.    First, while you were at the game from the

16   time you arrived and took your seat until the time

17   you decided you were going to leave Soldier Field,

18   did you at all get up and leave your seat for any

19   reason?

20       A.    Yes.

21       Q.    Okay.  Approximately how many times did

22   you get up and leave your seat?

23       A.    One time.

24       Q.    Okay.  What did you get up and leave the

                                                    60

1   seat for?

2      A.   Go get something to eat for me and him.

3      Q.   Did you actually get something to eat for

4   you and Mr. Ames?

5      A.   No, ma'am.

6      Q.   Why is that?

7      A.   An altercation happened with me and a

8   person.

9      Q.   When you say you and a person, was that

10  person Mr. Ames or someone else?

11      A.   Someone else.

12      Q.   Okay.  When you left your seat to get up

13  and go get something to eat for yourself and

14  Mr. Ames, can you tell me about how far through the

15  game it was?

16      A.   Three minutes left in the first quarter.

17      Q.   Okay.  I've never been inside Soldier

18  Field, so I don't know what the makeup is; but from

19  your seat where you were on August 30, 2007, can

20  you tell me where you had to go to try to get

21  something to eat?

22      A.   Down the stairs and then walk through the

23  tunnel to the right and wait in line.

24      Q.   Okay.  Now -- excuse me, sorry.

61

1           From the time you took your seat at

2   Soldier Field to the time you decided to leave, did

3   Mr. Ames ever get up and leave his seat for any

4   reason?

5       A.   He was waiting for me to come back.

6       Q.   Okay.  So when you got up to leave the

7   seat to go get something to eat for you and

8   Mr. Ames, he remained seated?

9       A.   Yes, ma'am.

10      Q.   Okay.  So with approximately three minutes

11  left to go in the game, you got up, you walked down

12  the stairs, went through the tunnel; and was there

13  a line at the concession stand?

14      A.   There was three minutes left in the first

15  quarter, not the game.

16      Q.   Sorry.  Fair.  Let me rephrase that.

17          With approximately three minutes left in

18  the first quarter, you got up with the intention to

19  go get yourself and Mr. Ames something to eat.  You

20  walked down the stairs through the tunnel and

21  approached the concession stand?

22      A.   Yes, ma'am.

23      Q.   All right.  When you got to the concession

24  stand, was there a line?

                                                  62

1     A.   Yes, ma'am.

2     Q.   Did you get in line?

3     A.   Yes, ma'am.

4     Q.   All right.  You indicated that you ended

5  up not purchasing any food because there had been

6  an altercation between yourself and someone else;

7  is that accurate?

8     A.   Yes, ma'am.

9     Q.   Had you ever met this person before?

10    A.   No, ma'am.

11    Q.   Had you ever seen this person before?

12    A.   No, ma'am.

13    Q.   Can you describe this person?

14    A.   Male, white, 30, 35 years of age.

15    Q.   What was the altercation about?

16    A.   I cannot recall.  He just started bumping

17  into me, pushing, shoving me, swearing at me; and

18  then the security broke it up.

19    Q.   The altercation that you had with the

20  white male who's approximately 35 years old in line

21  at the concession stand was both a physical and a

22  verbal altercation; is that a fair statement?

23    A.   More of a verbal than physical.

24    Q.   Okay.  When you say more of a verbal than

63

1    physical, he did bump into you, though?

2         A.    Yes, but no harm was done.

3         Q.    Okay.  How did he bump into you?  Was it

4    to the front, back, one of your sides?

5         A.    Maybe like, you know, just bumping.

6    You're in line and bump into someone.  It was not

7    like a hard one, but it was verbal.  Like he barely

8    touched me.  I looked and said sorry, and he

9    started swearing.

10        Q.    You indicated that security broke it up?

11        A.    Well, I was walking away, and they were

12   there.  And I tried to leave the stadium; and then

13   they took me and took some information down, and

14   then let me leave the stadium.

15        Q.    All right.  Following the altercation with

16   this white male, 35 years old, you attempted to

17   leave the stadium, true?

18        A.    Yes, ma'am.

19        Q.    Did you at all attempt to go back to tell

20   Mr. Ames what had happened?

21        A.    No, ma'am.

22        Q.    Why did you try to leave the stadium as

23   opposed to going back and talking to Mr. Ames?

24        A.    I felt, you know, my safety was

                                                      64

1    threatened.

2        Q.    You indicated there was security there.

3    What was your first knowledge of the presence of

4    security after this altercation?

5        A.    They wear red coats.

6        Q.    Were these security guards in the red

7    coats, were they present when the altercation

8    started, do you know?

9        A.    They were not like right next to us, but I

10   don't recall where they were.

11       Q.    Okay.  Did you ever get the name of the

12   person you were involved in the altercation with?

13       A.    No, ma'am.

14       Q.    You indicated security guards.  Is it they

15   attempted to prevent you from leaving the stadium;

16   is that accurate?

17       A.    Yes.

18       Q.    Okay.  So one of the -- how many security

19   guards were there?

20       A.    One.

21       Q.    And that security guard approached you as

22   you were attempting to leave the stadium, true?

23       A.    Yes.

24       Q.    That security guard asked for your

                                                    65

1    information?

2        A.   To come with them, they were going to take

3    some information down.

4        Q.   Did you go with him?

5        A.   Yes.

6        Q.   Did you have identification on you that

7    day?

8        A.   Yes.

9        Q.   What form of identification?

10       A.   Identification card and dog tags.

11       Q.   A state ID card?

12       A.   The California state ID card.

13       Q.   You didn't have any other identification

14   with you other than the California identification

15   and dog tags?

16       A.   The VISA card, I'll say that one.

17       Q.   The VISA was in your name?

18       A.   Yes.

19       Q.   Have you been in the military?

20       A.   No, ma'am.

21       Q.   How did you have dog tags?

22       A.   Relatives.

23       Q.   But they actually had your identifying

24   information on them?

                                                    66

1    A.   Yes.

2    Q.   And when you went with this security guy,

3  was the male who had been involved in the

4  altercation with him as well?

5    A.   No, ma'am.

6    Q.   What happened to that guy?

7    A.   I do not know.

8    Q.   Did you see if he went anywhere from the

9  time that you began to try to leave the stadium to

10  the time the security man caught up with you?

11    A.   No, ma'am.

12    Q.   How far did you get before the security

13  man actually approached you and said, hey, come

14  with me; let's get some information?

15    A.   Not far.

16    Q.   Okay.  You hadn't reached any sort of

17  tunnel or stairway or anything you needed to

18  actually exit the stadium?

19    A.   I was walking down the ramp; and then he

20  was right there, kindly asked me . . .

21    Q.   All right.  And when you went with him to

22  provide information, did you go into an office of

23  any sort?

24    A.   Yes.

67

1    Q.   Do you know where that is in Soldier

2    Field?

3    A.   No, ma'am.

4    Q.   And when you went into the office with the

5    security gentleman, was the man you had been

6    involved in the altercation with there?

7    A.   No, ma'am.

8    Q.   Did you at all call any sort of police or

9    any additional security once you arrived in the

10   office with the security man?

11   A.   No.

12   Q.   Did you request any additional security?

13   A.   No.  Nothing was -- he was just taking --

14   I wasn't cuffed or anything.  He was just taking

15   down information.  He let me go.  He was very nice.

16   Q.   Did he write out any sort of report that

17   you received a copy of?

18   A.   No, never received a copy of it.

19   Q.   Okay.  But you did actually see him

20   filling out some sort of a report?

21   A.   Yes.

22   Q.   Did you have an attempt or an opportunity

23   to review that report at any time before you left

24   the presence of the security guard?

68

1      A.   No.

2      Q.   Do you have any idea what he may have done

3  with the report?

4      A.   No.

5      Q.   Okay.  Did he indicate why he was taking

6  your information and writing a report?

7      A.   No.  I figured it was just basic, you

8  know . . .

9      Q.   If you were concerned for your safety from

10  this male you were involved in the altercation

11  with, may I ask why you didn't call the police or

12  file any formal complaint against him?

13      MR. FITZSIMMONS:  Objection.  That assumes that

14  the Monterey security person that he was with was

15  not the police or was not responsible for

16  maintaining security and reporting at Soldier

17  Field.  Go ahead and answer.

18  BY MS. MAYHEW:

19      Q.   You can answer.

20      A.   Can you repeat it.

21      MS. MAYHEW:  Can you read back the question?

22                    (Whereupon, the record was read

23                     as requested.)

24      THE WITNESS:  Figured I just wanted to leave.

69

1    He didn't make any harm, you know, to me

2    physically.  I figured, yes, I feared my safety;

3    but figured I was safe now.  I was with the

4    security guard.  I was going to leave, and he was

5    going to take information down and let me leave.

6    So that's why.

7    BY MS. MAYHEW:

8        Q.    When you were with the security guard did

9    you tell him -- at any time before you decided to

10   leave, did you tell the security guard that you

11   were afraid for your safety from the altercation of

12   this man?

13       A.    Yes.

14       Q.    Did he indicate at all that he was going

15   to do anything about that?

16       A.    No.

17       Q.    What did he say, if at all, about the

18   altercation?

19       A.    He said, yes, it happens a lot of times.

20       Q.    Okay.  Were you at all asked to leave by

21   anyone at Soldier Field?

22       A.    Yes.

23       Q.    Who asked you to leave?

24       A.    The security took me, the one guy took me,

70

1    took the information; and then they weren't going

2    to let me go back to the game in case, you know, if

3    the so-called guy was there.  He was going to, you

4    know -- they didn't want to have anything big

5    happen at the game.

6        Q.   Do you know if they asked the other

7    gentleman to leave?

8        A.   No.

9        Q.   I'm sorry.  That was a poor question.

10           No, you don't know if they asked him, or

11   no, they did not ask him?

12       A.   I do not know what happened to that man.

13       Q.   You said one guy took you into the office

14   for information.  Was there at some point another

15   security guy?

16       A.   There was other security guards around,

17   but one was just with me.  And he was the only one

18   I was talking to.  I wasn't talking to anyone else.

19       Q.   Did you observe whether these other

20   security guards were talking to this other

21   gentleman involved in the altercation?

22       A.   No.

23       Q.   Did the security guard actually ask you to

24   leave Soldier Field for your safety?

                                                    71

1    A.    Yes, and for the safety of others because

2    you never know what can happen.

3    Q.    Did you tell them you were there with

4    someone else?

5    A.    No.

6    Q.    Did he give you an opportunity to go see

7    Mr. Ames and let him know what was going on?

8    A.    No, because I would be walking back

9    through back into the stadium area, you know.

10    Q.    When you left Soldier Field were you

11    escorted by anyone?

12    A.    No.

13    Q.    Did you call Mr. Ames and let him know

14    what happened?

15    A.    Yes.

16    Q.    Okay.  Was he still at the game?

17    A.    No.

18    Q.    When did you call Mr. Ames to let him know

19    what happened?

20    A.    I cannot recall the time.

21    Q.    It was before the incident, though, that

22    happened later on that evening?

23    A.    When?

24    Q.    On August 30, 2007.

72

1    A.    The incident at the --

2    Q.    Fair enough.  Strike the question.  Sorry.

3          When you called Mr. Ames to tell him about

4    the incident with the altercation that you had and

5    security at Soldier Field, was that sometime before

6    the incident that later happened with Metra police

7    officers?

8    A.    Yes.

9    Q.    Have you been back to Soldier Field since

10   the incident -- the altercation and meeting with

11   the security guard?

12   A.    No, ma'am.

13   Q.    Why not?

14   A.    Haven't.  I don't know.  Saved my money

15   for different things.

16   Q.    Were you ever asked not to return to

17   Soldier Field?

18   A.    No.

19   Q.    Had you already reached the Jackson/Lake

20   Shore Drive area when you called Mr. Ames to let

21   him know what happened?

22   A.    No.

23   Q.    Were you in the process of walking from

24   Soldier Field down to the Jackson/Lake Shore Drive

                                                   73

1     area at the time that you called Mr. Ames to let

2     him know about the altercation and security from

3     Soldier Field?

4         A.    No, ma'am.

5         Q.    Where were you when you called Mr. Ames to

6     let him know what had occurred at Soldier Field?

7         A.    Directly outside the stadium.

8         Q.    You had indicated that Mr. Ames was no

9     longer at Soldier Field at that time?

10        A.    Yes.

11        Q.    How do you know he wasn't at Soldier Field

12    at that time?

13        A.    Because he said he was heading back up

14    north.

15        Q.    Did he say anything to you about why he

16    was heading up north without you?

17        A.    He didn't know where I was, you know, yes.

18        Q.    Did you ask him to wait for you?

19        A.    No.  He was already way, you know, a ways

20    from there.  It's like, why would he come back.

21    So, no, I didn't ask him to wait.

22        Q.    Okay.  Well, when you talked to Mr. Ames

23    about the incident that occurred at Soldier Field,

24    he was already heading up north.  Do you know

74

1    approximately where he was at the time that you

2    reached him on the phone?

3        A.   No, ma'am.

4        Q.   Do you know if he had reached the CTA Blue

5    Line yet?

6        A.   No, ma'am.

7        Q.   Approximately how long from the time you

8    left your seat to the time you were standing

9    outside the stadium to call Mr. Ames, how much time

10   passed there?

11       A.   40 minutes, maybe 30 to 40.

12       Q.   The security personnel that you met with

13   at Soldier Field, do you know if they -- that

14   security guy that you spoke with was a member of

15   any police force or if the security he was involved

16   with was certified police force?

17       A.   Monterey Security, that's all I knew it

18   was.

19       Q.   Do you know if the security guard from

20   Monterey Security had called the Chicago Police

21   Department about the altercation you were involved

22   in?

23       A.   No.

24       Q.   Did that security guard give any

                                                    75

1    inclination or did he imply to you that anyone from

2    the Chicago police was on their way to Soldier

3    Field with respect to that altercation?

4        A.    No.

5        Q.    Approximately what time was it when you

6    began walking north from Soldier Field in an effort

7    to come back towards the Loop to get the Blue Line?

8        A.    8:15, 8:30.

9        Q.    And was that accurate, it was still your

10   intention to walk north and then walk west to the

11   Blue Line as was your original plan with Mr. Ames?

12       A.    Yes.

13       Q.    Okay.  Did you call anyone else to tell

14   them about the altercation and meeting with

15   security at Soldier Field other than Mr. Ames?

16       A.    No, ma'am.

17       Q.    Did you receive any telephone calls from

18   anyone from the time you arrived at Soldier Field

19   to the time you left Soldier Field?

20       A.    No, ma'am.

21       Q.    Did you make or receive any phone calls

22   from the time you began walking north -- strike

23   that.

24             You began walking north from Soldier

                                                        76

1    Field, true?

2      A.   Yes, ma'am.

3      Q.   And you were walking north towards the

4    Loop area, true?

5      A.   Yes, ma'am.

6      Q.   Okay.  At some point while you were

7    walking north, did you reach the Lake Shore

8    Drive/Jackson area?

9      A.   Yes.

10      Q.   About how long did it take you to walk

11    from Soldier Field to the Lake Shore Drive/Jackson

12    area?

13      A.   15 minutes I believe.

14      Q.   All right.  So is it fair to say you

15    reached the Lake Shore Drive/Jackson area sometime

16    around 8:30, 8:45?

17      A.   8:30, yes.

18      Q.   And from the time that you actually began

19    walking north from Soldier Field to the time you

20    arrived at the Jackson/Lake Shore Drive area, did

21    you make or receive any phone calls?

22      A.   No, ma'am.

23      Q.   What did you do once reached the

24    Jackson/Lake Shore Drive area?

77

1        A.    Proceeded to Bennigan's across from the

2    Art Institute.

3        Q.    Okay.  So is it fair to say once you

4    actually reached the Jackson/Lake Shore Drive area,

5    you did walk a little bit west in order to get to

6    Michigan Avenue?

7        A.    Yes, ma'am.

8        Q.    Okay.  The Bennigan's across from the Art

9    Institute, that's located -- used to be located at

10   Adams and Michigan Avenue?

11       A.    Yes, ma'am.

12       Q.    All right.  Adams is one stoplight north

13   of Jackson?

14       A.    I believe so.

15       Q.    Okay.  Had you been to this Bennigan's

16   before August 30, 2007?

17       A.    Yes, ma'am.

18       Q.    So even when you were walking north --

19   strike that.

20             Were you getting hungry as you were

21   walking north from Soldier Field?

22       A.    Yes.

23       Q.    So you knew that Bennigan's was there

24   because you had been there before?

                                                78

1    A.    Yes.

2    Q.    You decided you were going to stop, get

3    something to eat?

4    A.    Yes, ma'am.

5    Q.    Now, this was summer.  So at about 8:30,

6    the approximate time you reached the Jackson/Lake

7    Shore Drive area, was it still light outside?  Was

8    it dark?  What was it like?

9    A.    It was the end of summer, so, you know,

10   7:45, 8:00, it's starting to get kind of dark out.

11   So it was dark out.

12   Q.    Okay.  Had the sun set completely by the

13   time you reached the Jackson/Lake Shore Drive area?

14   A.    Yes.

15   Q.    Was your dad expecting you home from the

16   game at any particular time?

17   A.    After the game.

18   Q.    Did you at all call your dad and tell him

19   what occurred in terms of the altercation and

20   meeting with the security personnel at

21   Soldier Field?

22   A.    No, ma'am.

23   Q.    Did you give your dad a call, let him know

24   you were going to be home early or anything of that

                                                    79

1    nature?

2        A.   No, ma'am.

3        Q.   Did you give your dad a call, let him know

4    you were stopping to eat at Bennigan's?

5        A.   No, ma'am.

6        Q.   Did you call anyone and let them know you

7    were eating at Bennigan's?

8        A.   No, ma'am.

9        Q.   Did you receive any phone calls from the

10   time you reached the Lake Shore Drive/Jackson area

11   to the time you got to Bennigan's?

12       A.   No, ma'am.

13       Q.   Okay.  The Bennigan's on August 30, 2007,

14   was located at Adams and Michigan.  It's since

15   closed down, right?

16       A.   I cannot -- I do not know.

17       Q.   Okay.  Fair enough.

18            You were alone at the time you reached

19   Bennigan's?

20       A.   Yes, ma'am.

21       Q.   From the time of the altercation -- strike

22   that.

23            From the time you departed security at

24   Soldier Field to the time you arrived at

                                                    80

1    Bennigan's, did you meet up with anyone else that

2    you knew?

3        A.   From the time I left Soldier Field and I

4    got to Bennigan's?

5        Q.   Yes.

6        A.   When I -- while I was at Bennigan's,

7    though?

8        Q.   Before you were there, just like when you

9    arrived at Bennigan's.

10       A.   No, ma'am.

11       Q.   All right.  When you arrived at Bennigan's

12   was there anyone you knew there?

13       A.   Yes, ma'am.

14       Q.   Who?

15       A.   A waitress by the name of Haven.

16       Q.   Is that spelled like it sounds, H-a-v-e-n?

17       A.   Yes, ma'am.

18       Q.   Do you know Haven's last name?

19       A.   No, ma'am.

20       Q.   How did you know Haven?

21       A.   I would go in there a lot.  She was a

22   waitress, so I talked to her.

23       Q.   You only knew her in her capacity as a

24   waitress at Bennigan's?

81

```
 1        A.    Yes, ma'am.

 2        Q.    You never met with her outside of

 3   Bennigan's?

 4        A.    No, ma'am.

 5        Q.    Did you know before you arrived at

 6   Bennigan's on August 30, 2007, what Haven's shift

 7   was at Bennigan's?

 8        A.    No.

 9        Q.    Before you arrived at Bennigan's on

10   August 30, 2007, did you have any idea whether or

11   not Haven would actually be working that evening?

12        A.    No, ma'am.

13        Q.    So you arrived at Bennigan's.  And once

14   you got there did you have a table, have a seat

15   somewhere?

16        A.    Yes, ma'am.

17        Q.    Did you see Haven before or after you had

18   a seat at Bennigan's?

19        A.    After I had a seat.

20        Q.    Was she your waitress that night?

21        A.    Yes.

22        Q.    Other than Haven the waitress, did you see

23   anyone else that you knew at Bennigan's?

24        A.    No, but they -- like how they have it is
```

82

1    like they have a few waiters, waitresses.

2    Sometimes like one will bring you the food, another

3    will bring you your drink.  So it's like her and

4    some other person.  I don't recall.

5        Q.    So throughout the time that you were at

6    Bennigan's, at some point Haven may have actually

7    brought you something to the table?

8        A.    Yes.

9        Q.    But she wasn't necessarily your assigned

10   waitress?

11       A.    Yes.

12       Q.    Okay.  Did you tell Haven about the

13   incident regarding the altercation at Soldier

14   Field?

15       A.    No.

16       Q.    Did you order something to eat at

17   Bennigan's?

18       A.    Yes.

19       Q.    What did you have?

20       A.    A cheeseburger.

21       Q.    It came with a side of fries?

22       A.    Yes, ma'am.

23       Q.    Did you eat the fries and the

24   cheeseburger?

83

1     A.   Yes, ma'am.

2     Q.   Did you have anything else to eat besides

3 the cheeseburger and the fries while you were at

4 Bennigan's?

5     A.   I cannot recall.

6     Q.   Did you have anything of an alcoholic

7 nature to drink while you were at Bennigan's?

8     A.   No, ma'am.

9     Q.   Did you have anything of a nonalcoholic

10 nature to drink while you were at Bennigan's?

11    A.   Yes, ma'am.

12    Q.   You had like a soda or water?

13    A.   Yes, soda.

14    Q.   The state identification that you had with

15 you, we previously talked a little bit about.  You

16 indicated that was a California state

17 identification?

18    A.   Yes, ma'am.

19    Q.   A California driver's license?

20    A.   Yes, ma'am.

21    Q.   Indicated your address was 6119 Sonoma

22 Way?

23    A.   Yes, ma'am.

24    Q.   It indicated your date of birth was

84

1    November 27, 1985?

2        A.    Yes, ma'am.

3        Q.    Did you at all have any Illinois

4    identification, not just on you; but did you have

5    any Illinois identification as of August 30, 2007?

6        A.    Yes, ma'am.

7        Q.    Did that Illinois identification identify

8    your address as 6119 North Mason in Chicago?

9        A.    No, ma'am.

10       Q.    Okay.  What address did it have for you?

11       A.    5040.

12       Q.    The Illinois identification, was that a

13   state ID or a driver's license?

14       A.    Driver's license.

15       Q.    The identification you had with you on

16   that evening, August 30, 2007, with the date of

17   birth of 1985 indicated you were 21 on that date,

18   on August 30, 2007?

19       A.    Yes, ma'am.

20       Q.    You were not, in fact, 21 at the time?

21       A.    Yes, ma'am.

22       Q.    Let me rephrase that.

23             You were not 21 on August 30, 2007?

24       A.    No, I was not 21.

                                                    85

1      Q.   Why did you have with you a state

2  identification from a state you had never lived in?

3      A.   Why does any kid have, you know -- it's

4  the thing, you know, a lot of teenagers have.

5      Q.   When you say a thing a lot of teenagers

6  have, you're talking about a fake ID, yes?

7      A.   Yes, ma'am.

8      Q.   Okay.  So you had the fake ID to indicate

9  you were 21 so that if you wanted something of an

10  alcoholic nature, that's the identification you

11  could show?

12      A.   Yes, ma'am.

13      Q.   You knew that it was a crime for someone

14  under the age of 21 in Illinois as of August 30,

15  2007, to drink alcohol?

16      A.   Yes, ma'am.

17      Q.   You also knew that having a fake

18  identification regardless of whether other

19  teenagers had them, you knew that having fake

20  identification was also a crime in Illinois as of

21  August 30, 2007?

22      A.   Yes, ma'am.

23      MS. MAYHEW:  Can we take a quick break?

24      MR. FITZSIMMONS:  Sure.

86

```
 1                    (Whereupon, a short break was

 2                    taken.)

 3        MS. MAYHEW:  Back on the record.  It's 215.

 4   BY MS. MAYHEW:

 5        Q.   Matthew, before I start getting into the

 6   complaint itself, I do have a couple more questions

 7   I missed earlier.

 8             First of all, as you were walking north

 9   from -- strike that.

10             As you were going either to or from

11   Soldier Field walking, was there anything going on

12   at Grant Park that weekend, any particular

13   festival?

14        A.   I do not recall.

15        Q.   And this was a Thursday night, right?

16        A.   Yes.

17        Q.   Have you been back to that Bennigan's

18   since August 30, 2007?

19        A.   No.

20        Q.   Have you heard from Haven since August 30,

21   2007?

22        A.   No, ma'am.

23        Q.   Have you seen Haven since August 30, 2007?

24        A.   No, ma'am.
```

87

1        Q.    Do you have any idea what Haven's last

2    name is?

3        A.    No, ma'am.

4        Q.    All right.  When you were meeting with the

5    security personnel at Soldier Field, did you show

6    that security person the identification that you

7    had on you at that time?

8        A.    Yes.

9        Q.    Did that security -- was it a man?

10       A.    Yes.

11       Q.    Okay.  Did that security man say anything

12   about the ID being a fake ID?

13       A.    No, ma'am.

14       Q.    Okay.  Did he take down all of your

15   information directly from that fake ID as far as

16   you know?

17       A.    I believe so.

18       Q.    He wasn't just asking you where do you

19   live, and then you orally told him?

20       A.    No, ma'am.

21       Q.    Just to be clear, the only identification

22   you had on you that evening was the California ID?

23       A.    I had a VISA card and dog tags.

24       Q.    Okay.  The only identification you had

                                                        88

1    that was a state identification of any sort was the

2    California ID?

3        A.   Yes.

4        Q.   All right.  When you were with the

5    security man at Soldier Field, did he ask at all

6    who you were at Soldier Field with?

7        A.   No, ma'am.

8        Q.   What race was the security guard at

9    Soldier Field?

10       A.   White.

11       Q.   You indicated it was Monterey Security

12   Services.  Was that on a uniform somewhere or how

13   did you know it was Monterey?

14       A.   The jacket.

15       Q.   Had you ever seen that particular security

16   guard at Soldier Field before August 30, 2007?

17       A.   No, ma'am.

18       Q.   All right.  Back to Bennigan's, you

19   ordered a cheeseburger, came with fries, you got a

20   soda, right?

21       A.   Yes, ma'am.

22       Q.   You ate all that?

23       A.   Yes.

24       Q.   Did you order anything else while you were

                                                    89

1    at Bennigan's?

2         A.    I do not recall.

3         Q.    Okay.  Did you get a check?

4         A.    Yes.

5         Q.    All right.  Did you pay your check?

6         A.    Yes.

7         Q.    How did you pay it, cash, credit card?

8         A.    Cannot recall.

9         Q.    Do you remember how much money in terms of

10   cash you actually had on you when you left Taco

11   Burrito King on August 30, 2007, to head to the

12   game?

13        A.    No, ma'am.

14        Q.    Was it more than 20 bucks, do you know?

15        A.    Do not recall.

16        Q.    All right.  You indicated that while you

17   were standing still outside Soldier Field, but

18   before you began walking towards the Loop, that you

19   managed to actually get in touch with Ryan Ames?

20        A.    Yes.

21        Q.    And that was from your cell phone to his

22   cell phone?

23        A.    No, ma'am.

24        Q.    How did you actually get in touch with

                                                        90

1    Ryan Ames?

2        A.    I asked someone that was walking by if I

3    could borrow their phone.

4        Q.    Why didn't you use your phone?

5        A.    It was dead.

6        Q.    Do you know approximately when that day

7    your cell phone died?

8        A.    Well, the battery went out.

9        Q.    Okay.  So at some point on August 30,

10   2007, the cell phone that you had with you, the

11   battery died or went out?

12       A.    Yes.

13       Q.    Okay.  And that -- do you have any idea

14   what time during that day that happened?  Was it

15   while you were at the game, before the game?

16       A.    As I probably got to the game, before -- I

17   don't recall really.

18       Q.    So someone allowed you to use their cell

19   phone to contact Ryan?

20       A.    Yes.

21       Q.    Okay.  And you called Ryan's cell phone?

22       A.    Yes.

23       Q.    All right.  Did Ryan say anything to you

24   that he was trying to get in touch with you or find

                                                     91

1    out where you went or anything like that?

2        A.    He asked where I was.

3        Q.    Okay.  And that's when you proceeded to

4    tell him about the altercation and --

5        A.    Yeah.

6        Q.    -- the security guard at Soldier Field?

7        A.    Yes.

8        Q.    All right.  And you understood that he was

9    already heading back up north, back towards home?

10       A.    Yes.

11       Q.    Okay.  And how was he getting there, did

12   he say?

13       A.    No.

14       Q.    So you don't know if he actually went with

15   the Blue Line which was the original plan?

16       A.    Do not know.

17       Q.    Okay.  And was that the last that you

18   spoke with Ryan that entire evening?

19       A.    Yes.

20       Q.    Okay.  Was it your intention to ultimately

21   go back home to 5040 North Nottingham on August 30,

22   2007?

23       A.    Yes, ma'am.

24       Q.    Okay.  At any time from the time that your

                                                        92

1    mother moved to Valparaiso to August 30, 2007, did

2    you stay with your mom at her address in

3    Valparaiso?

4        A.    Yes.

5        Q.    How often did you stay there?

6        A.    It varied.

7        Q.    Now, you were 19 in August of 2007.  I

8    understand your parents divorced some time ago,

9    true?

10       A.    Yes.

11       Q.    Your mother had been the custodial parent?

12       A.    Yes.

13       Q.    Once you reached majority of age, did they

14   let you decide who you wanted to live with?

15       A.    Yes.

16       Q.    So you chose to live with your dad?

17       A.    I lived with my mother.

18       Q.    Okay.  You lived with your mother until

19   she sold 6119 North Mason?

20       A.    Yes.

21       Q.    And you decided you wanted to stay in the

22   Chicagoland area?

23       A.    Yes, ma'am.

24       Q.    So you didn't reside on a permanent basis

                                                    93

1    with your mother after 6119 North Mason was sold?

2       A.   Correct.

3       Q.   Was there any reason why your mother would

4    be expecting you on August 30, 2007?

5       A.   No.

6       Q.   Okay.  How would you typically get to

7    Valparaiso when you would go to see her?

8       A.   South Shore train, Millenium Park.

9       Q.   Had you taken the South Shore to the

10    Valparaiso area prior to August 30, 2007?

11       A.   Yes.

12       Q.   What stop do you have to get off at

13    actually for Valparaiso?

14       A.   Do not recall.  I think -- I do not

15    recall.

16       Q.   You actually had been to Millenium Station

17    prior to August 30, 2007?

18       A.   Yes.

19       Q.   How many times had you been to Millenium

20    Station prior to August 30, 2007?

21       A.   I don't recall.

22       Q.   More than once?

23       A.   Yes.

24       Q.   Would you say more than a dozen times?

94

1     A.    No.

2     Q.    All right.

3     A.    We get on sometimes at Van Buren or

4  Roosevelt.  There's another stop.  I don't know the

5  name of it.

6     Q.    Okay.

7     A.    There's a few stops you could start,

8  though.

9     Q.    All right.  Can you tell me about how long

10  you were actually at Bennigan's before leaving?

11     A.    Hour, 15, until 10:00.

12     Q.    Okay.  Had you managed to call anyone

13  while you were at Bennigan's?

14     A.    Yes.

15     Q.    Who did you call?

16     A.    Girlfriend.

17     Q.    And how did you call her?

18     A.    Pay phone.

19     Q.    Okay.  And your girlfriend, that was

20  Denise at the time?

21     A.    Yes.

22     Q.    And you called Denise before you left

23  Bennigan's?

24     A.    Yes.

95

1     Q.   What did you tell Denise?

2     A.   Seeing if I could get a ride.

3     Q.   Do you know where Denise was that evening

4 when you called her?

5     A.   By my neighborhood.

6     Q.   North side of Chicago?

7     A.   Yes.

8     Q.   What's Denise's address?

9     A.   I don't know it offhand.

10    Q.   Do you know what street she lives on?

11    A.   It's an old street, but I don't really

12 know it.

13    Q.   Can you tell me how you would get to her

14 place from 5040 North Nottingham?

15    MR. FITZSIMMONS:  Let's go off the record for a

16 minute.

17                    (Whereupon, a discussion

18                    was had off the record.)

19 BY MS. MAYHEW:

20    Q.   All right.  When you called Denise from

21 Bennigan's and asked for a ride, did you have any

22 occasion to tell her about what occurred at Soldier

23 Field?

24    A.   It was not that big of a deal.

                                        96

1     Q.   Did you tell her about what happened at

2  Soldier Field?

3     A.   At the time or after?

4     Q.   I'll rephrase my question.

5        While you were at Bennigan's on the phone

6  with Denise asking for a ride, at that time during

7  that telephone conversation did you say anything to

8  her about what happened at Soldier Field?

9     A.   No.

10    Q.   Okay.  Did she ask why you needed a ride

11  home?

12    A.   No.

13    Q.   Why were you asking for a ride home

14  instead of taking public transportation?

15    A.   I was lazy.

16    Q.   So you asked Denise for a ride.  What did

17  she say?

18    A.   She couldn't come downtown.

19    Q.   Did she give you the name or phone number

20  of anyone else to call to ask for a ride?

21    A.   No.

22    Q.   Did you have any other phone numbers on

23  you, people you could have called for a ride?

24    A.   No.

97

1     Q.    Did you call anyone other than Denise from

2   Bennigan's?

3     A.    Yes.

4     Q.    Who?

5     A.    A friend named Lauren.

6     Q.    Can you spell that?

7     A.    L-a-u-r-e-n.

8     Q.    Is Lauren male or female?

9     A.    Female.

10    Q.    Where was Lauren at the time you called

11  her on August 30, 2007?

12    A.    North side.

13    Q.    What's Lauren's last name?

14    A.    Fuller, F-u-l-l-e-r.

15    Q.    Thank you.

16          When you talked to Lauren from Bennigan's,

17  did you tell her about what happened at Soldier

18  Field?

19    A.    No.

20    Q.    You asked Lauren for a ride?

21    A.    Yes.

22    Q.    What did she say?

23    A.    Couldn't come downtown.

24    Q.    You said you were using a pay phone at

                                                        98

1    Bennigan's?

2        A.    I believe there was one out in the street

3    or inside.  I don't recall really.

4        Q.    Was this one of those pay phones that

5    takes credit cards or would it only take change?

6        A.    Change.

7        Q.    Pay phones are what, 50 cents a call?

8        A.    I don't know what it was.  I don't recall

9    at the time.

10        Q.    Did you have to get change from anybody

11    inside Bennigan's to be able to actually use the

12    pay phone?

13        A.    No.

14        Q.    You already had coins with you?

15        A.    Yes.  At the time, yes.

16        Q.    All right.  Other than Denise and Lauren,

17    did you call anyone else while you were at

18    Bennigan's?

19        A.    No, ma'am.

20        Q.    Did either Denise or Lauren ask why you

21    weren't using your cell phone?

22        A.    Can't recall.

23        Q.    So you called Denise.  You called Lauren.

24    Then what did you do?

                                                    99

1     A.    Contemplated which, you know, how I was

2     going to get back.

3          Q.    Were you already finished eating at that

4     time?

5          A.    Yes.

6          Q.    Had you already paid your bill at that

7     time?

8          A.    Yes.

9          Q.    Okay.  Why didn't you call your dad to

10    come get you?

11         A.    Because I didn't -- it was late, that's

12    why.  Got to be up the next morning, you know.

13         Q.    Do you know if the South Shore had anymore

14    I guess scheduled runs that evening still?

15         A.    Don't recall.

16         Q.    You hadn't made plans at all with your mom

17    to go meet her or anything like that?

18         A.    No.

19         Q.    All right.  So you got off the phone.  No

20    one was going to be able to get you.  You

21    contemplated what you were going to do.  What did

22    you decide?

23         A.    Decided I was going to take the Metra

24    back.

                                              100

1     Q.   And had you taken Metra from the downtown

2  Loop area back to the area where you lived before

3  August 30, 2007?

4     A.   Yes.

5     Q.   What line would you take?

6     A.   Union Station.

7     Q.   Okay.  What stop would you get off at?

8     A.   Edgebrook.

9     Q.   Did you know the train schedule so that on

10  August 30, 2007, you knew what time you would need

11  to get on the train to head up home?

12     A.   No.

13     Q.   You didn't have a copy of the train

14  schedule on you?

15     A.   No.

16     Q.   Had you actually taken Metra from Union

17  Station to Edgebrook prior to August 30, 2007?

18     A.   Yes.

19     Q.   Approximately how many times?

20     A.   Cannot recall.

21     Q.   Okay.  You knew where Union Station was in

22  relation to the Bennigan's at Adams and Michigan

23  Avenue as of August 30, 2007, true?

24     A.   No.

101

1      Q.    So you did not know where Union Station

2    was in relation to the Bennigan's that you had just

3    eaten at on August 30, 2007?

4      A.    I had an idea in my head.

5      Q.    What was that idea?

6      A.    That it was by the Wrigley building.

7      Q.    Okay.  So is that what you decided to do

8    since you had planned on taking the Metra from

9    Union Station?  At the time you believed that Union

10   Station was near the Wrigley building, you began to

11   walk towards the Wrigley building?

12     A.    Yes, northbound.

13     Q.    Where is the Wrigley building?

14     A.    Michigan Avenue and before Ohio, I don't

15   know the exact address.

16     Q.    Did you have to stop and ask anyone for

17   directions to Union Station?

18     A.    No.

19     Q.    When was the last time you had taken the

20   train from Union Station prior to August 30, 2007?

21     A.    Cannot recall.

22     Q.    Was it within the month before the

23   incident?

24     A.    No.

                                                        102

1      Q.    Okay.  It was before that, longer than a

2   month?

3      A.    Yes.

4      Q.    All right.  And when you did take it from

5   Union Station, did you take it by yourself or were

6   you with people?

7      A.    Cannot recall.

8      Q.    Was it in the six months prior to

9   August 30, 2007?

10     A.    I cannot recall.

11     Q.    Typically what mode of transportation did

12  you use if you needed to come from your home

13  downtown to the Loop area?

14     A.    Blue Line or Metra.

15     Q.    Can you tell me on about how many

16  occasions you had actually gotten off of Metra at

17  Union Station prior to August 30, 2007?

18     A.    No.

19     Q.    More than once?

20     A.    Yes.

21     Q.    Okay.  Would you say half a dozen times at

22  least?

23     A.    Cannot recall.

24     Q.    And prior to August 30, 2007, had you had

103

1    occasion to take Metra and get off at Union Station

2    by yourself?

3        A.    Cannot recall.

4        Q.    All right.  When you left Bennigan's and

5    you were getting ready to proceed northbound on

6    Michigan Avenue, how would you characterize I guess

7    pedestrian traffic?  Were there a lot of people,

8    just a few people here and there, can you describe

9    it for me?

10       A.    There was a good amount of people out

11   there.

12       Q.    As you were going northbound on Michigan

13   Avenue towards the Wrigley building and you had --

14   would you have occasion to actually have to stop

15   for a traffic light for crossing the street?

16       A.    Cannot recall.

17       Q.    Which side of Michigan Avenue were you

18   walking north on?  Were you on the east side or the

19   west side?

20       A.    West side.

21       Q.    And as you were walking northbound on

22   Michigan Avenue towards the Wrigley building, at

23   some point you encountered a woman who has now been

24   identified as Deborah Coleman, true?

                                                    104

```
1     A.    No, ma'am.

2     Q.    No, okay.

3           So you were walking northbound on the west

4     side of Michigan Avenue towards the Wrigley

5     building.  What happened?

6     A.    I decided to turn back.

7     Q.    Okay.  So let me ask you this.

8           You decided to go north on Michigan

9     Avenue, and so you did proceed to walk northbound

10    on Michigan Avenue towards the Wrigley building,

11    true?

12    A.    Yes.

13    Q.    Okay.  How far north did you get on

14    Michigan Avenue before you decided to turn back?

15    A.    There's a busy street after Randolph.  I

16    don't know the name of the street, though.

17    Q.    So you got slightly north of Randolph?

18    A.    More than north, a good block and a half

19    past.  There was like a CVS over there.

20    Q.    Why did you decide to turn back?

21    A.    I only had two dollars on me.

22    Q.    What would the fare have been for you to

23    take the train, the Metra to Edgebrook?

24    A.    At the time I believe it was
```

                                                              105

1    three-something.

2        Q.    All right.  So is it fair to say that as

3    you were walking northbound on Michigan Avenue you

4    got to about a block and a half north of Randolph

5    when you realized you did not have enough money to

6    cover the fare to take Metra up to Edgebrook?

7        A.    Yes, ma'am.

8        Q.    All right.  Because you did not have

9    enough money to cover the fare to take Metra up to

10   Edgebrook, you realized you had to go back and find

11   some other means to get home?

12       A.    Yes.

13       Q.    Okay.  And what other means did you decide

14   to take home?

15       A.    The Blue Line.

16       Q.    All right.  So from the point where you

17   realized that you didn't have enough money to cover

18   the fare to take the Metra up to Edgebrook, in

19   terms of your physical location what route did you

20   plan on taking to get to the Blue Line?

21       A.    Go to Clark and lake.

22       Q.    And had you been on the Blue Line at Clark

23   and Lake prior to August 30, 2007?

24       A.    Yes.

                                                    106

1    Q.   Had you gotten on at that station before?

2    A.   Yes.

3    Q.   And you had gotten off at that station

4  before?

5    A.   Yes.

6    Q.   So you were a block and a half north of

7  Randolph.  You decided to turn back.

8        Now, where was Clark Street in relation to

9  where you were at the time?

10    A.   I believe west.  Yeah, west.

11    Q.   And did you know that as of -- or strike

12  that.

13        Did you have that idea that it was west as

14  of August 30, 2007?

15    A.   Yes.

16    Q.   Do you know where Lake Street was in

17  relation to Randolph?

18    A.   I know if you just walk down Randolph

19  about a mile, you can hit Clark and Lake.

20    Q.   When you say walk down Randolph, you mean

21  west on Randolph?

22    A.   Yes.

23    Q.   So it was your intention then once you

24  were originally a block and a half north of

                                                107

1    Randolph to turn back, walk to Randolph and then

2    west to Clark and Lake?

3        A.   Yes.

4        Q.   You turned around, and then you started

5    walking southbound on Michigan Avenue towards

6    Randolph, true?

7        A.   Yes.

8        Q.   And was it as you were walking southbound

9    on Michigan Avenue towards Randolph that you

10   encountered a woman we now know as Deborah Coleman?

11       A.   Yes.

12       Q.   As you were walking southbound on Michigan

13   Avenue you were still on the west side of the

14   street?

15       A.   Yes.

16       Q.   Did you at all see Ms. Coleman when you

17   were walking northbound on Michigan Avenue?

18       A.   Do not recall.

19       Q.   As you were walking southbound on Michigan

20   Avenue, where were you when you first observed

21   Miss Coleman?

22       A.   Walking by the 7-Eleven.

23       Q.   When you first saw Miss Coleman while you

24   were walking by the 7-11, what was she doing?  Was

                                                    108

1    she sitting, standing, walking?

2        A.   Standing.

3        Q.   Was anyone with her?

4        A.   No.

5        Q.   When you were walking northbound on

6    Michigan Avenue originally, did you see anyone

7    standing outside of the 7-11?

8        A.   Cannot recall.

9        Q.   When you first observed the woman we now

10   know to be Deborah Coleman, was she standing

11   outside the 7-11?

12       A.   When I was walking southbound?

13       Q.   Yes.

14       A.   Yes.

15       Q.   And when you first observed Miss Coleman

16   while you were walking southbound and she was

17   standing outside the 7-11, did she have anything in

18   her hands?

19       A.   Yes.

20       Q.   What did she have?

21       A.   Cup.

22       Q.   Did she have anything else in her hands

23   other than a cup?

24       A.   No.

109

1    Q.   What kind of cup was it, Styrofoam,

2  plastic, glass?

3    A.   Cannot recall.  Not a glass, though.

4    Q.   When you first observed Miss Coleman as

5  you were walking southbound on Michigan Avenue, did

6  you hear her say anything?

7    A.   Yes.

8    Q.   Okay.  What did you hear her say?

9    A.   She asked me for a quarter.

10    Q.   Did you hear her say anything to anyone

11  even if it was herself before she actually asked

12  you directly for a quarter?

13    A.   Cannot recall.

14    Q.   Okay.  I'm going to go ahead and mark this

15  as Deposition Exhibit Number 2, a copy of the first

16  amended complaint which is the one that ultimately

17  identifies all names; and I think is the most

18  current one on file.

19                    (Whereupon, Granberg Deposition

20                    Exhibit No. 2 was marked for

21                    identification.)

22  BY MS. MAYHEW:

23    Q.   When you observed Miss Coleman while you

24  were walking southbound on Michigan Avenue, you saw

                                                  110

1    she had a cup in her hand.  Which hand was it in?

2       A.   I don't recall.

3       Q.   Did you have an opportunity to see what

4    was in the cup?

5       A.   No.

6       Q.   Was she shaking the cup at all?

7       A.   Yes.

8       Q.   Okay.  Could you hear anything inside the

9    cup when she shook it?

10      A.   Yes.

11      Q.   What did you hear?

12      A.   Change.

13      Q.   Do you know how long Miss Coleman had been

14    standing outside that 7-11 before you saw her while

15    you were walking southbound on Michigan?

16      A.   No, ma'am.

17      Q.   Do you know if she asked anyone else for

18    change that evening?

19      A.   No, ma'am.

20      Q.   Did you see whether Miss Coleman was

21    wearing a watch?

22      A.   No, ma'am.

23      Q.   No, you didn't observe it or --

24      A.   Didn't observe.

111

1    Q.    Sorry, that was a poor question on my

2  part.

3          Did she have any papers with her at all?

4    A.    Do not recall.

5    Q.    Was she wearing any sort of identification

6  that was visible to you as you were proceeding

7  southbound on Michigan Avenue?

8    A.    No.

9    Q.    She didn't have any sort of lanyard with a

10  badge or anything like that?

11    A.    No.

12    Q.    By badge, I mean just identification

13  badge.

14    A.    No, ma'am.

15    Q.    Can you please describe for me what

16  Miss Coleman looked like?

17    A.    Female, black, 35 to 40.

18    Q.    About how tall was she?

19    A.    5'7".

20    Q.    Do you have an estimate about her weight?

21    A.    Skinny.

22    Q.    Did she have glasses?

23    A.    I do not recall.

24    Q.    What did her hair look like?

112

1    A.    It was dark out, so -- it was not blonde.

2    Q.    Was it short, long, medium length?

3    A.    I do not recall.

4    Q.    What was she wearing?

5    A.    Hoodie, jeans as I recall.

6    Q.    Was the hood up or down?

7    A.    Down.

8    Q.    Can you tell me what color the hoodie was

9   at all?

10    A.    I do not recall.

11    Q.    You said it was dark.  Was there any

12   street lighting right outside the 7-11 where you

13   encountered Miss Coleman?

14    A.    Yes.

15    Q.    Was there any light actually coming from

16   the 7-11 out shining onto the sidewalk when you

17   encountered Miss Coleman?

18    A.    Do not recall.

19    Q.    Were all the streetlights in the area

20   actually functioning?

21    A.    Do not recall.

22    Q.    Okay.  Well, I know you said it was dark.

23   You couldn't really tell what color her hair was,

24   not blonde; but you were able do see where you were

                                                    113

1    walking?

2       A.   Yes.

3       Q.   You could actually visualize Miss Coleman

4    standing outside the 7-11?

5       A.   Yes.

6       Q.   Okay.  You could see people in the general

7    vicinity?

8       A.   Yes.

9       Q.   Okay.  Were there people across the

10   street?

11      A.   Yes.

12      Q.   You could see them?

13      A.   Yes.

14      Q.   Okay.  Maybe not every little detail, but

15   you could certainly tell there were people walking

16   across the street, true?

17      A.   Yes.

18      Q.   Were there any people in front of you

19   walking southbound on Michigan Avenue?

20      A.   Do not recall.

21      Q.   Was there anyone walking behind you

22   southbound on Michigan Avenue?

23      A.   Do not recall.

24      Q.   And this is an area where you got the 7-11

                                                114

1    on the west side of the street, and then there's

2    some kind of apartment/business building on the

3    east side of the street?

4         A.   Do not recall.

5         Q.   From where you were when you encountered

6    Miss Coleman outside the 7-11 On Michigan Avenue,

7    do you know where Millenium Station was in relation

8    to that?

9         A.   Yes.

10        Q.   Where was Millenium Station in relation to

11   this 7-11?

12        A.   Corner of Randolph and Michigan.

13        Q.   Prior to August 30, 2007, were you aware

14   that Metra had a police force?

15        A.   I assumed.

16        Q.   Why did you assume?

17        A.   Mostly -- I mean, CTA has a police force,

18   you know.

19        Q.   Had your dad ever talked about having to

20   work in any capacity with any Metra police

21   officers?

22        A.   No.

23        Q.   Had he ever talked about the Metra police

24   force in any way?

                                                      115

1     A.   No, ma'am.

2     Q.   Had you heard any other officers maybe

3   your dad worked with that said anything ever about

4   Metra police officers?

5     A.   No, ma'am.

6     Q.   You talked about the CTA police.  You knew

7   that CTA police had powers to arrest just like

8   Chicago police?

9     A.   No.

10    Q.   The Metra police, did you have any idea

11  whether or not the Metra police actually had the

12  power to arrest people as of August 30, 2007?

13    A.   No.

14    Q.   Okay.  Had you ever inquired to anyone

15  about whether or not the Metra police could arrest

16  people?

17    A.   No.

18    Q.   What did you think the Metra police were

19  for?

20    A.   For security and if something gets out of

21  hand.

22    Q.   Now, coming from a family with a police

23  officer, your dad as a police officer, is it fair

24  to say that growing up you knew that if a police

116

```
 1    officer asked you to stop, that you should stop?

 2         A.    Yes.  A police officer, yes.

 3         Q.    That's something your dad had discussed

 4    with you?

 5         A.    No.

 6         Q.    That's just something you learned as you

 7    were growing up?

 8         A.    Yes.

 9         Q.    Were you taught how to recognize a police

10    officer by what they're wearing?

11         A.    Yes.

12         Q.    When were you taught how to recognize a

13    police officer by what the officer is wearing?

14         A.    The show Chips.

15         Q.    Does your dad have a uniform?

16         A.    Yes.

17         Q.    What's that uniform consist of?

18         A.    Blue uniform, Chicago police.

19         Q.    Your dad has a badge?

20         A.    Yes.

21         Q.    He wears that badge on the outside of his

22    uniform?

23         A.    Yes.

24         Q.    He also wears a bullet proof vest?
```

117

1     A.   Yes.

2     Q.   He wears that on the outside of his

3  uniform?

4     A.   No.  It's -- you wear the shirt over the

5  bullet proof vest.

6     Q.   Can you tell he's got the vest on when

7  he's got the shirt on top of it?

8     A.   Yes.

9     Q.   The vest is kind of thicker, makes it

10  stick out a little bit more?

11    MR. FITZSIMMONS:  I'm going to object to this

12  form of the questioning, Counsel.  If you want to

13  testify, you're welcome to.  Stick to questions.

14    MS. MAYHEW:  That's what I'm asking.

15    MR. FITZSIMMONS:  Thank you.

16  BY MS. MAYHEW:

17     Q.   It's a question.  You can answer.

18     A.   Well, if it's a skinny guy, then no.  It

19  depends, you know.

20     Q.   Does your dad's uniform have any stripes

21  on the pants?

22     A.   No.

23     Q.   Okay.  Now, you said you had seen CTA

24  police officers before, true, before August 30,

          118

1    2007?

2        A.    I know that it's called Mass Transit.

3        Q.    Had you ever seen a CTA police officer

4    before August 30, 2007?

5        A.    No.

6        Q.    Okay.  You had just seen the cars, is that

7    how you knew that those officers existed?

8        A.    Yes.

9        Q.    Had you ever seen a Metra police officer

10   prior to August 30, 2007?

11       A.    No.

12       Q.    Had you seen police officers other than

13   Chicago police prior to August 30, 2007?

14       A.    Yes.

15       Q.    And on those occasions where you've seen

16   other officers, have they always had a uniform of

17   sorts?

18       A.    Yes.

19       Q.    Those officers also wore badges on the

20   outside of their uniforms?

21       A.    Yes.

22       Q.    Does your dad carry any sort of weapons

23   with him other than the dog that he might have?

24       A.    Well, all police have guns.

119

1    Q.    Okay.  Does your father have a baton?

2    A.    I don't recall.

3    Q.    Do you know what a baton is?

4    A.    Yes.  I've seen what they look like.

5    Q.    You've seen them before August 30, 2007?

6    A.    Yes.

7    Q.    And on occasions where you've seen police

8    officers who are not Chicago police, those officers

9    also carry guns?

10   A.    Yes.

11   Q.    Did you observe whether those officers

12   carried batons?

13   A.    No.

14   Q.    Were those officers wearing -- strike

15   that.

16          All right.  The 7-11 where you encountered

17   Miss Coleman, that address is about 151 North

18   Michigan Avenue?

19   A.    Yes.

20   Q.    Miss Coleman you said was black in terms

21   of her race?

22   A.    Yes.

23   Q.    And when you first encountered her, there

24   was no one else with her, true?

                                            120

1     A.    Yes.

2     Q.    The complaint on Page 2, Paragraph 9,

3  indicates, "while he was walking on the street

4  Matthew was accosted and confronted by a 'homeless

5  person' later identified as Deborah Coleman, an

6  African American woman of indeterminate adult

7  middle age.  Coleman was also accompanied by two

8  other homeless persons when she confronted

9  Matthew."

10          Did I read that correctly?

11    A.    Yes.

12    Q.    Why did you think Miss Coleman was

13  homeless?

14    A.    Well, she was begging.

15    Q.    Well, you indicated she asked you for

16  money, true?

17    A.    Yes.

18    Q.    How much did she ask you for?

19    A.    A quarter.

20    Q.    Okay.  Where were you standing in relation

21  to her when she asked you that?

22    A.    Say the window and I was walking by.  Kept

23  walking, I never stopped at all.

24    Q.    Okay.  When you say the window, the window

                                                  121

1    is approximately where Miss Coleman was standing?

2         A.    Say the doorway, I was about right about

3    here walking by.  She was standing there.

4         Q.    And about how far away is that, would you

5    say it's 8 feet?

6         A.    It was not on the curb -- she was in front

7    of the store.  I was not in the street, but right,

8    you know, on the sidewalk.

9         Q.    I just want to try describe for the court

10   reporter because when you're reading this

11   transcript, no body else reading it is going to

12   have an understanding of the room.

13             So when you passed by Miss Coleman, the

14   distance between you is approximately from the

15   window in this room to where you're seated now,

16   true?

17        A.    Yes, yes.

18        Q.    Would you agree with me that's

19   approximately 6 feet?

20        A.    Yes.

21        Q.    Okay.  In other words, from where you were

22   in relation to Miss Coleman when she asked you for

23   money, you couldn't just reach out and touch her

24   from where you were?

                                             122

1      A.    Correct.

2      Q.    And at the time that Miss Coleman asked

3    you for change, did anyone join her at that point

4    in time?

5      A.    No.

6      Q.    So Miss Coleman asked you for money.  I'm

7    sorry.  I know I asked yu this just a second ago,

8    but I've already forgotten.

9           Did she ask for a particular amount?

10     A.    Yes.

11     Q.    What did she ask for?

12     A.    A quarter.

13     Q.    Okay.  Did you have a quarter on you?

14     A.    No.

15     Q.    You used your last quarter when you made

16   your phone call back at Bennigan's?

17     MR. FITZSIMMONS:  Objection.  That's not the

18   testimony.

19     MS. MAYHEW:  No, I said, did you.

20     THE WITNESS:  I do not recall.

21   BY MS. MAYHEW:

22     Q.    Is it fair to say that at the time you

23   encountered Miss Coleman the only money you still

24   had on you was the two dollars you realized you had

123

1    when you were on your way to the Metra train?

2        A.   Yes.

3        Q.   All right.  So Miss Coleman asked you for

4    a quarter.  You were walking by.

5             Did you stop when she asked you for a

6    quarter?

7        A.   No.

8        Q.   You continued to walk southbound?

9        A.   Yes.

10       Q.   Was she still -- was she shaking her cup

11   at that time?

12       A.   Yes.

13       Q.   Okay.  Did you say anything to

14   Miss Coleman in response to her asking for quarter?

15       A.   Yes.

16       Q.   What did you say?

17       A.   I said, no, I do not have one; can you

18   give me one.

19       Q.   Why did you ask Miss Coleman if she could

20   give you a quarter?

21       A.   Because I did need one.  I needed one.

22       Q.   What did you need one for?

23       A.   If I had 2.25 then I could get a transfer.

24       Q.   Talking about a transfer on the train?

                                                    124

1      A.    Train and bus.

2      Q.    So is it fair to say that at the time you

3  decided you were going to need to take the Blue

4  Line from Clark and Lake, you actually still did

5  not have enough money for the total fare to

6  actually take public transportation all the way

7  home?

8      A.    No.  I did have enough money.

9      Q.    Okay.  So you didn't really need to take

10  the bus?

11      A.    No, but it would have gotten me home

12  quicker.

13      Q.    And when you said, "no, I do not have one;

14  can you give me one", were you continuing to walk

15  at that point?

16      A.    Yes.

17      Q.    Did Miss Coleman say anything to you in

18  response?

19      A.    No.

20      Q.    When you said, no, I do not have one; can

21  you give me one, was Miss Coleman still by herself

22  at that point in time?

23      A.    Yes.

24      Q.    Okay.  You've been downtown in the Loop

125

1   prior to August 30, 2007, true?

2      A.   Yes.

3      Q.   You've encountered people on the streets

4   prior to August 30, 2007, who were asking for

5   change or money or food, true?

6      A.   No.

7      Q.   No, okay.

8           So August 30, 2007, this is the first time

9   you've encountered anyone on any Chicago street

10  asking for money; is that your testimony?

11     A.   On Chicago streets, yes.  By downtown you

12  mean or you mean the surrounding?

13     Q.   Okay.  Fair enough.  Let's talk about --

14     A.   I've encountered, yes, yes.

15     Q.   Okay.  Just so it's clear, I'll go ahead

16  and just specify?

17     A.   Yes, but never down in the vicinity of the

18  Loop, no.

19     Q.   Okay.  In the Chicagoland area you have

20  had occasion prior to August 30, 2007, where you've

21  encountered people on the streets asking for money?

22     A.   Yes.

23     Q.   Okay.  And on approximately how many

24  occasions have you encountered people in the

                                                    126

1   Chicagoland area on the Chicago streets asking for

2   money prior to August 30, 2007?

3       A.   Do not recall.

4       Q.   Was it more than once?

5       A.   Yes.

6       Q.   More than half a dozen times?

7       A.   Cannot recall.

8       Q.   Have you heard stories from any of your

9   friends where they've indicated to you they've

10  encountered people on the streets, the Chicago

11  streets, asking for money?

12      A.   No.

13      Q.   Have you yourself ever been asked for

14  money from someone on the Chicago streets prior to

15  August 30, 2007?

16      A.   Yes.

17      Q.   And was that someone who was unknown to

18  you?

19      A.   Yes.

20      Q.   Was that someone who you believed at the

21  time to have been homeless?

22      A.   Yes.

23      Q.   On that occasion prior to August 30, 2007,

24  when someone you believed was homeless had asked

                                            127

1    you for money, did that person threaten you

2    physically in any way?

3        A.    No.

4        Q.    Have you ever had occasion to be on the

5    Chicago streets and encounter anyone selling a

6    periodic called Streetwise prior to August 30,

7    2007?

8        A.    Yes.

9        Q.    Okay.  You've heard of Streetwise?

10       A.    Yes.

11       Q.    Do you know the types of people who is

12   entitled to actually sell Streetwise?

13       MR. FITZSIMMONS:  I would object to this line

14   of questioning.  It has nothing to do with the

15   begger in front of the 7-11.  It's completely

16   irrelevant.

17            You can gay ahead and answer the question.

18       THE WITNESS:  No, I do not know the types of

19   people that work for them.

20   BY MS. MAYHEW:

21       Q.    On occasion when you've encountered people

22   who were selling Streetwise, have they ever asked

23   for money outside of payment for Streetwise?

24       A.    I know of Streetwise.  No one's ever asked

                                              128

1    me to buy Streetwise, though.

2        Q.   When Deborah initially asked you for a

3    quarter, how did she ask it?  Was it an actual

4    question?  Was it a demand?

5        A.   Like, can I get a quarter.  So, yeah, it

6    was a question.

7        Q.   Okay.  What was her tone like?

8        A.   Loud.  She wasn't being aggressive,

9    though, but it was, you know . . .

10       Q.   All right.  You indicated that you said,

11   no, I don't have one; can I have one.  You

12   continued walking; and Miss Coleman made no verbal

13   response, true?

14       A.   Yes.

15       Q.   Did you have anything in your hands as you

16   were walking past Miss Coleman?

17       A.   No, ma'am.

18       Q.   In this area where the 7-11 is, are there

19   any, I don't know, vegetation along the street,

20   trees, things like that, that the city sometimes

21   fences off?

22       A.   There was these big old flower pots.

23       Q.   Okay.  Where were the flower pots located

24   in relation to the 7-11?  Were they at the edge of

                                                    129

1    the sidewalk as close to Michigan Avenue as

2    possible?  Were they right up next to the building

3    the 7-11 was in?

4        A.   Close to the street.

5        Q.   When you encounter Miss Coleman as you

6    were walking southbound on Michigan Avenue, I know

7    you indicated she was standing; but was there any

8    sort of stool, chair, rock, anything available

9    there for her to sit on?

10       A.   Do not recall.

11       Q.   Did she have any sort of cane or assistive

12   walking device with her?

13       A.   Do not recall.  She didn't have a cane,

14   though.  I know that.

15       Q.   She did?

16       A.   She didn't.

17       Q.   Did not have a cane.

18            All right.  So when you indicate in the

19   complaint that you were accosted and confronted by

20   Miss Coleman, what do you mean by accosted?

21       A.   Those are the words my lawyer put down.

22   You want me to put it in my own words?

23       Q.   Yeah.  What in your mind is accosted in

24   terms of --

                                                   130

1     A.     After I kept walking, then all of a sudden

2  I heard, you want to get stabbed you mother fucker;

3  and then I turned around.

4     Q.     Where were you when you heard, you want to

5  get stabbed you mother fucker?

6     A.     They have the Diamond building down at the

7  corner of Michigan and Randolph, you know, the

8  Diamond building, right basically in front of that

9  building, a little, you know, before you get to

10 that building.  A flower pot was behind me.

11    Q.     All right.  So you continued walking

12 southbound on Michigan Avenue until you reached the

13 corner approximately of Michigan and Randolph in

14 front of the Diamond building?

15    MR. FITZSIMMONS:  That's not what he said.  I'm

16 going to object to that.  Rephrase that.  That

17 recharacterizes his statement.  You can have the

18 court reporter read back specifically what he said.

19 He did not say that.

20    MS. MAYHEW:  Are you instructing him not to

21 answer the question?

22    MR. FITZSIMMONS:  Just making that objection

23 for the record.  If he can answer that question,

24 fine.  If he can't answer the question because

                                              131

1    that's not what he said, he'll tell you.

2        THE WITNESS:  I was not at the corner.  The

3    Diamond building is -- you got the building and

4    then there's like an area where you can walk and

5    turn, and then the corner.  It's kind of a good

6    amount of room.

7    BY MS. MAYHEW:

8        Q.   Okay.  This is a building -- is this a

9    building where -- the building itself ultimately

10   kind of takes up that corner lot; but there's I

11   guess sort of an entrance that's carved off that

12   allows for quite a bit of distance from when you

13   actually enter that door to the corner?

14       A.   I believe so.

15       Q.   Okay.  And is that particular area, kind

16   of I guess directly in front of that Diamond

17   building where the door is, is that a covered area

18   or is it open?

19       A.   I don't recall.

20       Q.   Okay.  How much time passed from when you

21   last spoke to Miss Coleman outside of the 7-11 to

22   when you reached the Diamond building?

23       A.   Five, ten seconds.  It's like right there.

24       Q.   Is it the building that's immediately

                                                    132

1    adjacent to the building the 7-11 is in?

2        A.    There's shops.  I mean, it's like 7-11,

3    and then I don't know what else is there now.  And

4    it's right there.

5        Q.    As you were walking southbound on Michigan

6    Avenue away from Miss Coleman, did you hear her or

7    anyone behind you pick anything up, break any

8    branches off any trees or anything like that?

9        A.    No.

10       Q.    Were there other people walking around in

11   the area when you heard, you want to get stabbed

12   you mother fucker?

13       A.    Yes.

14       Q.    Did you know any of these people?

15       A.    No.

16       Q.    Okay.  These other people, were there some

17   who were just regular pedestrians passing by in the

18   area?

19       A.    Yes.

20       Q.    Did any of those people passing by give

21   any sort of indication that they heard this

22   statement, you want to get stabbed you mother

23   fucker?

24       A.    I don't know.  I'm not them.  I don't know

                                              133

1   if they heard it or not.

2      Q.   Was there anything you observed about

3   these people passing by that would give you the

4   idea that they heard it?  You know, did they stop

5   and stare?  Did they say, look out, anything like

6   that?

7      A.   You could see from across the street on

8   the east side of Michigan Avenue.  You could see it

9   all around.

10      Q.   Well, I guess what I'm asking is was there

11   anyone who actually said anything, shouted anything

12   that you heard such as, look out or watch out or

13   anything of that nature?

14      A.   If they did yell it, I didn't hear it.

15      Q.   Do you actually know whether it had

16   actually been shouted in the area by anyone?

17      A.   No, I don't know.

18      Q.   So you heard the statement, you want to

19   get stabbed you mother fucker; and that caused you

20   to turn around?

21      A.   Yes.

22      Q.   All right.  When you turned around, were

23   you now facing northbound on Michigan Avenue?

24      A.   Yes.

134

1      Q.   All right.  Prior to that you had been

2   facing southbound because you were headed toward

3   Randolph, true?

4      A.   Yes.

5      Q.   Okay.  So you were facing northbound.  You

6   indicated there was a flower pot behind you?

7      A.   Yes.  Like not directly behind me, but,

8   you know, behind me to the right, yes.

9      Q.   Was this behind you to the right after you

10  turned around to be facing northbound?

11     A.   Yes.

12     Q.   When you turned around and were facing

13  northbound on Michigan Avenue while you were

14  outside the Diamond building, what did you see?

15     A.   I saw two women coming at me.

16     Q.   Was one woman Miss Coleman?

17     A.   Yes.

18     Q.   The other woman, had you seen her in the

19  vicinity prior to you leaving Miss Coleman at the

20  7-11?

21     A.   No.

22     Q.   Do you know where this other woman came

23  from?

24     A.   No.

                                                135

1    Q.   As you were walking away from Miss Coleman

2    did you hear Miss Coleman say anything to anyone

3    else?

4    A.   No.

5    Q.   What did this other woman look like?

6    A.   35 to 40, female, black, short.  What

7    else?

8    Q.   When you say short?

9    A.   5'3".  She was not like 6'8".

10   Q.   She was shorter than Miss Coleman?

11   A.   Yes.

12   Q.   She was shorter than you?

13   A.   Yes.

14   Q.   Miss Coleman was shorter than you?

15   A.   I would say so.  I mean . . .

16   Q.   And what about this short, black female,

17   was she fat, skinny, stocky?

18   A.   She wasn't like 300 pounds.  I don't know

19   how much she weighed.  She was not -- yeah, she was

20   kind of skinny, you know, not as skinny as Miss

21   Coleman.

22   Q.   Maybe about an average weight?

23   A.   Sure.

24   Q.   Okay.  All right.  So you turned around

                                                    136

1 and were facing northbound, you saw Miss Coleman

2 and this other unknown woman.  At any time did

3 Miss Coleman or anyone else shout a name that this

4 other black female responded to?

5     A.   I don't recall that.

6     Q.   Okay.  So you never heard this woman's

7 name; you have no idea what her name might be?

8     A.   No.

9     Q.   All right.  And when you saw Miss Coleman

10 and this other unknown female, what were they

11 doing?

12     A.   They were walking at me.  Miss Coleman had

13 a knife on her.

14     Q.   When did you first observe the knife?

15     A.   She was about -- she was walking at me.

16 She was holding it out right away.  When I turned

17 back, I saw it.

18     Q.   What did the knife look like?

19     A.   Your standard knife, not like a butter

20 knife or a steak knife.  It was one of those knives

21 that looked like it opened up like that.

22     Q.   Like a pocket knife?

23     A.   Bigger than that.

24     Q.   Did it look like a switch blade, the kind

137

1    of knife that you still have to open up?

2        A.    It looked like a knife that if she cut

3    me -- not like a pocket knife.  If you cut someone

4    with a pocket knife -- if she stuck me, it would

5    mess me up.  It was a good size knife.

6        Q.    Now, I got to tell you, in the complaint

7    there's no reference to a knife.

8        A.    In my complaint?

9        Q.    In the complaint that was filed in this

10   case there's no reference to a knife.  Why is there

11   no reference to a knife?

12       A.    When you talk about the complaint, you're

13   talking about this?

14       Q.    Exhibit Number 2, the complaint that's

15   been filed in federal court.

16       A.    I don't know.  It gets right to the thing

17   about the guy coming at me.  I don't know why it

18   doesn't have the woman in here.

19       Q.    Miss Coleman had the knife.  Was the

20   shorter woman carrying anything else?

21       A.    No.  The other woman didn't have anything

22   on her.

23       Q.    What was the other woman doing when

24   Miss Coleman --

                                                     138

1    A.    Just with her.

2    Q.    So this other woman was actually just

3 standing next to Miss Coleman?

4    A.    She was walking with her at me like she

5 was going to do something, too; but she didn't have

6 anything in her hand.

7    Q.    What did you think this woman was going to

8 do to you, not Miss Coleman, the shorter 5'3"

9 woman?

10    A.    Attack me.

11    Q.    Did the shorter woman say anything to you?

12    A.    No.  Miss Coleman was doing all the

13 talking.

14    Q.    Looking at Page 2, Paragraph 9, where it

15 talks about Miss Coleman was accompanied by two

16 other homeless persons, just so I am clear,

17 Miss Coleman was alone up until the point where you

18 were by the Diamond building, turned around, as far

19 as you knew that was the first time she had any one

20 else with her?

21    A.    Yes.

22    Q.    Okay.  And at that time it was only the

23 shorter woman, true?

24    A.    Yes.

139

1      Q.   Okay.  So where's the third person come

2   in?

3      A.   I turned around.  Miss Coleman was holding

4   the knife.  Her friend was staring at me; and I

5   observed to my left, kind of like towards by the

6   entrance of the 7-11 a male, black, running at me,

7   running in the direction where we were.

8      Q.   Do you know if this male, black, knew

9   Miss Coleman?

10     A.   I assumed.  He had a long white object and

11  was swinging at me, started to come at me and swung

12  at me.

13     Q.   I know you assumed, but do you actually

14  know whether this man knew Miss Coleman?

15     A.   No, but he was coming to her defense, so

16  more than likely he knew her.

17     Q.   Now, you say coming to her defense, let me

18  ask this question.

19          Why do you think he was coming to

20  Miss Coleman's defense if she was armed with a

21  knife?

22     A.   Do more damage to me.  Like a knife, you

23  could -- she could have stabbed me, but I still

24  could have done something.  So he was coming to

                                                    140

1  inflict more damage to me, so, I mean, to put me

2  down.

3      Q.    That's just what your impression was at

4  the time, true?

5      A.    Yes.

6      Q.    Okay.  Because he hadn't actually reached

7  you and Miss Coleman and this other woman when you

8  initially turned around and were facing northbound,

9  true?

10     A.    No, but he was sprinting; and I know he

11  wasn't running to attack them.

12     Q.    Why do you know that?

13     A.    Because it's just -- I never saw him; and

14  I figured this woman, her other friend came out of

15  nowhere --

16     MR. FITZSIMMONS:  We're going to go off the

17  record right now.

18                    (Whereupon, a discussion was had

19                     off the record.)

20     MR. FITZSIMMONS:  I've just called attention to

21  counsel's fact that this Officer Geanes at the end

22  of the table has received two telephone calls

23  during the course of the deposition in the

24  deposition room, and now he's sitting there openly

                                                    141

1    laughing at my client.  I just informed Ms. Mayhew

2    that Officer Geanes goes right now or we terminate

3    the deposition and we come back with a court order.

4    We pick one or the other, Counsel.

5        MS. ROSEN:  Well, hold on one second.  No,

6    we're not going to pick one or the other.

7        MR. FITZSIMMONS:  I have picked one then.

8        MS. ROSEN:  We're going to call the Court.

9        MR. FITZSIMMONS:  No, you can call the Court,

10   ma'am.

11       MS. ROSEN:  Joe, let me make --

12       MS. MAYHEW:  Actually there's a question

13   pending which he was not finished answering.  If he

14   could please finish answering the question.

15       MS. ROSEN:  And then we'll make our record.

16       THE WITNESS:  I'll answer.  All right.  First

17   it was Miss Deborah Coleman, okay.  It was just her

18   on the street.  Then I observed her and another

19   woman who just came out of nowhere.  So why -- when

20   I observed that guy coming, I figured he was with

21   them, too, you know.  The other woman came out of

22   nowhere.  Then he came out of nowhere, so I figured

23   they're coming, you know, attack me.

24       MR. FITZSIMMONS:  Are you done with your

                                                    142

1    answer?

2       MS. ROSEN:  Why don't we take a few minutes.

3    Why don't we take a couple minutes break, and what

4    we're going to do is talk about this.

5       THE WITNESS:  Can we just finish it?

6       MR. FITZSIMMONS:  We'll take a couple minutes

7    break.

8                  (Whereupon, a short break was

9                  taken.)

10      MR. FITZSIMMONS:  Back on the record.  Let the

11   record reflect that counsel -- both counsel and I

12   have had a conversation during the short break.

13   Counsel has assured me and the plaintiff that we

14   will be able to proceed without further incident;

15   is that correct?

16      MS. ROSEN:  We're not going to have incident

17   here at all.  We're going to proceed civilly.

18      MR. FITZSIMMONS:  Thank you.

19      MS. MAYHEW:  Off the record.

20                 (Whereupon, a discussion was had

21                 off the record.)

22  BY MS. MAYHEW:

23      Q.   All right.  Mr. Granberg, the complaint

24   indicates that both the two people accompanying

                                          143

1    Miss Coleman were homeless persons.  How do you

2    know they were homeless, the short woman and then

3    this gentleman?

4         A.   I assumed they were homeless.

5         Q.   Had either of them asked you for any

6    money?

7         A.   Deborah Coleman.

8         Q.   Had either the shorter woman or the man

9    asked you for any money?

10        A.   No, ma'am.

11        Q.   At any time while you were with

12   Miss Coleman, this gentleman and this shorter

13   woman, did you ever call any of them a nigger?

14        A.   No.

15        Q.   Had you heard that term used before?

16        A.   Yes.

17        Q.   You know what that term means?

18        A.   Yes.

19        Q.   Had you ever used the term before?

20        A.   No.

21        Q.   You've heard other people use the term

22   prior to August 30, 2007?

23        A.   Yes.

24        Q.   Okay.  Going to Page 3 of the complaint,

144

1    Paragraph 10, it says, all three attacked Matthew

2    and expressed statements and utterances implying

3    that all three intend to take property, in

4    parenthesis, including money, end parenthesis, from

5    Matthew by the use of force.

6            What statements or utterance did the short

7    woman make that implied to you she was intending to

8    take property, including money, from you by force?

9        A.    She didn't say anything.

10       Q.    Okay.  So the short woman never said

11   anything to you at all?

12       A.    No, but she was with Miss Coleman leading

13   me to believe that she was working with her to

14   do -- cause harm to me.

15       Q.    I understand that, but I want to take each

16   of them individually at the moment, okay?

17       A.    Okay.

18       Q.    So just so I'm clear, the short woman

19   never actually said anything to you at all, true?

20       A.    That I recall, yes.

21       Q.    Okay.  And the gentleman, did he say

22   anything to you at all?

23       A.    Yes.

24       Q.    What did he say?

                                                    145

1     A.   Like I'm going to get you mother fucker,

2  like he was coming running at me.

3     Q.   He shouted --

4     A.   I was more focused on her.  She had the

5  knife, and then I seen him.  It was going back and

6  forth.  I didn't know what was going to go on.

7     Q.   The other gentleman was shouting stuff as

8  he was running towards where you were standing with

9  Miss Coleman and the other female?

10    A.   Yes.

11    Q.   Did he ever say anything that actually

12  indicated to you that he planned on taking property

13  from you, including money?

14    A.   No.

15    Q.   Okay.  What did Miss Coleman say to you

16  that indicated she wanted to take property,

17  including money, from you by use of force?

18    A.   Can you repeat the question?

19    Q.   What did Miss Coleman say to you that

20  indicated to you that she intended to take

21  property, including money, from you by force?

22    A.   I mean, you don't just come up to someone

23  with a knife if you're not going to try to get

24  something from them.  What else is there?

                                              146

1     Q.   Did she say anything like, give me all

2   your money, give me your wallet, give me your

3   watch, anything like that?

4     A.   No.  It wasn't like, give me all your

5   money, put your hands up.  It was nothing like

6   that.  She was coming at me.

7     Q.   What was the last statement Miss Coleman

8   made to you before the gentleman -- strike that.

9          Did the gentleman actually arrive at where

10  you were standing with Miss Coleman and the short

11  woman?

12    A.   Yes.

13    Q.   Okay.  What was the last thing

14  Miss Coleman said to you before the gentleman

15  actually arrived at the location where you were

16  standing?

17    A.   A bunch of curse words.

18    Q.   Okay.  What was she saying?

19    A.   Mother fucker, you know, fuck head, white

20  boy, you think you can come down here, you know.

21  It was not like she was putting sentences together

22  saying, you know, you piece of shit.  It was just

23  swearing at me, yelling; and it was confusion.

24    Q.   While Miss Coleman was swearing at you,

                                                    147

1   was she standing still, moving forward, moving

2   backwards?  What was she doing?

3       A.   She had the knife like this.

4       Q.   Was she actually moving the knife forward

5   in a stabbing motion towards you?

6       A.   Yes.  If she wanted to stab me, she -- if

7   she really wanted to come at me, she definitely

8   could have.

9       Q.   How long were you standing there with

10  Miss Coleman while she was holding the knife?

11      A.   15, 20 seconds.

12      Q.   Now, during that time were you saying

13  anything to Miss Coleman?

14      A.   No.

15      Q.   Okay.  Did you say anything to the short

16  woman that she was with?

17      A.   No.

18      Q.   Did you say anything to the gentleman when

19  he arrived?

20      A.   No.

21      Q.   What did he look like?

22      A.   Male, black, 30, 40, husky, 5'9".

23      Q.   And you said he actually had something in

24  his hand, too?

                                              148

1    A.   Yes.

2    Q.   What did he have in his hand?

3    A.   From what had I observed, it was -- I

4  don't know what it was; but it was a white, looked

5  kind of like a leg of a chair.  I don't know what

6  it was.

7    Q.   He already had that in his hands when you

8  first saw him; is that a fair statement?

9    A.   When he came running, yes, he had it in

10  his hands.

11    Q.   Okay.  Now, you said that he came out of

12  nowhere, so you have no idea where he actually came

13  from?

14    A.   I believe he came from the area of the

15  7-11.

16    Q.   Okay.  Did you see --

17    A.   Not like he cut across the street.  I

18  looked to my left, and there he was coming.

19    Q.   Okay.  Going back to Paragraph 10 on

20  Page 3, the last sentence of that says, during this

21  attack one of the attackers was armed with a wooden

22  stick with which the attacker, a male person,

23  attempted to strike Matthew.

24         The wooden stick, is that this white thing

149

1  that you were talking about that this gentleman

2  had?

3      A.   Yes, yes.  It wasn't like a branch of a

4  tree, though.  If he hit me, it could have done

5  damage to me.

6      Q.   About was it round, square, rectangular?

7      A.   Rectangular, you know, you know.

8      Q.   Okay.  About how wide was it?

9      A.   4 feet long, 3 to 4 feet long, you know.

10 It was not huge, but it -- I don't know, 6 inches.

11     Q.   The knife that Miss Coleman had, what hand

12 was it in?

13     A.   I do not recall.

14     Q.   Okay.  How long was the blade?

15     A.   Again, it was not -- it was not like a

16 little knife.  Okay.  I don't know how long the

17 blade was; but if she stabbed me, it would have

18 done harm to me.

19     Q.   Was it more than 6 inches, less than

20 6 inches?

21     A.   Yes, more than 6 inches.

22     Q.   Was it serrated or smooth?

23     A.   I do not recall.

24     Q.   You know what serrated is?

150

1  A. Could you please tell me?

2  Q. Okay.  Like you've seen a steak knife that

3 sometimes has little edges on it?

4  A. Oh, yes, it had those.

5  Q. Were you able to see the handle of the

6 knife?

7  A. No.  It was not like a butter knife,

8 though, so I assume it had those ridges in it.

9  Q. Where was the cup that Miss Coleman had

10 previously been holding?

11  A. I do not know.

12  Q. Okay.  She didn't still have that in her

13 other hand?

14  A. No.

15  Q. Did Miss Coleman actually attempt to stab

16 you?

17  A. Yes.

18  Q. Okay.  How long had you been standing

19 there before she actually attempted to stab you?

20  A. She was moving it back and forth.  She

21 didn't come, you know -- I backed up each time she

22 tried to do it.

23  Q. When you initially turned around and were

24 facing northbound and saw Miss Coleman with a

151

1    knife, how far away from you was she standing?

2        A.   She was walking at me.

3        Q.   Okay.  So when you first saw her and she

4    was still walking at you while holding the knife,

5    how far away from you was she when you first saw

6    her?

7        A.   5 to 10 yards.

8        Q.   Okay.  And you were able to see the knife

9    at that point?

10       A.   Yes.

11       Q.   So why didn't you run then?

12       A.   Well, you look back, and, you know, it's

13   like they're coming at you.  It's like what, am I

14   going to run?  I don't know.  I don't know why I

15   didn't run.

16       Q.   You didn't scream for help then?

17       A.   No.

18       Q.   Was there anyone else on the street you

19   heard scream, she's got a knife, anything like

20   that?

21       A.   No.

22       Q.   What about when this gentleman had the

23   white, long, rectangular stick, did he actually

24   swing that at you?

                                              152

1     A.    Yes.

2     Q.    What part of your body did he swing it at?

3     A.    My head.

4     Q.    Was he holding it in one hand, both hands?

5     A.    I don't recall.

6     Q.    Okay.  And I think you previously said

7  that you had been standing there for was it 10 to

8  15 seconds before this gentleman actually arrived

9  to where you had been with Miss Coleman and this

10  other woman; is that accurate?

11     A.    Yes.

12     Q.    Okay.  When he got there, did he swing at

13  you immediately?

14     A.    Yes.

15     Q.    Did he say why he was going to swing at

16  you?

17     A.    He was yelling the whole way when he was

18  running, so he was -- I believe he was coming to

19  her like, you know, like he was coming to her aid.

20     Q.    Do you have any idea if this man saw you

21  and your encounter with Miss Coleman while she was

22  outside the 7-11?

23     A.    I do not have any idea.

24     Q.    Okay.  Paragraph 10 says that the attacker

153

1    attempted to strike you.

2           Did the stick actually make contact with

3    any part of your body?

4       A.   No, no.

5       Q.   Did the knife ever make any contact with

6    any part of your body?

7       A.   No.

8       Q.   Other than the gentleman with the stick

9    and Miss Coleman with the knife, did this shorter

10   woman have anything that she attempted to strike

11   you with?

12      A.   No.

13      Q.   Did any of them ask for your wallet,

14   money, anything that you had, other than when

15   Miss Coleman initially asked for a quarter back in

16   front of the 7-11?

17      A.   Not -- they didn't ask for my money.  They

18   didn't say, can I have your money.  But they

19   were -- I mean, why else you going to stab someone,

20   unless you're trying to get whatever they have.  Or

21   if they like, you know, if I attack them, then I

22   understand why they would stab me.  The only other

23   reason I could think of them coming to stab me is

24   it to rob me.

                                                154

1    Q.   Okay.  Did any of -- did you smell alcohol

2  on any of them?

3    A.   I don't recall.

4    Q.   Did any of them, either the short woman,

5  Miss Coleman or this man, say or do anything that

6  gave you the impression that they were under the

7  influence of anything?

8    A.   No.  Other than the loud swearing and

9  everything, but it didn't -- that doesn't really

10  say anything that they were drunk or anything.

11    Q.   You've heard people swear who were not

12  under the influence of anything?

13    A.   Of course.

14    Q.   All right.  Looking at Paragraph 11, it

15  says, after being assaulted with the wooden stick

16  Matthew seized the weapon and defended himself.

17  Nevertheless, Deborah Coleman stood her ground and

18  continued to attempt to harm and rob Matthew.

19        Did I read that correctly?

20    A.   Yes.

21    Q.   All right.  So the gentleman with the

22  stick took a swing at your head, true?

23    A.   Yes.

24    Q.   Did you duck?

155

1      A.    No.   I moved back, and then I grabbed it

2    from him.

3      Q.    Okay.   So when the gentleman took a swing

4    at your head with the stick, you leaned backwards,

5    true?

6      A.    Yes.

7      Q.    You said you took the stick from him.   Had

8    you leaned forward again or what did you do to

9    actually make contact with the stick?

10     A.    No.   When he swung at me I leaned back,

11   but he left himself open; and it was out there.   So

12   I grabbed it from him, and then I struck him.

13     Q.    Have you ever had any martial arts

14   training?

15     A.    No.

16     Q.    Have you ever had any self-defense

17   classes?

18     A.    No.

19     Q.    Have you ever learned anything from your

20   dad, practice with your dad, anything on how to

21   disarm someone?

22     A.    No.

23     Q.    Did you ever have any sort of training of

24   how to take a weapon away from somebody?

156

1      A.    No, ma'am.

2      Q.    Have you ever had an occasion where you've

3   had to take a weapon or something like a stick away

4   from someone who was brandishing it in an attacking

5   manner?

6      A.    No, ma'am.

7      Q.    Now, when you took the stick away from the

8   man, was Miss Coleman still holding the knife?

9      A.    Yes.

10     Q.    And you took the stick and then swung it

11  at the man?

12     A.    Yes.

13     Q.    All right.  So when this says, Deborah

14  Coleman stood her ground and continued to attempt

15  to harm and rob Matthew, what was she doing when

16  you were taking the stick away from the man?

17     A.    She was here.  He was here.  I hit him.

18  She was there the whole time.  I don't know what

19  she was doing.  I just hucked it at her.  I hit

20  him.  He went down.  And I knew she was there with

21  the knife the whole time, and I was open the whole

22  time.  Like she could have totally hit me.  When I

23  hit him, she could have came and got me.  And I

24  knew she was there the whole time, so I threw it at

                                               157