CASE NO. _08cv3131_

ATTACHMENT NO. _4_

EXHIBIT _C_

TAB (DESCRIPTION) _____

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

**ORIGINAL**

MATTHEW GRANBERG,                      )

        Plaintiff,                      )

    -vs-                               ) No. 08 CV 3131

METRA POLICE OFFICER DION KIMBLE, )

STAR #105, SERGEANT ALFRED          )

COLLINS, and POLICE OFFICER LARRY )

GEANES,                               )

        Defendants.                     )

        The continued deposition of MATTHEW
GRANBERG, called for examination pursuant to the
Rules of Civil Procedure for the United States
District Courts pertaining to the taking of
depositions, taken before Raelene Stamm, a notary
public within and for the County of Cook and State
of Illinois, at 330 North Wabash Street, Suite
3300, Chicago, Illinois, on the 19th day of March,
2010, at the hour of 10:00 o'clock a.m.

Reported by: RAELENE STAMM, CSR

License No.: 084-004445

1

ACCURATE REPORTING COMPANY
CHICAGO, ILLINOIS (312) 346-4707

```
 1        APPEARANCES:

 2            ROBERT D. KUZAS, LTD., by

 3            MR. JOSEPH T. FITZSIMMONS

 4            222 North LaSalle Street, Suite 200

 5            Chicago, Illinois  60601

 6            (312) 629-1400

 7                On behalf of the Plaintiff;

 8

 9            SWANSON, MARTIN & BELL, LLP, by

10            MR. A. JAY KOEHLER

11            330 North Wabash Street, Suite 3300

12            Chicago, Illinois  60611

13            (312) 321-8462

14                On behalf of the Defendants;

15

16            METRA LAW DEPARTMENT, by

17            MS. SUE-ANN ROSEN

18            547 West Jackson Boulevard

19            Chicago, Illinois  60661

20            (312) 322-6684

21                On behalf of the Defendants.

22

23

24
                                                    2
```

```
 1                    I N D E X

 2    WITNESS                          EXAMINATION

 3    MATTHEW GRANBERG

 4        By Mr. Koehler                    4

 5        By Ms. Rosen                    245

 6        By Mr. Koehler   (Further)      262

 7        By Ms. Rosen   (Further)        265

 8        By Mr. Koehler   (Further)      269

 9        By Mr. FitzSimmons              270

10        By Ms. Rosen   (Further)        271

11

12

13

14              E X H I B I T S

15    NUMBER                          MARKED FOR ID

16    Granberg Deposition Exhibit

17        No. 1                           117

18        No. 2                           196

19        No. 3                           219

20        No. 4                           257

21        No. 5                           262

22

23

24
                                              3
```

```
 1                        (Whereupon, the witness was

 2                         duly sworn.)

 3                    MATTHEW GRANBERG,

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                    EXAMINATION

 7   BY MR. KOEHLER:

 8       Q.   Mr. Granberg, will you state your full

 9   name and spell your last name for the record?

10       A.   Matthew Michael Granberg, G-r-a-n-b-e-r-g.

11       Q.   Let the record reflect this is the

12   deposition of -- the continued deposition of

13   Matthew Granberg taken pursuant to the federal

14   rules of civil procedure and all local applicable

15   rules.

16            Mr. Granberg, how would you like me to

17   address you today, Matt, Michael, Mr. Granberg?

18       A.   Matthew is fine.

19       Q.   My name is Jay Koehler, and I represent

20   the folks at Metra.  I'm going to be asking you

21   questions today.  You sat through one deposition

22   already.  You understand this is a question answer

23   session?          - -

24       A.   Yes.
```
                                                    4

1        Q.    And in this keep your responses out loud.

2    No shrugs of the shoulder, nod of the head like

3    you're doing now and that's because the court

4    reporter here can't take it down.

5        A.    I recall that now.

6        Q.    The other thing is don't speak when I'm

7    speaking, and I won't speak when you're speaking.

8    And the reason for that is again the court

9    reporter's got to take it down.  And the reason

10   that's important, Mike, and I tell this to every

11   witness, you're the only person here who takes the

12   oath to tell the truth.  And what's important here

13   is your truthful testimony.  We want to make sure

14   that this court reporter is able to transcribe your

15   truthful testimony.  And when we talk over each

16   other or you shrug your head, we're not getting

17   your sworn testimony down --

18       A.    Okay.

19       Q.    -- as the way it's supposed to be.

20             And unfortunately like I said you're the

21   only guy that takes the oath in here, so it's

22   important to you that your sworn testimony is

23   accurate.

24             If I ask a question you don't understand,

                                                        5

1    I just simply want you to tell me you're not sure

2    what I'm asking.  I'll try to repeat it so that you

3    do understand it.

4            Finally, let me finish my question.  You

5    may think I'm going to the left, and I go to the

6    right.  I want you to understand my question fully

7    before you answer, okay?

8        A.   Yes.

9        Q.   All right.

10    MR. KOEHLER:  Joe, before we get started, as

11    you know, we had records from Dr. Krupika

12    (phonetic).  She -- I sent them over by messenger

13    to you yesterday.  It's the same thing we had

14    yesterday.  I suspect, if I understand correctly,

15    that there is additional treatment, just don't know

16    if she has notes.  I don't know if Dr. Krupika is

17    producing all of her file or only a file that she

18    thinks is relevant.

19    MR. FITZSIMMONS:  Well, my understanding from

20    talking to Matthew who's had a conversation with

21    her is that she's given you everything that she

22    has.

23    MR. KOEHLER:  Well, we won't find that out for

24    sure until we sit with her and take a dep or

                                                        6

1    further request.

2        MR. FITZSIMMONS:  My understanding is she has

3    turned everything over.

4        MR. KOEHLER:  The other item we don't have

5    through the other subpoenas, we simply don't have

6    compliance with despite asking for a rush order

7    Swedish Covenant.  We asked for additional records

8    from there.

9        MR. FITZSIMMONS:  And there's a bunch of stuff

10   I don't have either.  I don't think that -- one of

11   the employers of Kimble, I'm trying to think of the

12   village, I think it's Harvey that he worked for,

13   has turned over to you guys.

14       MS. ROSEN:  Has not turned over?

15       MR. FITZSIMMONS:  Has not turned over to you

16   guys.

17       MS. ROSEN:  Let me just -- we have turned over

18   everything we have.

19       MR. FITZSIMMONS:  This is not an accusatory.

20       MS. ROSEN:  I want to make that clear because

21   the problem is when we were at court last time you

22   implied that we didn't --

23       MR. FITZSIMMONS:  My apologies for that.

24   Harvey I don't believe has turned over any of their

                                                    7

1   files regarding the civil lawsuits against him and

2   again the chief of police there, so . . .

3        MS. ROSEN:  They seem somewhat engaged now in

4   their own legal mess, so . . .

5        MR. KOEHLER:  That being said, I'm not worried

6   about those because those are for other

7   depositions.  For the purposes of today's

8   deposition I don't anticipate needing it.

9        MR. FITZSIMMONS:  What were you looking for,

10  anymore records from Dr. Krupika?

11       MR. KOEHLER:  Krupika and Swedish Covenant, I

12  think those are the only two remaining subpoenas

13  relevant.  Joe, I don't anticipate needing any

14  further time to spend with Michael on those topics.

15       MR. FITZSIMMONS:  Matthew.

16       MR. KOEHLER:  Matthew.  But if I do, I'll

17  certainly give you a call.  We'll try to work it

18  out.  Subject to that, I'm going to take the

19  deposition.  I'm going to try not to repeat

20  questions.  I'm going to skip around quite a bit,

21  try to get this done in a reasonable fashion today.

22  BY MR. KOEHLER:

23       Q.   Mr. Granberg, where do you currently

24  reside?

                                                  8

1     A.    River Grove, Illinois.

2     Q.    What's the address there?

3     A.    2600 Clark Street.

4     Q.    At the time of your last deposition where

5 were you residing?

6     A.    5040 Nottingham, Chicago, Illinois.

7     Q.    And at the time of your last deposition

8 who were you residing with?

9     A.    My father.

10     Q.    Okay.  Who are you residing with at the

11 2600 Clark --

12     A.    My mother.

13     Q.    Slow it down.  Let me finish.

14     A.    Sorry.

15     Q.    Now, I want to just get your

16 understanding.  There's been some movement.  I read

17 through your first deposition.  You lived with your

18 mom, then your mom moved to Valparaiso; and then

19 you took residence with your father.  So your mom

20 has now moved back to the Chicagoland area?

21     A.    Yes.

22     Q.    Okay.  What is the reason that you have

23 changed residence back from your dad now to your

24 mom?

9

1      A.    Close -- school, closer to school.

2      Q.    What school that?

3      A.    Triton College.

4      Q.    All right.  At your last deposition you

5  were at Wright Junior College?

6      A.    Yes, sir.

7      Q.    And you indicated you had about 40 hours

8  left to complete your associate's degree?

9      A.    No, sir.

10     Q.    Okay.  Where were you at Wright Junior

11  College?

12     A.    Within my credit hours?

13     Q.    Yeah, the last time we took your

14  deposition.

15     A.    Well, in the summer I just have to take a

16  math class, and I'll have 64.  I probably completed

17  40, but then -- I don't recall.

18     Q.    All right.  So you have since transferred

19  from Wright Junior College to Triton?

20     A.    Yes.

21     Q.    All right.  Are you seeking to get an

22  associate's degree or other specialized degree?

23     A.    Associate's.

24     Q.    Okay.  And how many credit hours do you

                                                    10

1       need to complete your associate's degree?

2           A.    64.

3           Q.    Okay.  And this summer you have a math

4    class?

5           A.    Yes, sir.

6           Q.    And that will give you the necessary

7    credits to obtain your degree?

8           A.    And I will take a fitness class, too, and

9    that will be 64 hours.

10          Q.    What is your intent after you complete

11   your associate's degree at Triton College?

12          A.    To transfer to a four-year university.

13          Q.    What university are you looking to

14   transfer to?

15          A.    It's up for grabs now.

16          Q.    All right.  Well, let me maybe widdle this

17   down.  What's your GPA?

18          A.    Last I checked it was 2 -- 2.8 I believe.

19          Q.    Okay.  Is your intent to transfer to a

20   state school?

21          A.    Undecided.

22          Q.    Okay.  Do you have any understanding where

23   you might go?

24          A.    No, sir.

                                                        11

1    Q.   Is it your intent to enroll into a

2  four-year university in the fall?

3    A.   Yes, sir.

4    Q.   Okay.  I know certainly it was when I was

5  in college, does your parents still take a look at

6  your grades?

7    A.   Yes.

8    Q.   Do they have any standards for you on

9  where they would like you to be gradewise?

10    A.   Good grades.

11    Q.   Is what you're currently achieving meeting

12  the family standard, if you will?

13    A.   There's never been a family standard.

14  There's no Fs or Ds, so . . .

15    Q.   Okay.  Tell me a little bit about where

16  you're working today?

17    A.   Oh, O'Hare Airport.

18    Q.   You're still at O'Hare Airport?

19    A.   Yes, sir.

20    Q.   And from -- when did you start at O'Hare?

21    A.   January 14, 2008.

22    Q.   And you have worked continuously from

23  January 2008 to the present?

24    A.   Yes, sir.

12

1       Q.    Okay.  And what is your job title there?

2       A.    Line service technician.

3       Q.    Okay.  And are you still working at

4  Edgebrook Golf Course?

5       A.    Yes, sir.

6       Q.    This summer you'll be a back employed

7  there?

8       A.    As long as they accept me.

9       Q.    Is there some process you go through for

10  acceptance?

11      A.    Well, we have a new pro, so -- but I

12  already applied.  Most likely I will be accepted

13  again.

14      Q.    Okay.  How did you get the job at O'Hare

15  Airport?  Did anybody help you get that job?

16      A.    No, sir.

17      Q.    How about Edgebrook, anybody help you get

18  that job?

19      A.    No, sir.

20      Q.    Okay.  Are you putting yourself through

21  school?

22      A.    No, sir.

23      Q.    Okay.  Mom?

24      A.    It's kind of both, you know.

                                                    13

1     Q.   Mom and dad?

2     A.   Yes.

3     Q.   Okay.  Other than this litigation here

4 have you ever been a plaintiff or a defendant in

5 any civil litigation?

6     A.   No, sir.

7     Q.   Okay.  Other than the charges that were

8 brought against you in this instance involving

9 Miss Coleman, have you ever been charged with any

10 crimes before?

11     A.   No, sir.

12     Q.   Have you ever pled guilty to a felony?

13     A.   No, sir.

14     Q.   Have you ever pled guilty to a crime

15 involving dishonesty or deceitfulness?

16     A.   No, sir.

17     Q.   Have you ever been convicted of a felony?

18     A.   No, sir.

19     Q.   Have you ever been convicted of a

20 felony -- strike that.

21     Have you ever been convicted of any crime

22 involving dishonesty or deceitfulness?

23     A.   No, sir.

24     Q.   Okay.  So is it fair to say other than the

14

1    charges that were brought against you by

2    Miss Coleman, you have had no other incidences, if

3    you will, with the law?

4        A.    Yes, sir.

5        Q.    Clean bill of health, if you will, with

6    the criminal justice system?

7        A.    Yes, sir.

8        Q.    Okay.  Prior to August 30 of 2007 had you

9    ever sustained any injuries that required medical

10    treatment?

11        A.    When I was a kid, a toy motorcycle blew up

12    in front of my face.

13        Q.    Okay.  Other than that?

14        A.    Yes.  I tore my ACL, my leg.

15        Q.    When did you tear your ACL?

16        A.    I believe '05.

17        Q.    What were you doing in '05 to tear your

18    ACL?

19        A.    Playing basketball.

20        Q.    Okay.  Since August 30 of 2007 had you

21    sustained any injuries that required medical

22    treatment?

23        A.    No, sir.

24        Q.    Prior to August 30, 2007, had you ever

15

1   sought counseling from any mental health provider?

2       A.   Yes, sir.

3       Q.   All right.  I think we established

4   Dr. Krupika, is that someone you sought counseling

5   with prior to August 30, 2007?

6       A.   Yes, Krupika.

7       Q.   Thank you.

8            Any other counseling or treatment you

9   received from any mental healthcare provider other

10  than Dr. Krupika?

11      A.   No, sir.

12      Q.   Okay.  When, if you recall, prior to

13  August 30, 2007, did you first seek treatment with

14  Dr. Krupika?

15      A.   I cannot recall.

16      Q.   Let me see if I can narrow it down a bit.

17  More than five years prior?

18      A.   Yes.

19      Q.   Okay.  You were 19 on August 30, 2007,

20  right?

21      A.   Yes, sir.

22      Q.   All right.  So what grade were you in when

23  you first sought treatment with Dr. Krupika?  8th

24  grade, 7th grade, freshman in high school?

                                            16

1      A.   I believe 7th grade.  I can't recall,

2   though.

3      Q.   Okay.  And did you counsel with

4   Dr. Krupika by yourself?

5      A.   Yes.

6      Q.   And from -- let's assume you're correct

7   that it's about 7th grade, okay?  How long did you

8   treat with Dr. Krupika at the time you started up

9   to the point of August 30, 2007?

10     A.   Like what do you mean by that?

11     Q.   What I'm trying to find out, did you treat

12  with Dr. Krupika continuously from 7th grade up to

13  August 30, 2007, or did you go starting, let's say,

14  7th grade and by 8th grade you had stopped treating

15  with her?  I'm trying to get the period of time of

16  treatment with Dr. Krupika.

17     A.   It was off and on.

18     Q.   Off and on for how long?

19     A.   I cannot recall.

20     Q.   More than a year, though?

21     A.   Without seeing her for more than a year?

22     Q.   More than a year that it was off and on?

23     A.   I cannot recall.  · ·

24     Q.   And when you would meet with Dr. Krupika,

                                                    17

1     you would discuss current events or current

2     troubles you were having?

3         A.    We would talk about everything.

4         Q.    Okay.  And she would take notes?

5         A.    I do not recall.

6         Q.    Okay.  What were the reasons you were

7     seeking treatment from Dr. Krupika?

8         A.    Well, my parents got a divorce.

9         Q.    Okay.  When did your parents divorce?

10        A.    I believe 2000.

11        Q.    That about lines up then about seven years

12    prior which is -- you were 19, puts you about

13    12 years old, roughly 7th grade?

14        A.    About right.

15        Q.    I presume at a child of divorce you kind

16    of remember that point in your life, I was in 7th

17    grade when it happened or 8th grade when it

18    happened?

19        A.    Yes, sir.

20        Q.    Okay.  Other than the troubles you had

21    with your parents' divorce, any other reasons for

22    the treatment, anything else going on?

23        A.    No, sir.

24        Q.    Being in 7th grade did your mom also treat

                                                    18

1    with Dr. Krupika with you?

2        A.    Never with me.

3        Q.    Okay.  She treated separately and you

4    treated separately?

5        A.    Yes, sir.

6        Q.    All right.  How about your father?

7        A.    What about him?

8        Q.    Was he with you at all with Dr. Krupika?

9        A.    No, sir.

10       Q.    All right.  You have a sister?

11       A.    Yes, sir.

12       Q.    What's her name?

13       A.    Michaelene (phonetic).

14       Q.    How about your sister, ever treat with

15   your sister?

16       A.    No, sir.

17       Q.    The divorce between your parents, I'm

18   going to spend a little time so I understand it.

19             Would you consider it to have been

20   acrimonious, you know what I'm asking you?

21       A.    No, sir.

22       Q.    Fighting, difficult, difficult divorce, if

23   you will, between your parents?

24       A.    I don't recall.

                                                    19

1    Q.   Okay.  Do you recall at all what for lack

2    of a better word traumatized you about the divorce?

3    A.   Well, any kid would, you know, parents are

4    getting separated, you know.

5    Q.   Understood.  I'm just trying to -- I want

6    to know more specific about you.  I understand

7    generally it would traumatize a child or have an

8    impact; but for you what was the bother for you

9    with the divorce?

10   A.   I don't recall.

11   Q.   But those are topics you would have

12   discussed with Dr. Krupika?

13   A.   Do not recall.

14   Q.   Do you recall any topics you discussed

15   with Dr. Krupika?

16   A.   Yes.

17   Q.   All right.  Tell me what you do recall.

18   A.   Sports.

19   Q.   Okay.  Let's break that down.  What about

20   sports was on your mind?

21   A.   White Sox, Bears, you know.

22   Q.   She talked to you about your favorite

23   sports and your interests?

24   A.   Yes, sir.

20

1  Q. All right.  Did you play sports in grammar

2 school?

3  A. Yes, sir.

4  Q. What sports did you play?

5  A. Basketball, baseball, football, hockey,

6 golf.

7  Q. Very active?

8  A. Yes, sir.

9  Q. Did those activities continue when you

10 entered Notre Dame High School?

11  A. Yes.

12  Q. Okay.  What sports did you play at Notre

13 Dame High School?

14  A. I never played on a team at Notre Dame.  I

15 played in park districts.

16  Q. Okay.  Talking about the treatment with

17 Dr. Krupika you said you didn't recall a lot.

18 Would you defer to Dr. Krupika's memory or whether

19 she has notes of this as to what was bothering you

20 or what topics you discussed with her at that time?

21  A. I couldn't tell you.

22  Q. Would you defer to her if she came in and

23 said, yes, I remember sitting with Matthew, and

24 here are the things we discussed and talked about?

                  21

1      A.   Yes, if she remembers.

2      Q.   Okay.  Do you recall prior to August 30,

3  2007, when the last time it is you saw Dr. Krupika?

4      A.   No, sir.

5      Q.   Did you see her when you were at high

6  school at Notre Dame?

7      A.   Yes, sir.

8      Q.   Okay.  When do you recall seeing her in

9  high school at Notre Dame, freshman, sophomore,

10  junior, senior year?

11      A.   I cannot recall.

12      Q.   You continued to treat with Dr. Krupika

13  even after your parents' divorce was finalized?

14      A.   Yes.

15      Q.   Did the care and treatment provided by

16  Dr. Krupika continue to address the impacts and

17  issues associated with your parents' divorce or had

18  you migrated into other areas that you were seeking

19  help for?

20      A.   I cannot recall.

21      Q.   Was there anything, events or issues that

22  developed for you in high school that you sought

23  mental healthcare?

24      A.   No, sir.

                                                    22

1      Q.    Okay.  High school at Notre Dame, where's

2    that located?

3      A.    Niles, Illinois.

4      Q.    Did you live with your mom during that

5    time?

6      A.    Yes, sir.

7      Q.    Was your mom the custodial parent of your

8    and your sister?

9      A.    Yes.

10     Q.    And did you have visits with your father?

11     A.    Yes, sir.

12     Q.    Okay.  Did he have a home somewhere in the

13    area?

14     A.    Yes, sir.

15     Q.    Okay.  And how often did you visit your

16    dad?

17     A.    I cannot recall.

18     Q.    Was it structured, once a week, you know,

19    every other Tuesday, something like that?

20     A.    No, sir.

21     Q.    All right.  Would you call it

22    unstructured?

23     A.    Yes, sir...

24     Q.    All right.  At Notre Dame High School how

                                                              23

1     did you do gradewise?

2          A.    Fair to midland.

3          Q.    Fair to midland, haven't heard that in a

4     while.   I would say about a 2.0 to 2.5?

5          A.    Yes, sir.

6          Q.    Is that about right, C to C-plus average?

7          A.    Yes, sir.

8          Q.    Did you take any college entry exam, SAT,

9     ACT.

10         A.    Yes, sir.

11         Q.    Okay.   How did you do on the ACT, SAT?

12         A.    I believe 18.

13         Q.    18 on the ACT then, right?

14         A.    I believe so.

15         Q.    All right.   In high school did you have

16    any -- during your four years at Notre Dame High

17    School, any discipline issues at all?

18         A.    No, sir.

19         Q.    Okay.   Did you ever have any fights at

20    school?

21         A.    No, sir.

22         Q.    All right.   No detention, suspensions?

23         A.    A few JUGs.

24         Q.    What's a few JUGs mean?

                                                        24

1     A.     Justice under God.

2     Q.     What is that?  Explain it.  Explain that

3   to me what they do at Catholic high school.  I know

4   what they do at Catholic grammar school.

5     A.     You get one JUG for three tardies.

6     Q.     Okay.

7     A.     And, you know, never anything bad.

8     Q.     What's bad?  Explain to me bad.

9     A.     You know, causing a disruption in class,

10   yelling out loud, you know, fighting kids, booking

11   kids.

12     Q.     What's booking kids?

13     A.     Like a kid will walk by, and kids would

14   knock books -- they have a ton of books in their

15   hand --

16     Q.     Go behind them and they pop them and they

17   drop them?

18     A.     Yeah.

19     Q.     You guys call that booking kids.

20            All right.  So the JUGS, JOGS, if you

21   will, J-O-G --

22     A.     JUG.

23     Q.     Justice under God, you get those for

24   tardies, disruption in classes, fighting kids or

25

1    booking kids?

2        A.    Late for lunch you could put.

3        Q.    Okay.  And these are events that happened

4    during your time at Notre Dame?

5        A.    I wasn't a part of booking kids or

6    fighting kids.

7        Q.    Okay.  What activities did you participate

8    in high school other than you went to class, did

9    you have -- were you a member of any society,

10    any -- I know I weren't a part of any sports, but

11    I'm trying to understand the lay of the land for

12    Matt Granberg at Notre Dame High School.  Other

13    than classroom any other activities associated with

14    high school?

15        A.    I guess the homework club you could say.

16        Q.    Give me a rundown on who you were -- your

17    high school friends were?

18        A.    Mr. Ames who you guys already met.

19        Q.    I have not melt Mr. Ames.

20        A.    Oh, you didn't.  I believe you did.

21              Ryan Miskowits (phonetic).

22        Q.    Okay.

23        A.    That was pretty much it.  I had a lot of

24    acquaintances, but I really didn't have, you know,

                                                        26

```
1    no close friends.

2        Q.    Did you bring your buddies to your mom's

3    house?

4        A.    I never brought anyone.  I mean, they were

5    invited.

6        Q.    Did they come over?  Did you have friends

7    at your mom's house?

8        A.    Yes.

9        Q.    Did your mom know Ryan Ames?

10       A.    Yes.

11       Q.    Did your mom know Ryan Miskowits?

12       A.    Yes.

13       Q.    Did she approve of your friends?

14       A.    Yes.

15       Q.    Your dad, were you friends allowed at your

16   dad's house?

17       A.    Yes.

18       Q.    Okay.  Did your dad approve of your

19   friends?

20       A.    Yes.

21       Q.    Is there any friends that your dad didn't

22   approve of?

23       A.    No.

24       Q.    Okay.  Did your dad have that if I would
                                                      27
```

1    say authority with you as to approve of who you

2    would hang out with and who not to hang out?

3        A.   Well, any parent would care, you know.

4    I'm sure you would care if you have kids and they

5    were hanging out with some, you know . . .

6        Q.   Derelict?

7        A.   I don't know that word, but yes.

8        Q.   Okay.  What I'm getting at is that's

9    exactly your point is did your father play a role

10   in ensuring that you were hanging out with kids

11   that were good for you?

12       A.   No.

13       Q.   Okay.  No input at all?

14       A.   No.

15       Q.   Okay.  After your parents' divorce, help

16   me out a little bit, give me a picture of the

17   dynamics of the discipline in your house.  In other

18   words, once mom and dad were in separate households

19   how did that work?  Did mom principally have the

20   discipline over you or was it your dad that had the

21   discipline over you?  Was there any conflict

22   between your parents over how you would be

23   disciplined as teenager?

24       A.   No, sir.

                                                    28

1     Q.    All right.  So who was in charge of that?

2     A.    Well, I live with my mother.

3     Q.    She was the boss?

4     A.    Yes, but so was my father.

5     Q.    Okay.  Was there any ever conflict between

6  your parents, between your mom and dad, over the

7  discipline of you and the structure of you?

8     A.    That I can recall, it never was in front

9  of me.  I don't know what happened, you know, when

10  I wasn't -- if they ever said anything, but no.

11     Q.    Okay.  Do you know if your father approved

12  of the, for lack of a better word, the amount of

13  freedom you were given by your mother?

14     A.    Cannot recall.

15     Q.    Okay.  How about your sister, same

16  situation, mom kind of ran the roost?

17     A.    Yes, and father.

18     Q.    Okay.  Did you have a curfew when you were

19  living with your mom?

20     A.    Yes.

21     Q.    What was your curfew?

22     A.    No set time, but just don't be out so

23  late, you know.

24     Q.    So the curfew was a little bit vague,

29

1    don't be out late?

2        A.    Well, don't, you know, not, you know,

3    10:00 o'clock is late enough, you know.  It never

4    was set, but shouldn't be out at that time, you

5    know, being a teenager.

6        Q.    Why?

7        A.    Because stuff can happen.

8        Q.    What stuff happens?

9        A.    Well, I was reading the paper a few months

10   ago; and I saw a whole thing on the Chicago crime

11   thing, crime rate.  And they have months and times

12   when crimes happen, and a lot of times crime

13   happens from 9:00 at night to 5:00 in the morning,

14   so . . .

15       Q.    Okay.  And you understood that I take it

16   back in August of 2007?

17       A.    Yes.

18       Q.    Okay.  What were the repercussions if you

19   violated a rule imposed by your mom?  Go back to

20   high school.  You're in high school.  Mom's got a

21   rule for X.  Matthew violates that rule.  What's

22   the repercussion?  Is there any repercussions?  Is

23   there any grounding?  Is there any enforcement of

24   discipline?

                                                    30

1     A.   I cannot recall.

2     Q.   Have you ever been grounded?

3     A.   Yes.

4     Q.   For what?  What were the infractions that

5 got you grounded?

6     A.   I cannot recall.

7     Q.   Okay.  How about dad, what were the

8 repercussions for violating a rule of dad's?

9     A.   Can't recall.

10    Q.   Did you ever violate a rule of your

11 father's?

12    A.   Cannot recall.

13    Q.   You have no recollection as you sit here

14 today of ever violating a rule imposed on you by

15 your dad?

16    A.   I don't think there was ever any rules

17 like, you know.  I mean, it's obvious any parent

18 would say, you know, don't mess up.  Don't, you

19 know . . .

20    Q.   Well, what was your understanding about if

21 your dad's rule was as vague as, hey, simply don't

22 mess up, right?

23    A.   Yes.

24    Q.   What did that mean to Matthew Granberg

31

1    that his dad said don't mess up?

2        A.    Don't go down the wrong path.

3        Q.    Okay.  Tell me what you understood the

4    wrong path to be?

5        A.    Murder.

6        Q.    Okay.  That's one.

7        A.    Robbing trains, liquor stores.

8        Q.    Okay.

9        A.    Stealing old grannies' purses.

10       Q.    Did your dad have, you know -- I've never

11   met your father.  I've read about your father.

12   He's a Chicago police officer, correct?

13       A.    Yes, sir.

14       Q.    I take it he's proud to be a Chicago

15   police officer?

16       A.    Yes, sir.

17       Q.    All right.  And he's been a Chicago police

18   officer for as long as you can remember?

19       A.    Yes, sir.

20       Q.    Okay.  Was he ever in the military?

21       A.    Yes, sir.

22       Q.    What branch of the military was your

23   father in?

24       A.    United States Marine Corps.

                                                    32

1     Q.   He's a former marine.  Is he a proud

2  former marine?

3     A.   Yes, sir.

4     Q.   My dad is a former marine, okay?  My dad

5  in our family had a code of honor as a former

6  marine and seven kids.  What I'm getting at with

7  your father, if he's like my ex-marine dad, there

8  was a code of honor and a code of respect.  Similar

9  type of structure with your father?

10     A.   Cannot recall.

11     Q.   Did your dad have an expectation for you

12  as his son that you carried yourself at all times

13  in a respectful and honorable way?

14     A.   It's in the bible, yes.

15     Q.   And if your dad perceived your conduct not

16  to be honorable or respectful, what could you

17  anticipate from your father?  I can tell you what I

18  would anticipate from my dad to this day, but what

19  would be your expectations if your father perceived

20  your conduct not to be honorable and respectful?

21     A.   I assume he'd be angry.

22     Q.   Okay.  How about repercussions?

23     A.   Couldn't tell you.

24     Q.   Any repercussions?  Do you recall whether

33

1     it was, I'm taking the keys to the car, I'm taking

2     your license. My father's line was terrific. He

3     would say, that makes you a pedestrian. That meant

4     that you surrendered your license to him. Okay.

5     What were the repercussions as Matthew Granberg

6     sits here that he says, all right, I got myself in

7     a pickle. My dad's going to look at this and not

8     be happy. And I'm a son still. I understand those

9     moments. That moment happens, okay. You're up

10    that special creek without a paddle as we know

11    about.

12            What's your expectation as to what wrath,

13    if you will, that your father's going to place on

14    you when he learns of this dishonorable

15    disrespectful conduct? There had to be a moment

16    somewhere along the line where something surfaced

17    that dad said, uh-uh.

18        A.    Maybe get the Play Station 3 taken away.

19        Q.    Okay. You said your dad would be angry.

20    How did your dad express himself when he was angry

21    with you involving your conduct, if you will, when

22    he perceived it to be dishonorable and

23    disrespectful?

24        A.    I cannot recall.

                                                    34

1      Q.   When my dad was angry it was some loud

2   voices, some doors slamming, some pounding of

3   fists.  I remember it very well to this day.

4           I take it you've had moments somewhere

5   along the way with dad that was -- he was angry and

6   upset with you?

7      A.   Cannot recall.

8      Q.   Did any of your counseling with

9   Dr. Krupika deal with any of the anger that your

10  father expressed at you during the period of time

11  you sought treatment?

12     A.   I don't know where this anger -- where do

13  you assume that there was anger at me coming from

14  my father.  I don't recall any of that.

15     Q.   I'll tell you where I'm coming from.  This

16  is not meant to be confusing at all.  If I am, I

17  apologize.

18          What I'm trying to understand is the

19  relationship you have with your father.  Time out.

20     MR. KOEHLER:  Joe, do you need a break?

21     MR. FITZSIMMONS:  I need a cup of water.

22                     (Whereupon, a discussion was had

23                      off the record.)

24     MR. KOEHLER:  You guys okay if I keep going?

                                                    35

1          MR. FITZSIMMONS:  Yeah.

2     BY MR. KOEHLER:

3          Q.   What I'm getting at is there's -- your

4     dad, we talked about a little bit honor and

5     respect, and I asked you earlier, I said, what

6     could you anticipate if your dad had perceived your

7     conduct to be dishonorable or disrespectful in any

8     way.  And one of the ways you said he would express

9     his response was anger.  Surprise, surprise.

10         A.   I said any parent would be angry.

11         Q.   I know, but I am asking you now about your

12    dad and your relationship.  That's really what I

13    want to hone in on.

14         A.   I have a very good relationship with my

15    father.

16         Q.   And I'm not suggesting otherwise.

17              What I want to know is the anger that you

18    referenced earlier, how did that come about?  How

19    did that get expressed?

20         A.   I don't -- I never said that he was angry.

21    I said any parent would be angry.

22         Q.   Has he ever been angry at you for any of

23    your conduct that you can recall?

24         A.   Maybe making an error.

                                                    36

1      Q.   Give me an example.

2      A.   Ground ball to shortstop, I make it.  I

3  overthrow it, you know, should have been right on.

4  I'd be angry at myself -- mad at myself, too.

5      Q.   But that would anger your father?

6      A.   No.  He wouldn't like hold it against me;

7  but, I mean, you know, if my -- if my buddy or my

8  son or even a White Sox player made a play and

9  hucked it over to first base, you know, I did not

10  get angry at that.  It was an easy out.

11      Q.   Something expected or routine?

12      A.   Routine ground ball.

13      Q.   You bet.

14           So it's expected or routine your father

15  would expect those moments to get the job done?

16      A.   In baseball, yes.

17      Q.   In life?

18      A.   I could not tell you.

19      Q.   Okay.  It seems to me that you have -- I

20  think you said you have a good relationship with

21  your father.  Was it important to you, Matthew, not

22  to disappoint your father in the way you carried

23  yourself?

24      A.   Yes.

                                              37

1     Q.    Okay.  And at times have you had the

2  experience where you knew you did something, some

3  act or said something where you disappointed your

4  father?

5     A.    I cannot recall.

6     Q.    You don't remember sitting here today at

7  20-something years old ever having a moment where

8  you disappointed your father?

9     A.    A few errors.

10    Q.    Limited to baseball errors, that's a

11 pretty good run.  I have to tell you.  From having

12 my dad a very strong father and ex marine --

13    A.    Once a marine, always a marine.

14    Q.    You bet.  That is exactly it.  Once you're

15 a marine, you die as a marine?

16    A.    Yes, sir.

17    Q.    And that's honor, respect and God, right?

18    A.    Yes, sir.

19    Q.    Did your dad ever talk to you about the

20 principles of the Marine Corps?

21    A.    He didn't have to.  I already knew.

22    Q.    How did you know?  I had a sticker on my

23 door, that's how I know.

24    A.    It's United States history.

38

1     Q.    Okay.  Did your dad fight in any wars?

2     A.    Yes, sir.

3     Q.    What war was he in?

4     A.    Vietnam war 1968, '69.

5     Q.    Was he on the ground at Vietnam?

6     A.    Yes, sir.

7     Q.    Did he receive any honorable discharge?

8     A.    Yes, sir.

9     Q.    What type of discharge did your father

10   receive from the Marine Corps?

11    A.    Honorable discharge.

12    Q.    Any medals or honors of recognition for

13   his service in Vietnam?

14    A.    Yes, sir.

15    Q.    Tell me what you know.

16    A.    Navy achievement, Vietnam medal.

17    Q.    Have you seen these?

18    A.    Yes, sir.

19    Q.    Are they displayed at his home?

20    A.    No, sir.

21    Q.    Where did you see them?

22    A.    In the medal box.

23    Q.    Does he have other medals from other

24   achievements in life outside of the Marine Corps?

39

```
1      A.   Yes, sir.

2      Q.   Tell me about those.

3      A.   Good police work.

4      Q.   Okay.  So he's been -- he has been honored

5  for his police work with the Chicago Police

6  Department?

7      A.   Yes, sir, a number of times.

8      Q.   Okay.  Is that also in that medal box?

9      A.   What I meant by medal box is each medal

10  has their own little blue box.

11      Q.   A case?

12      A.   Yes.  So it's not like he has, you

13  know . . .

14      Q.   Okay.  Sounds to me like your relationship

15  with your father is a matter of you certainly look

16  up to your father?

17      A.   Yes, sir.

18      Q.   You're proud of him?

19      A.   Yes, sir.

20      Q.   All right.  Is your dad satisfied with

21  where you're at in life as far as you know?

22      A.   Yes, sir.

23      Q.   Okay.  Is there anything that he's ever

24  expressed to you in terms of disappointment in
```

40

1    either where you're at school, how you're doing in

2    school, with what you're doing with your life?

3         A.   No, sir.

4         Q.   Okay.  Now, we talked a little bit about

5    some of the things when you said your dad said,

6    just don't screw up, right?  Those were kind of the

7    words, something like that; and you said, no

8    murder, no robbing trains, no liquor stores.  You

9    gave me some things.  What was your dad's view as

10   you understand it on fights?

11        A.   That they're wrong.

12        Q.   Okay.  And what's your understanding of

13   your dad's view of why fights are wrong?

14        A.   He never full out told me they were wrong.

15   It's just, you know, any parent would think that

16   their kid fighting is wrong.

17        Q.   You know, let me bring your anxiety down a

18   little bit on this topic.  I'm not challenging your

19   father here.  And I know -- I think you keep

20   wanting to compare him to any parent.  I'm not

21   suggesting he's not doing anything different or

22   what have you.  I just want to know about your

23   relationship with your dad, okay?  That's what I'm

24   getting at really.  That's the whole purpose of the

                                                   41

1    question and really nothing more than that.

2            So for purposes of what any parent would

3    do, truth is I don't care about that.  I want to

4    know more specifically about your relationship with

5    your dad, your relationship with your mom and then

6    we'll move on from that topic, fair enough?

7        A.   Yes, sir.

8        Q.   All right.  Your dad's position on

9    fighting, getting in fights, is that it was wrong,

10   right?  Is that true?

11       A.   He never full out told me it was wrong.  I

12   assume that he would believe it is wrong.

13       Q.   Okay.  Your perception and understanding

14   is that your dad would perceive a fight as wrong?

15       A.   Yes.  And I believe fighting is wrong,

16   too.

17       Q.   All right.

18       A.   Except if it's boxing or UFC.

19       Q.   How about it wouldn't be wrong if you were

20   defending yourself, though?

21       A.   Absolutely not.

22       Q.   You would have no fears to go home and

23   tell your dad you were in a fight where you were

24   defending yourself?

                                                        42

1    A.    I don't see why it would be a problem.

2    Q.    But you --

3    A.    If I was attacked, self-defense.

4    Q.    But if you were the aggressor and you

5    started the fight, that would be a problem at home

6    with your dad, fair enough?

7    A.    Yes.

8    Q.    Okay.  Did you ever have an instance

9    somewhere along your path of life, put aside all

10   the events that we're here about in this

11   litigation, where you've had a fight with another

12   kid, another human being, that your father was

13   involved with in terms of talking with you about

14   that?

15   A.    No, sir.

16   Q.    Never had a fight in school?

17   A.    No.

18   Q.    Playground fights?

19   A.    No, sir.

20   Q.    So prior to August 30, 2007, is it your

21   sworn testimony you've never had any scuffle with

22   anybody?

23   A.    Football.

24   Q.    Okay.  Was that organized football or lot

                                                    43

1    football?

2         A.    Organized.

3         Q.    Okay.  Who did you play for?

4         A.    Park Ridge Jaguars.

5         Q.    Okay.  And what happened there at the Park

6    Ridge Jaguar youth football program?

7         A.    What do you mean?

8         Q.    You said there was a fight some --

9         A.    Never like a fight.  I mean, if you're an

10   offense lineman and defense lineman, you're

11   fighting to get, you know, fighting to block,

12   fighting to get to the quarterback.  So, yeah,

13   that's a fight.

14        Q.    But that's not what I'm getting at.

15        A.    I never got in a fistfight with anyone.

16        Q.    Football, that part of football is the

17   rules of the game, right?

18        A.    Yes.

19        Q.    That's part of the football game, so

20   that's really not what I'm looking for.  Okay.

21            So generally in your -- did your mom share

22   the same view, Matthew, on fighting that your

23   father shared?

24        A.    I assume.

                                                   44

1      Q.   Don't know?

2      A.   Once again you don't want me to take that

3   path, but any parent would be against their kid

4   fighting for wrong reasons.

5      Q.   Right reasons for fighting would be

6   defending yourself?

7      A.   Yes, sir.

8      Q.   And so long as you were defending yourself

9   or your parents believed you were defending

10  yourself, you were okay, fair enough?

11     A.   Yes, sir.

12     Q.   All right.  Did your relationship with

13  your dad change at all after the divorce?

14     A.   No, sir.

15     Q.   Okay.  Stayed the same?

16     A.   Wasn't living with him, so I guess you

17  could call that change.

18     Q.   But other than the mere location, what I

19  want to know is the father/son relationship, did

20  that change at all?

21     A.   Absolutely not.

22     Q.   And it has stayed -- whatever it was, it

23  has stayed the same up until today?

24     A.   Yes, sir.

                                                45

1      Q.   Okay.  What was your dad's position on

2   friends and having friends come over and spend the

3   night at the house or anything like that?

4      A.   I moved in with my father when I was 19,

5   so that whole sleepover thing is a little . . .

6      Q.   Past the date?

7      A.   Yeah.

8      Q.   At 19 years old is the reason you moved in

9   with your father because your mom moved to Valpo?

10     A.   Yes, sir.

11     Q.   And you were at that point continuing to

12  choose to live in Chicago?

13     A.   Yes, sir.

14     Q.   Was there any conflict with mom that you

15  weren't moving with her?

16     A.   Well, I'm her son.  She would definitely

17  like me to go with her.

18     Q.   Did she understand why you weren't going

19  to go with her?

20     A.   Yes.

21     Q.   All right.  And your father was okay with

22  you living with him?

23  -- A.   Yes, sir.

24     Q.   All right.  Was there any reason other

46

1    than the fact that your mom moved to Valparaiso

2    that you were then going to move in with your

3    father?

4        A.    No, sir.

5        Q.    All right.  I'm going to ask you, were

6    there any problems with your mom from a discipline

7    standpoint, from a conduct standpoint, that

8    necessitated you moving in with your father so that

9    he could take full control of your current path, if

10   you will?

11       A.    No, sir.

12       Q.    Okay.  Did you have friends at your

13   father's house when you moved in with him at 19?

14       A.    Yes, sir.

15       Q.    Okay.  Who came over to your dad's house,

16   who would be your buddies that hung out with you at

17   your dad's house?

18       A.    I never really let, you know, never -- I

19   never really wanted to hang out.  They come and we

20   go, never inside the house.

21       Q.    Is that a rule or?

22       A.    No rule.

23       Q.    What was the reason that a friend never

24   got inside the house at your dad's place?

                                                      47

1      A.    There was no reason.

2      Q.    Your dad didn't -- go ahead.

3      A.    I believe Mr. Ames came over one time.

4      Q.    You keep calling him Mr. Ames, and I guess
5   I'm troubled by that.  That's a buddy of yours,
6   right?

7      A.    I haven't hung out with him in a while,
8   but, yes, he was a friend of mine.

9      Q.    Is he still a friend of yours?

10     A.    If I see him, yeah.

11     Q.    You call him Mr. Ames.  I keep thinking
12  you're referring to his father or somebody.  Do you
13  call him Mr. Ames?

14     A.    I cannot recall.  I might have called him
15  it before.

16     Q.    Okay.  But do you typically call him Ryan?

17     A.    Yes, sir.

18     Q.    All right.  When's the last time you spoke
19  to Ryan?

20     A.    I cannot recall.

21     Q.    This year, 2010?

22     A.    Yes.

23     Q.    Okay.  This month, March?

24     A.    No, sir.

48

1     Q.     Okay.  Where does Ryan currently live?

2     A.     I believe he's back in Chicago.

3     Q.     But when you called him did you dial a

4  local area code or did you dial an out-of-state

5  area code?

6     A.     Local area code.

7     Q.     Okay.  And how did you know that that

8  number would reach Ryan?

9     A.     Through a friend.

10    Q.     What friend?

11    A.     Ryan Miskowits.

12    Q.     Does Ryan Miskowits keep in contact with

13  Ryan Ames?

14    A.     Couldn't tell you.

15    Q.     But he's the guy that you were able to

16  obtain the number from?

17    A.     Yes, sir.

18    Q.     So the somewhere between your friendship

19  with Ryan you had lost a number for him?

20    A.     Yes, sir.

21    Q.     Okay.  What was the purpose of your call

22  to Ryan this year?

23    A.     Heard an old song and thought of him.

24    Q.     That's neat.  What song was it?

49

1      A.    Bourbons and Lax.

2      Q.    Bourbons and Lax?  Who sings it?

3      A.    Master P.

4      Q.    Okay.  Does that bring back a specific

5 memory for you and Ryan of an event or a time you

6 shared?

7      A.    Yes.

8      Q.    Well, clue me in on it.  I like it.

9      A.    Just I guess an old song, you know,

10 there's a bunch of songs.  You know how oldies are.

11     Q.    If I call Ryan up and reference this song,

12 he'll know what you mean?

13     A.    Yes.

14     Q.    Okay.  There's a story here you don't want

15 to tell me, right?

16     A.    No, not at all.  It's just a classic song.

17 If you listen to it, you might like it yourself.

18     Q.    I may.  I may.

19           I do know Master P.

20     MR. FITZSIMMONS:  Better than me then.

21     MR. KOEHLER:  I have young kids.

22     MR. FITZSIMMONS:  So do I, and I haven't heard

23 that one.

24

                                                    50

1   BY MR. KOEHLER:

2       Q.   Well, there was no reason or rule or

3   direction from your father that prevented your

4   friends from coming into his house when you were

5   living with him?

6       A.   No, sir.

7       Q.   Okay.  They were free to come in, they

8   simply had not come in?

9       A.   Yes, sir.

10      Q.   All right.  Did your -- has your dad ever

11  spoke to Ryan Ames or Ryan Miskowits?

12      A.   Ryan Miskowits, yes.

13      Q.   Okay.  How about Ryan Ames, ever meet him,

14  ever talk to him?

15      A.   Don't believe so.

16      Q.   Okay.  If I sat down with your dad and

17  said give me Matthew's top three buddies, who do

18  you think your dad would name?

19      A.   My old neighbor.

20      Q.   Who's that?

21      A.   Joseph Stuckel (phonetic).

22      Q.   Stuckel?

23      A.   Stuckel.

24      Q.   Okay.  Where does he live, back in the old

                                                    51

1    neighborhood.

2        A.    Yes, sir.

3        Q.    Riverside?

4        A.    No, Edgebrook.

5        Q.    Okay.  Who else?

6        A.    Kyle Varney (phonetic).

7        Q.    Okay.  I've seen that name in your

8    interrogatories.

9        A.    And Ryan Miskowits.

10       Q.    Okay.  And your dad's met all three of

11   these?

12       A.    Yes, sir.

13       Q.    And does he like these three kids that are

14   your buddies?

15       A.    Yes, sir.

16       Q.    Are there any friends that your dad does

17   not like or would be a problem if he found out you

18   were hanging out with him?

19       A.    No, sir.

20       Q.    Okay.  Prior to August 30, 2007, you were,

21   what, a year out of high school?

22       A.    Yes, sir.

23       Q.    All right.  And you continued to treat

24   well Dr. Krupika on and off from about 7th grade

                                                      52

1    through high school?

2        A.    Yes, sir.

3        Q.    Do you know when the last time -- I may

4    have asked you this.

5              Do you know when the last time you saw

6    Dr. Krupika prior to August 30, 2007?

7        A.    No, sir.

8        Q.    Within a week, within a year, any idea?

9        A.    I cannot recall.

10       Q.    Okay.  How did you pay for her services

11   was it through insurance, mom's insurance, dad's

12   insurance?

13       A.    It's really not my field, so I could not

14   tell you.

15       Q.    But you understand she was compensated for

16   her time?

17       A.    I couldn't tell you.  I believe she would

18   be, I mean . . .

19       Q.    She didn't do it for free, right?

20       A.    You never know, maybe she did do it for

21   free.  I mean, she's a friend of mine, so . . .

22       Q.    Was she a friend of yours before you

23   started treating or did you develop a friendship

24   after you began treatment?

                                                    53

1       A.   Developed a friendship.

2       Q.   Okay.  Fair enough.

3            And during this timeframe that your mom

4   and I think you said your sister and you were

5   treating separately with Dr. Krupika, did that

6   continue off and on for all three of you through

7   high school?

8       A.   I never said my sister was treating.

9       Q.   Then I misunderstood that.  My fault.

10           Your mom and you, did that continue off

11  and on through high school for both of you?

12      A.   I don't know on my mother's part.  Yes,

13  with me.

14      Q.   Okay.  Where's your dad live today?

15      A.   Chicago, Illinois.

16      Q.   Same address as before?

17      A.   No, sir.

18      Q.   He's since moved, right?

19      A.   Yes, sir.

20      Q.   What's his address today?

21      A.   It's on Luna.  I don't know the exact

22  digits.

23      Q.   When did your dad move?

24      A.   I believe August '09.  I might be wrong.

                                                    54

1    It's around there, though.

2        Q.    Okay.  When did you move back in with your

3    mother?

4        A.    August '09.

5        Q.    At the time he moved?

6        A.    Yes, sir.

7        Q.    All right.

8        A.    He did not move yet.  It was like a week

9    before.

10       Q.    All right.  He was getting ready to move,

11   and his plan was he was moving to a new residence;

12   and then you were going back to mom's place?

13       A.    And school was starting, so . . .

14       Q.    Okay.  Why the reason for the switch from

15   Wright Junior College to Triton?

16       A.    It's closer and, yeah, it's closer.

17       Q.    Closer to mom's new residence?

18       A.    Yes, sir.

19       Q.    Prior to August 30, 2007, had you ever

20   been arrested before?

21       A.    No, sir.

22       Q.    Okay.  Since August 30, 2007, not

23   including this event, have you ever been arrested?

24       A.    No, sir.

                                              55

1    Q.    Where were you working in August 2007,

2    Edgebrook Golf Course still?

3    A.    Yes, sir.

4    Q.    Okay.  Where else?

5    A.    That's it.

6    Q.    And what were you doing for Edgebrook,

7    caddying?

8    A.    No, sir.

9    Q.    Okay.  What were you doing for them?

10    A.    Ranger, golf cart, I guess handler, inside

11    staff.

12    Q.    Pretty cush gig?

13    A.    I mean, you work, you know.

14    Q.    Paid by the hour?

15    A.    Yes, sir.

16    Q.    How many hours a week were you working?

17    A.    It would vary, so, I mean, at least five

18    days a week.

19    Q.    Oh, okay.  So 40 hours plus?

20    A.    Yes.

21    Q.    And in August 2007 you were at 40 hours

22    plus.  Was that a minimum wage job or close to it?

23    A.    I cannot recall.

24    Q.    Paid two times a month or weekly?

56

1       A.      Two times a month.

2       Q.      So usually 15th and 30th, right?

3       A.      I believe so.  It varies, you know.

4       Q.      Okay.  And when you were living with your

5   dad, did you have any expenses, car payment,

6   insurance payment, tuition payment, any expenses at

7   that time?

8       A.      Never owned a car.

9       Q.      Okay.  Did you have any expenses, bills,

10  things you had to pay?

11      A.      Cell phone bill.

12      Q.      Okay.  Your cell phone bill was your dime?

13      A.      Yes, sir.

14      Q.      Everything else was taken care of by

15  either your dad or mom or a combination of both?

16      A.      Once in a while I buy milk and bread, you

17  know.

18      Q.      But other than those incidentals?

19      A.      I didn't have any other bills.

20      Q.      Okay.  So other than the cell phone bill

21  and some incidentals along the way, the rest of the

22  income you were earning at that time would go to

23  pay for your, you know, your leisure, your spending

24  money?

57

1      A.    And I saved up because I put some money

2    towards my tuition.

3      Q.    Okay.  So you had a savings account I take

4    it with money in it?

5      A.    Yes, sir.

6      Q.    Okay.  Where did you bank, Citi Bank?

7      A.    At the time Chase.

8      Q.    Chase, I'm sorry.  That's what I meant.

9            And you had a check cashing card?

10     A.    Yes, sir.

11     Q.    All right.  That also acts as an ATM,

12   right?

13     A.    Yes, sir.

14     Q.    So am I right on the Chase check cashing

15   card, you can do an ATM or you can do a debit

16   against your checking?

17     A.    Yes, sir.

18     Q.    All right.  And did you have both a

19   checking account and a savings account?

20     A.    Yes, sir.

21     Q.    Okay.  And if it's like my card, you can

22   transfer funds from your savings to your checking

23   if you need to out of that check cashing card?

24     A.    Yes, sir.

58

1    Q.   Okay.  You knew Ryan Ames from high

2  school?

3    A.   Yes, sir.

4    Q.   All right.  In your first deposition you

5  said that he didn't graduate with you, and it

6  seemed that by the way you worded some of your

7  responses that maybe he was supposed to graduate

8  with you, but didn't?

9    A.   Yes, sir.

10    Q.   All right.  Was he your graduating class,

11  but didn't graduate?  Is that what I understand out

12  of your testimony?

13    A.   Yes, sir.

14    Q.   All right.  Why didn't Ryan graduate?

15    A.   I cannot recall.

16    Q.   You have no idea why he didn't graduate?

17    A.   Unless I answered it in the last

18  deposition, I cannot recall.

19    Q.   All right.  So did he enter Notre Dame

20  with you?

21    A.   Yes, sir.

22    Q.   All right.  Do you recall if he had any

23  discipline problems or any expulsions, suspensions?

24    A.   I cannot recall.

59

1     Q.   Okay.  Do you know what kind of student

2  Ryan was?

3     A.   I believe he was a good student.

4     Q.   Was he in classes with you?

5     A.   I cannot recall.

6     Q.   Okay.  Ryan Miskowits, did he go to school

7  with you?

8     A.   Yes.

9     Q.   Did he graduate with you?

10    A.   I believe, no, sir.

11    Q.   Okay.  He didn't graduate with you because

12  he wasn't in your graduating class; is that --

13    A.   No.  He was.

14    Q.   So both Ryan Ames and Ryan Miskowits,

15  neither one of them graduated with you, though they

16  were supposed to graduate with you; is that fair?

17    A.   I believe -- I believe so on Miskowits did

18  not graduate with my.  I might be wrong, though.

19  But, yes, they were supposed to graduate.

20    Q.   Do you know when Ryan Ames and Ryan

21  Miskowits did graduate?

22    A.   No, sir.

23    Q.   Do you know if they completed high school?

24    A.   No, sir.

60