CASE NO. _____ 08cv3131 _____

ATTACHMENT NO. _____ 5 _____

EXHIBIT _____ C part 2 _____

TAB (DESCRIPTION) _____

1      Q.   Do you know if they went off and got a GED

2   or anything of that nature?

3      A.   No, sir.

4      Q.   Okay.  All right.  I'm taking you back to

5   August 30, '07.  Talk to you about two more folks.

6   Denise Bilski (phonetic), who is she?

7      A.   My friend.

8      Q.   My understanding is she was your

9   girlfriend.  Little different than a friend; is

10   that accurate?

11      A.   Yes, sir.

12      Q.   All right.  Is she currently your

13   girlfriend?

14      A.   No, sir.

15      Q.   Tell me the period of time that Denise was

16   your girlfriend.

17      A.   I believe July of '07 until November of

18   '09.

19      Q.   Okay.  So a good little over two years you

20   guys dated?

21      A.   Yes, sir.

22      Q.   Ever talk about getting married?

23      A.   Yes, sir.

24      Q.   Okay.  Did you ever get engaged?

61

```
 1      A.   No, sir.

 2      Q.   What happened?

 3      A.   Nothing bad.  We're still friends.

 4      Q.   I didn't say anything bad?

 5      A.   We're on a little hiatus.

 6      Q.   The romance ended and --

 7      A.   Not at all, not at all.

 8      Q.   Who ended it?  Who stopped the girlfriend

 9   status?

10      A.   It was -- I don't know.

11      Q.   Well, if I sit down with Denise under

12   oath, what's she going to tell me?

13      A.   She might tell you I did.

14      Q.   Okay.  She might?

15      A.   Never know.

16      Q.   What was the reason for the split, if you

17   will?

18      A.   Nothing bad.

19      Q.   I'm not suggesting anything bad.  I'm just

20   trying to understand your life a little bit.

21   That's all.  You seeing someone else?

22      A.   No, sir, not at all.

23      Q.   Reason for the split?

24      A.   To be honest with you, I do not know, and
```

                                                        62

1    that's from my heart.

2       Q.   Okay.  How often do you talk to Denise

3    today?

4       A.   I have a class with her on Tuesday.

5       Q.   At Triton?

6       A.   Yes, sir.

7       Q.   What class do you have?

8       A.   Espanol.

9       Q.   Spanish, okay.

10          Is Denise dating anybody now?

11      A.   No, sir.

12      Q.   You guys are both single?

13      MR. FITZSIMMONS:  Let me put on the record a

14   standing objection to this line of questioning

15   which involves events that are at this point two

16   and a half years subsequent to the events of August

17   2007, and his relationship with this young lady now

18   is of little or no relevance to an inquiry as to

19   what happened in August of 2007.

20      MR. KOEHLER:  Well, that's what we're trying to

21   find out.

22      MR. FITZSI8MMOHNS:  I understand that.

23   BY MR. KOEHLER:

24      Q.   You did call Denise on the night of

                                              63

1  August 30, 2007, right?

2      A.   I cannot recall.

3      Q.   In your first deposition you told us that

4  you did.

5      A.   If I said it then, then that's what I said

6  on the record.  I cannot recall now.  I haven't

7  seen you guys since -- I don't know when the last

8  deposition was.

9      Q.   Did you read your deposition before you

10  came in today?

11     A.   No, sir.

12     Q.   Have you ever read your deposition?

13     A.   No, sir.

14     Q.   Have you read Debra Coleman's deposition?

15     A.   No, sir.

16     Q.   Have you read any of the depositions taken

17  in this case?

18     A.   No, sir.

19     Q.   Would you like a copy of them?

20     A.   Absolutely.

21     Q.   My point is, I'll get them made right now

22  and give them to you.  You can have them.

23     A.   Absolutely.

24     Q.   Denise Bilski, I'm trying to understand

64

1    the relationship because she's a component of this

2    because you had contacted her that night.  I

3    understand she's a girlfriend, and she's

4    represented by a lawyer, okay?

5          Where does Denise currently reside?

6    A.    Same address I gave you last deposition.

7    Q.    Okay.  She hasn't moved?

8    A.    No, sir.

9    Q.    Okay.  Did you go to high school with

10   Denise?

11   A.    No, sir.

12   Q.    Where did you meet her?

13   A.    Edgebrook Golf Course.

14   Q.    Okay.  What high school did she go to?

15   A.    Lane Tech.

16   Q.    Who's Laura Fuller (phonetic)?

17   A.    Lauren Fuller?

18   Q.    Who's that?

19   A.    An old friend.

20   Q.    Was she ever a girlfriend?

21   A.    She might say we dated.  I don't really

22   believe we ever dated, but I guess you could say

23   we, you know, we were close like that.

24   Q.    All right.  She may have confused some

                                                    65

```
 1   incidences of dating and maybe was a little more of

 2   of a romantic friendship?

 3       A.   Yes, sir.

 4       Q.   All right.  In August of 2007 was Lauren

 5   at that point somewhat of a romantic friend, if you

 6   will?

 7       A.   No, sir.

 8       Q.   Okay.  Did the romantic part of it develop

 9   after August of '07 or is that something that

10   happened before?

11       A.   Before.

12       Q.   And you through these romantic events you

13   guys stayed friends?

14       A.   Yes.

15       Q.   Is she a friend today?

16       A.   I haven't hung out with her in a long

17   time.

18       Q.   Okay.  When's the last time you talked to

19   Lauren Fuller?

20       A.   A week ago.

21       Q.   Okay.  What was the occasion for the call?

22       A.   She believes that I don't -- hate is a

23   strong word.  She believes that I hate her because

24   of our -- we stopped hanging out, and I just wanted
```

66

1    to tell her I don't hate her and everything's cool.

2         Q.    Okay.  So her perception of the reason you

3    guys kind of went down your different paths, she

4    thinks you have some type of hatred toward her?

5         A.    Yes, sir.

6         Q.    Do you have any understanding why

7    Miss Fuller would have that belief?

8         A.    Well, I got a new girlfriend so I kind of,

9    you know . . .

10        Q.    New girlfriend's not going to be really

11   cool with hanging out with an old --

12        A.    I would not say that, but, I mean, you

13   never know.

14        Q.    All right.  Where does Lauren Fuller live?

15        A.    I do not know.

16        Q.    How you getting ahold of her, cell phone?

17        A.    Yeah, yeah.

18        Q.    I presume you called her on her phone.

19   It's her cell phone, right?

20        A.    I believe it's her cell phone.

21        Q.    You have a number for her?

22        A.    Yes, sir.

23        Q.    Okay.  You also called -- you told us in

24   your prior deposition that you called Lauren Fuller

                                                    67

1   that evening, too; is that accurate?

2       A.   Yes, sir.

3       Q.   While you were at Notre Dame High School

4   did you ever treat with any school counselors?

5       A.   What do you mean by that?

6       Q.   You know, some schools have counselors

7   that you can meet with if there's any issues going

8   on in high school.

9       A.   No.

10      Q.   Okay.

11      A.   No, sir.

12      Q.   Did you have a counselor assigned to you

13  at Notre Dame High School?

14      A.   Yes, sir.

15      Q.   Who was your assigned counselor?

16      A.   Ann Martin.

17      Q.   Okay.  Did you get along with Miss Martin?

18      A.   Absolutely.

19      Q.   Okay.  Prior to August 30 of 2007 did

20  Dr. Krupika ever prescribe any medicine to you?

21      A.   No, sir.

22      Q.   Okay.  Following August 30 of 2007 did

23  Dr. Krupika ever prescribe any medicine to you?

24      A.   No, sir.

68

1    Q.   All right.  Have you ever taken any

2  antidepressants, antianxiety or any medicines for

3  any emotional issues you had?

4    A.   No, sir.

5    Q.   All right.  Back in August of 2007 did you

6  have a primary physician that you treated with for

7  any ailments?

8    A.   I believe Dr. Gelvez (phonetic), that was

9  a pediatrician.

10    Q.   Okay.  Prior to August 30, 2007, did

11  Dr. Krupika ever give you a diagnosis or anything,

12  say, well, you're suffering from depression or

13  separation anxiety?

14    A.   I cannot recall.

15    Q.   Okay.  What was her recommended treatment

16  for you prior to August 30, 2007, when you were

17  treating with her?  What was the plan, every month,

18  every two weeks, whenever you felt like it?  How

19  did the sessions end?

20    A.   Have a good one, talk to you later.  We

21  never -- it varied.  I cannot tell you.

22    Q.   Sometimes you'd set another appointment,

23  sometimes you would leave it open?

24    A.   Yes, sir.

69

1 Q. Okay.  If you were having trouble, you

2 would see her; is that fair?

3 A. Yes, sir.

4 Q. All right.  And if you were doing okay, it

5 was fair to draw from that if you went six months

6 without seeing her during that period you seemed to

7 be doing okay?

8 A. No.  Even if I was doing good, I still go.

9 She's a friend of mine.  Even if I was doing good.

10 Q. You would go visit her on a friendship

11 level.

12 A. Sometimes, yeah.

13 Q. Okay.

14 A. But we talk about everything, you know.

15 Q. When you were living with your dad, did he

16 ever give you spending money or help you?

17 A. I cannot recall.

18 Q. Ever?

19 A. Yeah, I mean . . .

20 Q. If you needed 40 bucks or something?

21 A. I had a job, so I never would go and ask

22 for money.

23 Q. It sounds to me like you had a job that

24 you got some good hours at?

70

1      A.   Yes, sir.

2      Q.   So you basically had enough spending money

3   to support yourself; is that fair?

4      A.   Well, not if I moved out, but yeah.  Yes,

5   sir.

6      Q.   For the things you wanted to do, you had

7   money for?

8      A.   Yes, sir.

9      Q.   Okay.  And you've never owned a car even

10  up until today?

11     A.   Yes, sir.

12     Q.   Okay.  You have a current valid Illinois

13  driver's license?

14     A.   Yes, sir.

15     Q.   You've had that since you were 16?

16     A.   No, sir.

17     Q.   Okay.  When did you get your driver's

18  license?

19     A.   18 years old.

20     Q.   Okay.  And has your driver's license

21  between the time you got it until now ever been

22  suspended or revoked?

23     A.   No, sir.

24     Q.   What was the reason between 16 and 18 that

71

1    you didn't get your license?

2        A.    Laziness, never signed up for driver's ed

3    I guess you could say.

4        Q.    When did you take driver's ed in high

5    school?

6        A.    We didn't have a driver's ed.  I never

7    took it.

8        Q.    You had to take it outside of high school?

9        A.    Yes, sir.

10       Q.    Who did you go to, like a Lynn Skadoodle?

11       A.    I never went.  Once you're 18 you don't

12   have to go to a driver's ed class, you just go

13   straight to the DMV.

14       Q.    I did not no that.

15       MR. FITZSIMMONS:  Neither did I.  I would have

16   saved $800 if I had known.

17       MR. KOEHLER:  It scares me.  I can hold my kid

18   off until 18, and then he's on his own.

19   BY MR. KOEHLER:

20       Q.    Did your parents, either your mother or

21   your father, at all restrict you to go get a

22   driver's license up until you turned 18?

23       A.    Absolutely not.

24       Q.    Did they know you were going to the DMV to

                                                        72

1  get your driver's license at 18.

2     A.  Yes, sir.

3     Q.  Did any one of them have to drive you?

4     A.  My father.

5     Q.  All right.  Did he give you any fatherly

6  advice about the freedom of having a driver's

7  license?

8     A.  No, sir.

9     Q.  What did he say to you at the time you're

10 driving to go get your license?

11    A.  Well, you should have your license.  I

12 should have got it when I was 16 in case something

13 ever happened and I had to drive, you know.

14    Q.  Sure.

15       So no other reason for why you didn't have

16 that license between 16 and 18 other than sheer

17 laziness?

18    A.  Well, don't make it sound like I'm a lazy

19 person, but it just really wasn't a need to, you

20 know.  I had a bicycle.  I was working close right

21 by the house.  I mean, you know, no urge to get it.

22    Q.  I take it you had access to cabs, too?

23    A.  Yes, and a bus.

24    Q.  Okay.  So you understood how to take

                                                     73

1    public transportation at that time, and that's how

2    you got around?

3        A.    Yes, or I would walk.

4        Q.    But either walk or public transportation?

5        A.    Throw it up in the air, yes.

6        Q.    All right.

7        MR. KOEHLER:  You want to take a two-minute

8    break?

9        MS. ROSEN:  Sure.

10                      (Whereupon, a short recess was

11                      taken.)

12   BY MR. KOEHLER:

13       Q.    I think we're done with that part.  We're

14   going to go on to some of the issues at hand.  And

15   bear with me because I'm going to try not to

16   repeat, and I'm going to be jumping a little bit

17   here.  So it's going to be a question here, a

18   question there.

19            First thing, I want to talk about is you

20   worked -- I just want to the get the lay of the

21   land.  You worked that day at Edgebrook?

22       MR. FITZSIMMONS:  The day we're talking about

23   is?                                    - -

24

                                                    74

1    BY MR. KOEHLER:

2        Q.    August 30, 2007.  Just trying to get our

3    bearings here.

4        A.    Whatever I said in the last deposition.

5        Q.    Just so you realize, I'm not trying to

6    contradict you and impeach you with your last dep.

7    I'm just trying to get a foundation to start our

8    discussion.

9              Do you recall sitting here today did you

10   work at the Edgebrook Golf Course?  That's all I'm

11   looking for.

12       A.    I believe so in the morning.

13       Q.    Very good.

14             Let's talk about when did you get the

15   Chicago Bears tickets from your dad?  Was it that

16   day?  Was it a week ago, saying, hey, I got two

17   tickets?

18       A.    We had season tickets.

19       Q.    These were your dad's season tickets.

20       A.    Yeah.  He split them with someone I

21   believe.

22       Q.    Now, do you know if they were four and

23   they split them or there was two?  Do you

24   understand my question?

75

1    A.   Yeah.

2    Q.   Where you split the block, and then you

3  take two and I take two for each game.

4    A.   Yeah, it was like that.

5    Q.   Who was his buddy that he split these

6  season tickets with?

7    A.   I do not know.

8    Q.   But it's a buddy that you would know.  If

9  your dad said, it's Mike Smith, you'd say, yeah,

10  that's his buddy?

11    A.   Not necessarily.  My dad knows a lot of

12  people, so . . .

13    Q.   But you understood that he was giving you

14  his season tickets that he shared with a friend,

15  right?

16    A.   Yes.

17    Q.   All right.  And was it a friend that he

18  was on the Chicago Police Department with, was that

19  your understanding?

20    A.   I believe so.

21    Q.   Okay.  Fair enough.

22       The seats, to skip ahead a little bit,

23  when you and Ryan were there in the first quarter,

24  do you know if you were sitting next to his buddy

76

1    or who was in the seats on either side of you to

2    make up the four?

3        A.    It was a preseason game so there was a lot

4    of empty seats.  They were never up there.

5        Q.    My question was, was there anybody on

6    either side of you?

7        A.    No one was, no.

8        Q.    Okay.  And just so I think we're clear, if

9    I understand from the ticket you -- this is the

10   color, right here, right?

11       A.    Absolutely.  428 I think it was or 429.

12       Q.    We'll get to this later, but the ticket we

13   have for you is Section 429, Row 20, Seat 24.  Does

14   that sound accurate?  It's not a trick question.

15       A.    Yeah.

16       Q.    You were up in the higher levels?

17       A.    Yes, sir.

18       Q.    All right.  When did your dad give you the

19   tickets, not physically, when did he said, hey, I

20   got these two tickets, the season tickets, why

21   don't you use them?

22       A.    I do not recall.

23       Q.    Was it that day or was it some time

24   before?

                                                    77

1     A.   Could have been from the point he got them

2  to, I mean . . .

3     Q.   How long prior to 2007 had your dad been a

4  season ticket holder?

5     A.   Few years.

6     Q.   He's a Bears fan?

7     A.   Yes.

8     Q.   Like some of us, is he a passionate Bears

9  fan?

10     A.   Not as passionate as I am, but, yeah, of

11  course.

12     Q.   Okay.  In Chicago sports is football is

13  his favorite sport?

14     A.   I believe baseball.

15     Q.   Sox fan?

16     A.   Yes, sir.

17     Q.   Okay.  Good man.  I don't know what that

18  other team is up north.

19         And am I correct he had season tickets for

20  a couple years before, but this was the first time

21  you had been to a Bears game using his tickets?  I

22  think that's what you told us.

23     A.   I always went with him.

24     Q.   Oh, you did go with him?

78

1  A. Yeah, all the time.

2  Q. Okay.  So prior to this you had been in

3 these seats with him at the game?

4  A. Yes, sir.

5  Q. How many times had you attended a Bears

6 game prior to August 30 of 2007?

7  A. 15 to 20 times I believe.

8  Q. Okay.  Your dad I take it didn't let the

9 seats go empty when he had the tickets, he used

10 them.

11  A. Yes.

12  Q. Okay.  Was this the first time he let you

13 take a friend versus you and him going?

14  A. It was never like, you're not allowed, I'm

15 going.

16  Q. No, I'm not saying that.

17   Is this the first time you brought a

18 friend and it wasn't your father?

19  A. Yes, sir.

20  Q. And did your dad know which friend you

21 were bringing to the Bears game?

22  A. No, sir.

23  Q. All right.  Did he ask you who you would

24 be bringing?

79

1      A.    I was going to take my girlfriend.

2      Q.    All right.  What happened between the

3   going to take Denise to taking Ryan?

4      A.    I don't recall.

5      Q.    Okay.  Any particular reason at all that

6   Denise didn't attend with you?

7      A.    I cannot recall.

8      Q.    Okay.  Hold on.

9            It was a Thursday night game?

10     A.    Yes, sir.

11     Q.    All right.  And did your dad I take it --

12  I take your dad had to work?

13     A.    The next morning, I believe so.

14     Q.    Okay.  So probably the reason why you got

15  the tickets and your dad didn't go with you?

16     A.    It was also preseason.  I'm sure if it was

17  a regular season, maybe he would have went.

18     Q.    Okay.  When your dad and you would attend

19  the Bears game on those 15 to 20 games before

20  August 30, 2007, how did you get to the games?

21     A.    We would drive, park and walk across the

22  bridge at 18th Street and right there.

23     Q.    Okay.  Did you ever have the occasion to

24  take the Blue Line or public transportation with

80

1    your dad into the city so you didn't have to deal

2    with the parking?

3        A.    We would park at the police station.  But

4    I don't recall -- I don't recall taking a train.

5    It might have happened, might not have.

6        Q.    Okay.  Your dad paid for the season

7    tickets.  You didn't have to pay for any of it,

8    right?

9        A.    Yes, sir.

10       Q.    All right.  When did you let Ryan know

11   that you were inviting him to the Bears game?

12       A.    I cannot recall.

13       Q.    Okay.  The game was a night game?

14       A.    Yes, sir.

15       Q.    7:00?

16       A.    I believe so, 7:00, 7:30.

17       Q.    So they played Cleveland, Thursday night

18   game?

19       A.    Yes, sir.

20       Q.    What was the game plan?  You and Ryan,

21   what was the game plan?  Why don't you walk me

22   through it a little bit?

23       A.    Take the train down there.

24       Q.    Okay.  Walk me through.  What were you

81

1    guys supposed to do, meet up and take the Blue Line

2    down, go to the game, walk me through it.

3        A.   That was it.

4        Q.   Well, put it this way, the night didn't

5    end the way it was planned?

6        A.   No, sir.

7        Q.   So what I want to know is what was

8    supposed to happen?

9        A.   Watch the whole game and then come back

10    home.

11        Q.   All right.  And the game would have end

12    about 10:00, right?  Three-hour game?

13        A.   Overtime, could have ended at any time.

14        Q.   Was it an overtime game?

15        A.   I don't know.  I didn't see.  I don't know

16    what the result was.

17        Q.   Your dad would expect you home I take it

18    after the game?

19        A.   Yes, with train traffic, yeah, give a

20    little time.  Yeah.

21        Q.   I'm not saying five minutes, but point is

22    he would expect Point A to Point B?

23        A.   Yes, sir.

24        Q.   Again having a father of a marine

                                                    82

1    background, I've heard the Point A to Point B,

2    meaning when you're done with the game you're going

3    back to the Blue Line and heading home, fair

4    enough?

5        A.   Yes, sir.

6        Q.   And was the intent to take the Blue Line

7    back out to your home?

8        A.   Yes, sir.

9        Q.   All right.  And if I understand your

10   testimony earlier, the earlier deposition, you were

11   about a block and a half from your home where the

12   Blue Line comes in?

13       A.   Not a block, probably a mile.

14       Q.   A mile.  How long -- take you 15 minutes

15   to walk?

16       A.   13 minutes.

17       Q.   13 minutes, fair enough.

18            But the intent at roughly let's call it

19   10:30 at night, you're okay walking a mile to your

20   house?

21       A.   Yes.

22       Q.   Okay.  And your dad's shift at that time

23   was what?

24       A.   5:00 to 2:00 I believe.

                                              83

1      Q.    5:00 at night?

2      A.    No, no, 5:00 in the morning.

3      Q.    Until 2:00?

4      A.    In the afternoon.

5      Q.    Okay.  So when you would get home from the

6  game you would expect him to be there?

7      A.    Yes, sir.

8      Q.    All right.  Now, help me out.  When your

9  dad gets home at 2:00, you know, that's an early

10  start for him.  Does he go to sleep or does he have

11  a regular night and then head to bed at 9:00,

12  10:00?

13      A.    Yes, sir.

14      Q.    What time does he get up in the morning?

15      A.    4:00, I don't know.

16      Q.    Some time to have get to work by 5:00?

17      A.    Yeah.

18      Q.    Okay.  Your expectation -- strike that.

19            The expectation and the game plan was

20  after the game you and Ryan would both take the

21  Blue Line back to the area and then walk home?

22      A.    Yes, sir.

23      Q.    Did Ryan have a car?

24      A.    I cannot recall.

84

1      Q.   All right.  How close did Ryan live to the

2  Blue Line, 10 minutes?

3      A.   About the same time.

4      Q.   Okay.  So both of you were planning to

5  walk home.  Nobody was picking you up or doing

6  anything like that?

7      A.   No, sir.

8      Q.   Okay.  Did you have permission from your

9  dad to do anything else after the game?

10     A.   I didn't have any plans.

11     Q.   But my point was that your understanding

12  is that your dad expected you to get home after the

13  game?

14     A.   Well, if I told him I was going to do

15  something else, I mean . . . .

16     Q.   You would call him?

17     A.   Yes, sir.

18     Q.   All right.  You would let him know?

19     A.   Yes, sir.

20     Q.   That was the protocol, if you were going

21  to change plans, you would call him and say, hey,

22  Dad, by the way after the game we're going to get a

23  piece of pizza over at this place?

24     A.   Well, not like directly -- if it's on the

85

1    way to the train, there's really no reason to call

2    him.  I'm still taking that way back.  Piece of

3    pizza wouldn't take that long.

4        Q.   My point if there's a -- if you get

5    sidetracked and say, hey, we're going to hang out

6    here for an hour or two, you would let your father

7    know that?

8        A.   Most likely.

9        Q.   Okay.  Would you expect your dad to be

10   waiting up for you?

11       A.   No, sir.

12       Q.   He would go to sleep?

13       A.   Yes, sir.

14       Q.   Okay.  Was there any understanding or rule

15   within the house that you lived at with your dad

16   about, you know, if there was a problem calling him

17   after he went to bed?

18       A.   No.  He never addressed anything.  I mean,

19   if there was a problem, maybe I should have called,

20   yeah.

21       Q.   For example, in our house there was no

22   calls after 10:00 unless there was something wrong.

23   That was just the rule.  Phones shut down at 10:00.

24   That's what I want to understand for your house.

                                                    86

1    Similar concept?

2       A.   No.  I cannot recall.

3       Q.   Okay.  Does your dad have a car?

4       A.   Yes, sir.

5       Q.   Okay.  If you needed a ride home and

6    called your dad for whatever reason, would there

7    have been any problems or difficulty getting him to

8    come downtown and picking you up?

9       A.   Absolutely not.

10      Q.   No -- and I want to know your testimony on

11   this.  No reservations at all to call your dad and

12   say, hey, Dad, plans get derailed; I need a ride

13   home?

14      A.   I'm old enough to, you know, get my own

15   way home.  Maybe if I broke my leg or something

16   like that I could call him up for a ride, but

17   there's no really -- it's not like I'm 12 years

18   old, pick me up, Dad, please.

19      Q.   No.  My question, though, is, did you have

20   any reservations at all or expect any repercussions

21   that, you know, you were prevented from calling

22   your dad for any reason to say, Dad, I need a ride

23   home, for whatever reason it may be?

24      A.   That I would be afraid to call him?

87

1    Q.   That he would be angry or --

2    A.   Absolutely not.

3    Q.   Okay.  No question, free to pick up the

4    phone, and your dad would be very accommodating?

5    A.   Well, if he was sleeping, he probably be

6    like, yeah, all right, you know, eventually come

7    and get me, you know.

8    Q.   Okay.  Did you have anything to eat when

9    you met up with Ryan before you took the Blue Line

10   downtown?

11   A.   I cannot recall.

12   Q.   All right.  Did Ryan have a cell phone,

13   too?

14   A.   Yes.

15   Q.   Okay.  Did you have his number at that

16   time?

17   A.   Yes.

18   Q.   All right.  Your cell phone, what kind of

19   cell phone did you have back in August of '07?

20   A.   The company or?

21   Q.   Yeah.  What was it?

22   A.   I believe AT&T.

23   Q.   And you paid your cell phone bills.  Who

24   was it with, who did you pay?

88

```
 1      A.    I believe that was with my mother.

 2      Q.    What was with your mom?

 3      A.    I believe like that was her bill package

 4  like thing.

 5      Q.    You were part of --

 6      A.    I believe so.

 7      Q.    You were part of your mom's cell phone

 8  package?

 9      A.    Yeah, you know how there's like a family

10  plan or something like that.

11      Q.    Yeah.  Okay.

12            Does your mom have the same cell phone

13  today as she had back then?

14      A.    Yes, sir.

15      Q.    Okay.  Same number I take it?

16      A.    Yes, sir.

17      Q.    Was your sister on that plan, too?

18      A.    I cannot tell you.

19      Q.    All right.  And you no longer have that

20  cell phone or that cell phone today, that cell

21  phone number today?

22      A.    No, sir.

23      Q.    Different number today?

24      A.    Yes, sir.
```

89

1      Q.   Is it still with your mom's plan?

2      A.   No, sir.

3      Q.   Okay.  Did you ever meet -- strike that.

4           Who did Ryan live with at that time?

5      A.   His grandparents.

6      Q.   Okay.  Did you go to Ryan's house before

7  you went to the Blue Line?

8      A.   I cannot recall.

9      Q.   What do you recall?  When you were meeting

10 up with Ryan before you took the Blue Line, what do

11 you recall?

12     A.   Whatever I said in the last deposition.  I

13 do not remember.

14     Q.   I'm not trying to trick you.

15     A.   I'm not saying you are.  That's a long

16 time, sir.  A lot of stuff happens, events happen,

17 and I tend to forget stuff.

18     Q.   Okay.  What -- and that's why I'm asking

19 you this question.  What do you recall?  I

20 understand --

21     A.   Taking the train.

22     Q.   I'm asking you a lot of questions that you

23 don't recall.  Now I'm going to ask you to try to

24 avoid 13 more questions, what do you recall?  Tell

                                                    90

1    me what you recall and where you hooked up with

2    Ryan, what you did before you took the Blue Line

3    down to Soldier's Field?

4    A.   Harlem and Higgins.

5    Q.   Okay.

6    A.   And then we took the train.

7    Q.   Did you meet at his house?  Did you meet

8    at --

9    A.   I do not recall.

10    Q.   Do you recall meeting his grandparents?

11    A.   That day or before?

12    Q.   Yeah.  When you hooked up with him -- I'm

13    trying to trigger your memory.  Do you recall

14    meeting his grandparents that day?  Did you speak

15    to his grandparents when you hooked up with Ryan or

16    did you hook up on a corner at Harlem and Higgins?

17    A.   I do not recall.

18    Q.   Okay.  The Blue Line, that I'm not

19    familiar with.  What does it cost to get downtown

20    on the Blue Line?

21    A.   2.25.

22    Q.   Okay.  And is that the cost no matter what

23    time and what line you take?

24    A.   Yes, sir.

91

1    Q.   Did you have -- there's a CTA card that

2    you can swipe, right?

3    A.   Yes, sir.  You have to -- in order to get

4    on the train you have to purchase the card, put it

5    in.

6    Q.   When you purchase the card, can you

7    purchase a two-way?

8    A.   You got to put more money in.

9    Q.   Did you buy a two-way when you bought your

10   card to go down to Soldier's Field?

11   A.   I don't believe so.

12   Q.   Why not?

13   A.   I don't know if I did or if I didn't.  I

14   just -- I don't believe I did.

15   Q.   But your intent I think what you told

16   us --

17   A.   Was to come back.

18   Q.   So why wouldn't you buy a two-way?

19   A.   Well, how it is at Harlem, okay, say

20   you're getting on the train, the bell will go off;

21   and then it will say, train to Loop, west side.

22   And if the train's coming, you want to get on it.

23   You don't want to wait an extra -- it could be like

24   18 minutes you could wait.  So it's like the bell

                                                    92

1    went off, you put the money in and take off.

2       Q.   But does it take longer to get a two-way

3    versus a one-way?

4       A.   No.  See, the whole thing is, say I'm

5    coming back from downtown, they have the same box

6    where you put the money in.  So it doesn't matter

7    if you pay, it's not like a two-way thing.  You're

8    still going to have to put money in.  You pay.

9    There's no such thing as a two-way.  You pay next

10   time you come.

11      Q.   Did you have any plans to hook up with

12   Denise after the game?

13      A.   I do not recall.

14      Q.   Did you have any plans to look up with

15   Lauren after the game?

16      A.   Do not recall.

17      Q.   And what I'm getting at, was there any

18   reason why you may not have wanted to pay for a

19   two-way ticket at the time you boarded the Blue

20   Line inbound to Chicago?

21      A.   No, sir.

22      Q.   Okay.  You called both of those females

23   after the game, right?  After you left the stadium,

24   let me put it that way to you.

                                                    93

1    A.    Yes, sir.

2    Q.    How much money did you bring with you to

3  go downtown?

4    A.    I do not recall.

5    Q.    You did have your ATM card on you?

6    A.    Yes, sir.

7    Q.    All right.  I think you said you had dog

8  tags?

9    A.    Yes, sir.

10    Q.    These dog tags had your name on it, right?

11    A.    Yes, sir.

12    Q.    All right.  Where are they from?

13    A.    When I was 9 years old my cousin in the

14  Air Force worked in an identification area for the

15  Air Force in Tennessee, and she made them for me.

16    Q.    Okay.  You had the tickets, right, the

17  Bears tickets?

18    A.    Yes, sir.

19    Q.    And then you had a California driver's

20  license that you talked about in your deposition?

21    A.    Yes, sir.

22    Q.    All right.  Did you bring your Illinois

23  driver's license with you?

24    A.    I do not recall.

94

1       Q.   Okay.  The California driver's license

2    that you talked about in your first deposition,

3    where did you get it?

4       A.   Some guy that made fake IDs.

5       Q.   Okay.  What was the guy's name?

6       A.   I really do not know that name.

7       Q.   How long had you had it?

8       A.   I don't recall.

9       Q.   More than a year?

10      A.   No.

11      Q.   Did your mom and dad know you had a fake

12   ID?

13      A.   No, sir.

14      Q.   All right.  Now, I was 19 once, too.  Fake

15   ID s at that age is for one purpose, to be able to

16   purchase alcohol when you're not 21, right?

17      A.   Yes, sir.

18      Q.   All right.  How many times had you had the

19   opportunity to use the California driver's license?

20      A.   I do not recall.

21      Q.   Did you use the California driver's

22   license to purchase any alcoholic beverages at

23   Soldier's Field?

24      A.   No, sir.

                                                    95

1    Q.    Okay.  Did you use the California driver's

2    license at all on August 30, 2007, throughout that

3    entire day at all to purchase any alcoholic

4    beverages?

5    A.    I do not recall.

6    Q.    From the time you were at work until you

7    left, Soldier's Field and all the events that

8    happened afterwards and your stopoff at Bennigan's

9    and so forth, did you ever use that California

10   driver's license to purchase alcoholic beverages?

11   A.    I don't recall.

12   Q.    Could have, may not have, you don't

13   recall?

14   A.    Most likely no.

15   Q.    Why do you say most likely no?

16   A.    There was really not -- really no urge to.

17   Q.    You did have a couple beers that day,

18   though, right?

19   A.    Whatever I said in the last deposition.

20   Q.    What you said in the last dep is you had a

21   couple beers with Ryan Ames, Miller Lights; and I

22   think you said he had a six pack.  You drank three

23   beers in about 45 minutes, headed downtown.  Is    --

24   that the last alcoholic beverage you had that

96

1  evening?

2      A.   Yes, sir.

3      Q.   Okay.

4      A.   Sorry, this is going back.  This is, you

5  know, that was an afternoon day, and then a lot of

6  stuff happened after that, so that's, you

7  know . . .

8      Q.   Is that clouding your recollection of

9  these events?

10     A.   Not really.  I mean, you're getting

11  sophisticated with how many six pack of beers,

12  whatever was in the last deposition.  I answered a

13  lot of these questions earlier.

14     Q.   I'm not trying to --

15     A.   I'm not saying you are, but it's already

16  on there; and I'm not trying to cop an attitude

17  with you, sir, but all these questions I've, I

18  mean . . .

19     Q.   Trust me.  What I'm asking, you didn't

20  answer.  I wouldn't ask it if you answered it.  I'm

21  not trying to trick you.  What I am trying to

22  understand, you told the prior counsel what you

23  drank with Ryan.  What wasn't asked is, did you

24  drink anything afterwards, after your beer before

97

1    you got on the Blue Line.

2        A.    No, sir.

3        Q.    And the woman that you went to visit at

4    Bennigan's her name was Haven?

5        A.    Yes, sir.

6        Q.    Did Haven serve you any alcoholic

7    beverages at Bennigan's?

8        A.    No, sir.

9        Q.    Haven did serve you though, right?

10       A.    I cannot recall.

11       Q.    And you had been at that restaurant

12   before, correct?

13       A.    Yes, sir.

14       Q.    And you had known Haven from the prior

15   times you went to that restaurant, right?

16       A.    Yes, sir.

17       Q.    And Haven would recognize a photograph of

18   you, correct?

19       A.    I do not . . .

20       Q.    Would you be surprised if Haven was able

21   to identify you in a photograph?

22       A.    No.

23       Q.    Would you be surprised if Haven recalled

24   you?

                                              98

1    A.   No.  I mean, I probably met her a few

2  times.  I mean, she's a waitress in there.  I would

3  go in there and take the train to Indiana, so . . .

4    Q.   And you'd talk to her?

5    A.   Yes, sir.

6    Q.   Yeah.

7    So you wouldn't be surprised -- my

8  question is, you wouldn't be surprised if she

9  recalled who you were?

10    A.   Not at all.

11    Q.   Okay.  Did you ever get a phone number

12  from her?

13    A.   I do not recall.

14    Q.   Did you ever drink any alcoholic beverages

15  at Bennigan's when you went there?

16    A.   I do not recall.

17    Q.   Did Haven ever serve you any alcoholic

18  beverages at any time that you were at Bennigan's

19  including August 30, 2007?

20    A.   No, sir.

21    Q.   Okay.  Where was the pay phone located in

22  the Bennigan's restaurant that you testified

23  earlier that you used?

24    A.   I do not recall.

99

1    Q.   All right.  Was it located inside the

2    restaurant?

3    A.   It might have been.  It might have been

4    right on the street.

5    Q.   If I understand your testimony from

6    earlier, when you exited the stadium it's your

7    sworn testimony that you then borrowed a cell phone

8    from somebody outside the stadium and called Ryan

9    Ames?

10   A.   Yes, sir.

11   Q.   And you spoke to Ryan Ames?

12   A.   Yes, sir.

13   Q.   All right.  Wasn't a voicemail?

14   A.   No, sir.

15   Q.   Okay.  And Ryan Ames spoke to you, and

16   you'd have no reason to believe that it was anybody

17   other than Ryan Ames talking to you, right?

18   A.   Yes, sir.

19   Q.   All right.  And you'd expect Ryan to

20   recall this conversation?

21   A.   I don't -- no, sir.  I mean, he might.  He

22   might not.

23   Q.   Do you have any reason to believe that he

24   would or would not recall this conversation?

100

1    A.   No reason, I just, you know . . .

2    Q.   Okay.  What I don't -- what I want to

3  understand is you had no problems when you left

4  Soldier's Field to ask somebody to use their cell

5  phone.  Cell phone is pretty prevalent in 2007.

6  Any reason why you chose to use a pay phone versus

7  simply asking somebody if they had a cell phone?

8    A.   Well, right when I walked out of the

9  stadium there was no pay phones around.

10    Q.   Okay.  Did you ask Haven at Bennigan's to

11  use her cell phone?

12    A.   No, sir.

13    Q.   You knew she had a cell phone, correct?

14    A.   No, sir.

15    Q.   Okay.  And I want to make sure I'm clear.

16  You're confident in your recollection that it was a

17  cell phone that you called Denise and Lauren in

18  from Bennigan's?

19    A.   A pay phone?

20    Q.   Pay phone, yes.

21    A.   Yes.

22    Q.   Okay.

23    A.   I don't know if it was in or outside of

24  Bennigan's.

101

1    Q.   And Bennigan's had TVs in the restaurant?

2    A.   By the bar I believe.

3    Q.   And they had the Bears game on that night,

4 correct?

5    A.   I don't recall.

6    Q.   Where did you sit?

7    A.   In the restaurant?

8    Q.   Were you in the restaurant, did you sit at

9 the bar, with where did you sit in the facility?

10    A.   In a booth.

11    Q.   Okay.  And how did you pay?  I understand

12 you said you ate?

13    A.   Yeah.

14    Q.   How did you pay for it?

15    A.   I don't recall.

16    Q.   Can you use your check cashing card to pay

17 for a meal?

18    A.   Yes, sir.

19    Q.   Okay.  So there would be bank records that

20 would exist in August of 2007 that would be able to

21 verify whether or not you had a charge from

22 Bennigan's on Michigan Avenue, correct?

23    A.   Yes. - -

24    Q.   So certainly if you used your check

102

1    cashing card there would be a record of that?

2        A.   Yes.

3        Q.   All right.  Otherwise cash, and I take it

4    you don't have a receipt from Bennigan's?

5        A.   Yes, sir.

6        Q.   True, you don't have a receipt from

7    Bennigan's?

8        A.   No, sir.

9        Q.   Okay.  Did Haven ever comp you?

10       A.   No, sir.

11       Q.   Okay.  So if Haven served you, fair enough

12   that you would get a bill; and you would pay for

13   those whatever you ordered?

14       A.   Yes, sir.

15       Q.   Okay.  What did you -- if I recall

16   correctly, you said you ordered cheeseburger with

17   fries and a Coke, right?

18       A.   Yes, sir.

19       Q.   All right.  Do you recall what that cost

20   about?

21       A.   No, sir.

22       Q.   Less than 10 bucks?

23       A.   I cannot recall.

24       Q.   Okay.  Who's Mike McMahon?

                                                  103

1    A.   A buddy of mine.

2    Q.   Oak.  Did you have his cell phone on

3 August 30, 2007, his cell phone number?

4    A.   I believe it was in the my contacts, yes.

5    Q.   How about Mike Barone (phonetic)?

6    A.   Yes.  These are kids I went to high school

7 with.

8    Q.   Right.  They're buddies of yours?

9    A.   Acquaintances, yes.

10    Q.   Do you distinguish between buddies and

11 acquaintances or --

12    A.   Well, I don't use the word buddy.  Buddy

13 is the same thing as an acquaintance.  Then there's

14 friends, you know, acquaintances.

15    Q.   And that's probably a better question.

16 How do you distinguish between a friend and an

17 acquaintance?

18    A.   Friend who's like really close to you and

19 you see all the time, and then acquaintance is a

20 buddy you once in a while hang out with.

21    Q.   Okay.  Ryan Ames in 2007, a friend?

22    A.   Acquaintance.

23    Q.   And he would be an acquaintance today?

24    A.   Yes, sir.

104

1    Q.    Okay.  Who's Kyle Varney?

2    A.    Childhood -- a friend, childhood friend.

3    Q.    Did you have his cell phone number?

4    A.    I don't recall if he had a cell phone at

5    the time.

6    Q.    Which friends in August 30 of 2007 had

7    cars, which buddies or friends or acquaintances had

8    cars or access to cars?

9    A.    Lauren Fuller, but -- Lauren Fuller and my

10   girlfriend.

11   Q.    How about Kyle, Mike McMahon or Mike

12   Barone?

13   A.    I don't -- I don't recall.

14   Q.    Okay.  Did any of your guy friends have

15   cars or access to cars in August of 2007?

16   A.    I don't recall.

17   Q.    If you needed a ride, is there anybody you

18   could call and try to get a ride?

19   A.    The two girls, yes.

20   Q.    Other than Denise and Lauren?

21   A.    No.  I never tried to use anyone for --

22   use any of the guys I guess.  Even if they did have

23   a car, I don't know, I didn't depend on them, you

24   know.

105

1    Q.   How far did Denise or Lauren, how far did

2  they live away from the city?

3    A.   11 miles I believe.

4    Q.   Okay.  So not too far?

5    A.   No.

6    Q.   Did they live close to your home where you

7  were living with your father?

8    A.   Yes, sir.

9    Q.   Bear with me.

10     When you got to the Bears game, had the

11  game started?

12    A.   I don't recall.

13    Q.   All right.  And I'm going to fast forward

14  a little bit.  My understanding at some point

15  midway through the first quarter you left your seat

16  with Ryan still there, and you were going down to

17  get some food?

18    A.   Yes, sir.

19    Q.   All right.  What were you going to get?

20    A.   They have a variety of food.  I didn't

21  have anything --

22    Q.   Popcorn or are we going to get a burger or

23  a hot dog, something little bit more of substance?

24    A.   Food.  Popcorn is really, you know,

106

1    like -- food, food, probably a burger.

2        Q.   You going to get a burger or --

3        A.   A burger most likely.

4        Q.   And you were getting something for Ryan,

5    too?

6        A.   Yes.

7        Q.   Did he give you money to get him something

8    or did you have him covered?

9        A.   I don't recall.

10       Q.   All right.  But certainly you went down

11   there with enough money to buy the food you were

12   going to buy?

13       A.   Yes.

14       Q.   Okay.  And you never -- if I understand

15   your testimony, you never did buy that food?

16       A.   Correct.

17       Q.   Is that right?

18       A.   Correct.

19       Q.   All right.  You were interrupted at some

20   point with another ticket holder at the Bears

21   stadium?

22       A.   Yes, sir.

23       Q.   All right.  What happened?

24       A.   I don't recall.

                                                    107

1    Q.   All right.  Did somebody come in contact

2    with you?

3    A.   Yes, sir.

4    Q.   All right.  And is it your testimony that

5    somebody was out of line with you?  You were

6    standing minding your own business, sitting in

7    line, waiting to get something to eat?

8    A.   Yes, sir.

9    Q.   All right.  What did this guy look like?

10   A.   I do not recall.

11   Q.   White, black, Hispanic, yellow?

12   A.   White, I believe.

13   Q.   How tall?

14   A.   I do not recall.

15   Q.   What was he wearing?

16   A.   I do not recall.

17   Q.   What color hair did he have?

18   A.   I do not recall.

19   Q.   What did he say to you, what did you say

20   to him?

21   A.   I do not recall.

22   Q.   Okay.  Did he in any way harmfully or

23   offensively touch you?

24   A.   I do not recall.

108

1      Q.    Did he ever come in physical contact with

2    you?

3      A.    Yes.

4      Q.    Okay.  How did I physically contact you?

5      A.    I do not recall.

6      Q.    But in any event, he physically, if you

7    will, assaulted you, he touched you?

8      A.    Yes.

9      Q.    It was without your permission?

10     A.    Yes, sir.

11     Q.    All right.  And you had never known this

12   guy from before, right?

13     A.    Yes, sir.

14     Q.    Was he bigger than you?

15     A.    I do not recall.

16     Q.    Okay.  What happened after that?  Well,

17   let me back up.

18          Was that the only altercation that

19   happened between you and this other ticket holder?

20     A.    Yes, sir.

21     Q.    All right.  Wasn't a bunch of people?

22     A.    Correct.

23     Q.    It was just one person?

24     A.    Yes, sir.

                                                    109

1    Q.   All right.  What happened to that guy

2  after he bumped you, did you have words?

3    A.   I don't recall.

4    Q.   Did you tell him, you know, somewhere what

5  the heck are you doing or watch where you're

6  walking?

7    A.   I do not recall.

8    Q.   Any reason why he would bump into you?

9    A.   No, sir.

10   Q.   Where were you standing?

11   A.   In line.

12   Q.   Where at, though, in the stadium?  I've

13  been to the games.  Walk me through a little bit.

14   A.   You walk down 429 down the hill, and then

15  you turn and then to the right there's . . .

16   Q.   And at that stand, if I'm correct, in the

17  300 levels?

18   A.   It's 400.

19   Q.   But you go down a level, right?

20   A.   Yeah, but there's no seats.  It's not like

21  the 300.  It's the 400 level still.

22   Q.   You go down a ramp I guess is my point?

23   A.   Because, see, I was sitting all the way up

24  high.  So I was in Row 20, so 429, Row 1, is

                                              110

1    equivalent to where the food is.  So you walk down

2    the stairs, and it's right there.  It's on the same

3    section.

4        Q.    And that's the concession stand they sell

5    everything at.  They sell food, beer, pop and, you

6    know, popcorn?

7        A.    Yes, sir.

8        Q.    Everything's there.

9              Were there people in front of you and

10   people behind you?

11       A.    Well, I was in line, so yes, there was

12   people in front of me.

13       Q.    How did this guy come to contact you in

14   the middle of the line?

15       A.    Well, there's like three lines.

16       Q.    Okay.  And what line were you in?

17       A.    I do not recall.

18       Q.    Okay.  But you were in the middle of one

19   of those three lines?

20       A.    It might have been three.  It could have

21   been four.  It's however many registers they have.

22       Q.    Okay.  And where was this guy?

23       A.    I do not recall.

24       Q.    Where did he come from?

                                                      111

1     A.   I do not recall.

2     Q.   Which side did he hit you on?

3     A.   I wasn't hit by him.  I mean, shoving -- I

4  don't recall.

5     Q.   So if I'm understanding what happened,

6  you're standing there simply getting ready to make

7  a purchase; and this guy for no explainable reason

8  shoves you?

9     A.   Yes, sir.

10    Q.   All right.  You had prior to that moment I

11  take it you never said a word to him, and you made

12  no contact with him?

13    A.   Never saw him.

14    Q.   Never had an interaction with him?

15    A.   Never seen him before.

16    Q.   All right.  Do you have any understanding

17  at all why this gentleman would choose you to

18  shove?

19    A.   I don't -- I do not know.

20    Q.   Did he cut in line or did you cut in line?

21    A.   No, sir.

22    Q.   So you didn't do -- just so I understand

23  your sworn testimony, you didn't do anything to

24  provoke this guy at all?

112

1      A.   I do not recall.

2      Q.   You don't recall if you did anything?  I

3  want to be clear about this.

4      A.   I don't start trouble.  I don't start

5  trouble.

6      Q.   I'm not suggesting you do.  I'm trying to

7  understand what that event happened.  This guy

8  unprovoked for no apparent reason came up and

9  shoved you.  Did you fall down?

10     A.   I do not recall.

11     Q.   Okay.  Did you defend yourself?

12     A.   It was not like a fistfight.  I just -- I

13  don't -- whatever happened at the Bears game is

14  very -- that's very -- a minor thing to what

15  happened later on that night to me.  So that's --

16  that was really minor to me.

17     Q.   Well, we'll get to the other items, but I

18  want to understand this first.  Every step of the

19  way builds on the evening.

20     A.   It sure does.

21     Q.   So it's all -- in that relationship it's

22  connected.  It builds; right?

23     A.   Yes, sir.

24     Q.   You understand that, right?

                                          113

1      A.   But I'm telling you I do not recall the

2   incident at all.  I just remember the security

3   escorting me, and that's it.  And I don't recall

4   anything else.

5      Q.   You were escorted by the security

6   department to their office, correct?

7      A.   Yes, sir.

8      Q.   What did they do to the other guy that

9   started this fight?

10     A.   I do not recall.  I answered this in my

11   last deposition, and I don't recall.

12     Q.   Okay.  Did you advise the security office

13   that you didn't do anything wrong, and this guy

14   unprovoked and unexpected shoved you?

15     A.   I do not recall.

16     Q.   I mean, at some point did you defend

17   yourself to the security department saying, hey,

18   I'm not the bad guy here; I was just standing in

19   line trying to make a purchase?

20     A.   I dough not recall.

21     Q.   Did you tell the security department that

22   you had a buddy sitting up in the seats that would

23   be expecting you back shortly?

24     A.   I don't recall.

114

1    Q.    Did you voluntarily leave that stadium?

2    A.    Yes.

3    Q.    Okay.  And you had the right to then stay

4    at the stadium, you had an option, is that what

5    you're telling me?  If you wanted to stay, you

6    could have?

7    A.    No, sir.

8    Q.    Explain that to me.

9    A.    If you get escorted by security and they

10   felt that something happened, why they going to let

11   you back into the stadium?  They just let you go.

12   Q.    Well, that's what I'm getting at.  Let's

13   make sure we're clear?

14   A.    They never gave me an option.

15   Q.    The security company escorted you out of

16   the stadium; is that true?

17   A.    It's not like they walked with me, and

18   here's the door.

19   Q.    You were asked to leave the stadium, true?

20   A.    Yes, sir.

21   Q.    You were not welcome back in the stadium

22   for that day?

23   A.    No, sir.

24   Q.    All right.  And they didn't give you the

115

1  opportunity to go back and tell Ryan?

2      A.  I don't recall.

3      Q.  That's the reason you called him after you

4  got out of the stadium, right?

5      A.  Yeah.

6      Q.  To try to let him know, hey, I'm done, I'm

7  out?

8      A.  Yes, sir.

9      Q.  All right.  And as far as you know, okay,

10  you have know idea what the security company did or

11  did not do with the guy that was this supposed

12  aggressor to this event?

13      A.  Whatever I answered in the last

14  deposition.  As of now I do not recall.

15      Q.  All right.  Where did the security officer

16  confront you?

17      A.  I do not recall.

18      Q.  What did he look like?

19      A.  I do not recall.

20      Q.  You went to an internal office where the

21  security guard -- with the security guard; is that

22  right?

23      A.  Yes.

24      Q.  The security guard required you to tender

116

1    your ticket, right?

2         A.    I do not recall.

3         Q.    Do you recall them asking if you had a

4    ticket to be in the stadium?

5         A.    You have to have a ticket in order to get

6    into the game.

7         Q.    Have you ever seen the Monterey Security

8    incident report dated August 30, 2007?

9         A.    No, sir.

10        Q.    I want to mark this as an exhibit and have

11   you take a look at it, okay?

12        A.    Okay.

13                         (Whereupon, Granberg Deposition

14                         Exhibit No. 1 was marked

15                         for identification.)

16   BY MR. KOEHLER:

17        Q.    All right.  You good?

18        A.    Yes.

19        Q.    Matthew, go ahead and hang onto that.

20   We've handed you what we've marked as Deposition

21   Exhibit 1?

22        A.    Yes, sir.

23        Q.    Have you ever seen this document before?

24        A.    No, sir.

                                              117

1     Q.   Do you recognize the photo up in the

2  right-hand corner?

3     A.   No, sir.

4     Q.   Okay.  Are you -- just so we're clear for

5  the record, are you suggesting that's not a picture

6  of you?

7     A.   Oh, that's me all right.

8     Q.   Do you recall where that photograph was

9  taken?

10     A.   Yes.

11     Q.   Where were you at when that photograph was

12  taken?

13     A.   In the Monterey Security office.

14     Q.   And that was within the Soldier's Field,

15  correct?

16     A.   Yes.

17     Q.   Your hair was a little different than it

18  is today?

19     A.   If you want to say that, yes, sir.

20     Q.   Well, I'm looking at it.  Your hair is

21  shaved off today in a crew cut style?

22     A.   I would say so.  It doesn't look like I

23  have that much hair.

24     Q.   When did you cut your hair?

118

1    A.   A few days ago.

2    Q.   Okay.  I want to go through this.  Top

3 point says, the event, Bears versus Browns; that's

4 true, right?

5    A.   Yes, sir.

6    Q.   Date was August 30, 2007, right?

7    A.   Yes, sir.

8    Q.   Time says, 7:55 p.m., does that sound

9 about right to you?

10    A.   I do not recall.

11    Q.   I think you testified at the first dep

12 that it was toward the end of the first quarter.

13 Does that sound about right?

14    A.   So that would sound about right.

15    Q.   Weather clear, is that your recollection?

16    A.   Yes, sir.

17    Q.   75 degrees or so?

18    A.   Yes, sir.

19    Q.   All right.  It says, arrest.  No, they did

20 not arrest you, correct?

21    A.   Yes.

22    Q.   It says under subject, it's marked patron.

23 You were a ticket holder, right?

24    A.   Yes, sir.

                                         119

1    Q.   All right.  And is the name, address, city

2  and state, is that accurate?

3    A.   That's the address I lived at, yes, sir.

4    Q.   Okay.  And you would have given them that

5  have information, correct?

6    A.   Yes, yeah.  I used to live there,

7  6119 Mason.

8    Q.   Is that the address you were living at

9  with your father?

10    A.   No, sir.

11    Q.   All right.  That was the address you lived

12  at with your mom, correct?

13    A.   Yes, sir.

14    Q.   You didn't give them the address you were

15  currently living at, correct?

16    A.   Well, I guess you could say I lived at

17  both houses, but I was staying, you know, at

18  my . . .

19    Q.   At that time, Matthew, you weren't living

20  with your mom.  You were living --

21    A.   I was not living at 6119 Mason at the

22  time, sir.

23    Q.   You didn't give them your father's

24  address, correct?

120

1      A.   No, sir.

2      Q.   Is that correct?

3      A.   I did not give them my father's address.

4   That was my old address.

5      Q.   All right.  You did not give them an ID,

6   correct?

7      A.   They searched me, so I don't know if -- I

8   don't know why they wouldn't . . .

9      Q.   Well, if you look at Page 2, they

10   photocopied your Chase debit card.  That is your

11   Chase debit card, correct?

12      A.   Yes.

13      Q.   And then they photocopied a copy of your

14   ticket stub.  Do you recall that?

15      A.   Yes.

16      Q.   Those are the two items you surrendered to

17   them?

18      A.   I don't recall surrendering anything.

19      Q.   Do you recall them having this

20   information, right, your debit card?

21      A.   No, sir, I do not recall.

22      Q.   Somehow they got it, right?

23      A.   Yes, sir.

24      Q.   And somehow you had it when you left,

121

1   right?

2      A.   Yes, sir.

3      Q.   All right.  Location of the incident was

4   Section 332.  Does that sound about accurate?

5      A.   I do not recall.  Whatever they put on

6   here.

7      Q.   Do you have any reason to disagree with

8   that?

9      A.   No, sir.

10      Q.   All right.  Monterey Security, the name

11   listed as Valesques, does that ring a bell with

12   you?

13      A.   No, sir.

14      Q.   Do you recall if that was the name of the

15   gentleman who was interviewing you?

16      A.   No, sir.

17      Q.   Could be, might not be.  You just don't

18   recall?

19      A.   I don't recall anything.

20      Q.   All right.  Person reporting the conduct

21   says, S3.  Do you know what S3 means?

22      A.   No, sir.

23      Q.   Okay.  Subject in possession of ticket, it

24   says, yes, right?  That's accurate?

122

1     A.   Yes, sir.

2     Q.   And then the ticket information is

3  accurate?

4     A.   Yes, sir.

5     Q.   And that's your father's season ticket

6  holder, right?

7     A.   Yes, sir.

8     Q.   And you would understand that based on

9  this information they could identify who the season

10  ticket holder was, you understood that, right?

11     A.   Yes, sir.

12     Q.   So if they looked up 429, Seat 20-24, it

13  would come up your father?

14     A.   No, sir.

15     Q.   Who would it come up?

16     A.   Whoever the owner of the four seats was.

17     Q.   His buddy?

18     A.   Yes, sir.

19     Q.   Whoever he shared that with?

20     A.   Yes, sir.

21     Q.   Okay.  And then underneath it says, a

22  summary above -- strike that.

23       It says, the nature of the incident.  Do

24  you see that?

          123

1      A.   Yes.

2      Q.   All right. It says, subject. You

3  understand that to be you?

4      A.   Yes, sir.

5      Q.   Was identified by an S3 staff as the

6  individual in the above section who was see, I

7  presume they mean seen, pushing other patrons. Is

8  that an accurate statement of what occurred that

9  night?

10     A.   I do not recall.

11     Q.   You don't recall whether or not you were

12 pushing other patrons?

13     A.   No, sir.

14     Q.   So you might have been pushing other

15 patrons, you just don't recall?

16     A.   I could have got attacked and pushed,

17 pushed. I don't recall anything what happened.

18     Q.   Okay. So after you were attacked you

19 don't remember how you responded; is that fair?

20     A.   Yes, sir.

21     Q.   Fair enough you defended yourself?

22     A.   But not in a fistfight, nothing violent.

23     Q.   Okay. So is that -- I guess what I want

24 to know is what's written here accurate. Did you

                                                    124

1    push other patrons?

2         A.    As the whole, admits to being involved in

3    a fight, claims he was a victim, that's all

4    correct.  I don't . . .

5         Q.    Let's just stick with this first sentence,

6    and then we'll to the second sentence.

7               Did you push other patrons before a fight

8    ensued?

9         A.    No, sir.

10        Q.    Okay.  That's inaccurate then?

11        A.    Yes, sir.

12        Q.    All right.  Subject's actions, meaning

13   your actions, escalated into a fight; is that true?

14        A.    Yes, sir, but I did not start any fight.

15        Q.    All right.  So you disagree with that

16   statement?

17        A.    Yes, sir.

18        Q.    All right.  Subject admits being involved

19   in a fight, that's true, right?

20        A.    Yes, sir.

21        Q.    But claims he was the victim?

22        A.    Yes, sir.

23        Q.    All right.  Subject released after no

24   victims could be found; is that true?

125

1    A.    They released me.  I don't -- I don't know

2    if they found anyone or I don't know.

3    Q.    Okay.  So up to the point of the summary,

4    that information is all accurate, the top section

5    of this security incident report?

6    A.    It's all accurate.  That was not my

7    address, but everything else is accurate, yes, sir.

8    Q.    All right.  The description of what

9    happened is not accurate according to you, correct?

10    A.    Yes, sir.

11    Q.    All right.  Any idea why a Monterey

12    Security officer may not want to represent actually

13    what happened that evening?

14    MR. FITZSIMMONS:  I'm going to object to that

15    question.  It really calls for him to speculate

16    what was in the mind of somebody else.

17    MR. KOEHLER:  Fair enough.

18    BY MR. KOEHLER:

19    Q.    You understand there's a difference of

20    what you're telling us versus what the security

21    officer put in this report, right?

22    A.    I didn't start any fight.  I don't cause

23    trouble.

24    Q.    I'm not --

126

1     A.   So yes, I'm saying that's wrong.

2     Q.   Okay.  So if this gentleman comes in and

3  testifies under oath and says, you know, you,

4  meaning Mr. Granberg, started this fight by pushing

5  patrons and then went into a fight, that would be

6  inaccurate as to what happened that evening?

7     A.   Yes, because I never started a fight.

8     Q.   All right.  At any time did you talk to

9  the security representatives about what would

10  happen with the tickets to the season ticket

11  holder?

12     A.   Do not recall.

13     Q.   Okay.  What do you recall saying to the

14  security officer, and what do you recall the

15  security officer saying to you when you were in the

16  office?

17     A.   I don't recall anything.

18     Q.   Okay.  What did they say to you when they

19  escorted you from the line to their office?

20     A.   I do not recall.

21     Q.   Considering your testimony here today is

22  that you didn't start the fight, did you not think

23  it was rather unfair that they were escorting you

24  away versus trying to get to the person who started

127