CASE NO. ___08cv3131___

ATTACHMENT NO. ___7___

EXHIBIT ___C – part 4___

TAB (DESCRIPTION) _____

1    any criticisms of him pursuing you and trying to

2    take you under control, would you, based on that

3    information?

4        A.   No, sir, but he could have done it in a

5    nicer fashion, a proper fashion instead of the way

6    he did take it.

7        Q.   What should he have done that would have

8    stopped you from running and getting away from the

9    situation?

10       A.   What I mean by that is when he finally did

11    take me down, he didn't need to keep hitting me.

12    And that's it.

13       Q.   Okay.  But other than -- how was he

14    supposed to stop you?

15       A.   I --

16       Q.   Sounds like --

17    MR. FITZSIMMONS:  I'm going object to the

18    question.  It calls for him to kind of speculate as

19    to all kind of police training.

20    MR. KOEHLER:  I want to know what his

21    expectations are.  I don't need any police

22    training.

23    BY MR. KOEHLER:

24       Q.   Just what were your expectations at that

                                       190

1    point?  What would have stopped you?

2       A.  What would have stopped me?  Well, I lost

3    my shoe and my other shoe was untied, so that's

4    what stopped me.  I couldn't keep running, so . . .

5       Q.  But you said Officer Kimble could have

6    done things different.

7       A.  What he could have done different is when

8    he finally did get me he didn't need to keep

9    hitting me.

10       Q.  Okay.  And the reason is because you

11    weren't resisting arrest, right?

12       A.  I was not resisting arrest.  Never

13    resisted arrest one time.

14       Q.  And you certainly understand the

15    difference between resisting arrest and not

16    resisting arrest, right?

17       A.  Running from the police is resisting, but

18    at the time I believed that he wasn't a police

19    officer.  I didn't know what he was.  I just

20    thought he was all part of it.  Running from the

21    police is resisting arrest, but I never resisted

22    him at one time.

23       Q.  Great. - -

24          When did Officer Collins come on the scene

191

1   as far as you know?

2     A.   He came on the scene.  We turned on

3   Garland Court back onto Randolph.  We're walking

4   towards Michigan Avenue.  That's when he came onto

5   the scene.

6     Q.   Okay.

7     MR. FITZSIMMONS:  And by Officer Collins you

8   mean the sergeant.

9     MR. KOEHLER:  Yes.  You got him named in the

10   complaint.

11  BY MR. KOEHLER:

12     Q.   When did you first realize -- come to

13   realize Officer Kimble was a police officer of any

14   sort?

15     A.   I was cuffed.

16     Q.   At no time prior to being handcuffed did

17   you understand that he was a police officer; is

18   that fair?

19     A.   Well, when I was running and he took me

20   down to the ground, he had a uniform on and a

21   baton, so . . .

22     Q.   So the baton --

23     A.   Not many people dress up as police

24   officers and fake it.  Maybe they do, but I don't

192

1    know.

2    Q.   So at the time that -- the baton indicated

3    to you that he was likely a police officer?

4    A.   No, sir.

5    Q.   What indicated to you that he was likely a

6    police officer, after you were cuffed?

7    A.   Yes, sir.

8    Q.   All right.  Up until the point of being

9    cuffed you presumed that he was part of this group

10    trying to kill you?

11    A.   Yes, sir.

12    Q.   All right.  And that would for your

13    purposes justify why you were trying to get away

14    from Officer Kimble up to the point of being

15    handcuffed, right?

16    A.   Yes, sir.

17    Q.   All right.  You referenced that your

18    handcuffs were painful or you sustained injuries to

19    your wrists.  Did you receive any medical treatment

20    or have anything with your wrists?

21    A.   I do not recall.

22    Q.   Did you take any photographs of your

23    wrists?

24    A.   I do not recall.

193

1      Q.   Okay.

2      MR. FITZSIMMONS:  You know, let the record

3  reflect that any photographs that were taken have

4  already been turned over to Miss Rosen.

5      MR. KOEHLER:  I got them and --

6      MR. FITZSIMMONS:  If there's copies -- if there

7  are no photographs of wrists included, then there

8  weren't any taken.

9      MR. KOEHLER:  Well, what we have when I looked

10  at it is we don't have all the photographs.  There

11  are on the roll that shows 24 photographs, and on

12  the back there's like 20, 23, 19.  We don't have

13  all the photographs in that roll.  So if you

14  could --

15      MR. FITZSIMMONS:  Do you have photographs that

16  are in consecutive order?

17      MR. KOEHLER:  No.  We don't have all the photos

18  from that roll.

19      MR. FITZSIMMONS:  I'll look into it.

20      MR. KOEHLER:  Look into it because obviously we

21  would be entitled to all the photographs.

22      MR. FITZSIMMONS:  No problem.

23      MR. KOEHLER:  As soon as I get done with this,

24  I'll go through the photographs so we can get some

194

```
 1    foundation.

 2    BY MR. KOEHLER:

 3        Q.    Officer Collins I think you talked about

 4    pretty clearly in your prior deposition, you had an

 5    interaction with Officer Collins and

 6    Officer Kimble, right?

 7        A.    Yes, sir.

 8        Q.    All right.  I think what you told us

 9    somewhere along the line Kimble hit you in the face

10    with a closed fist two or three times?

11        A.    I never said that.

12        Q.    I thought in your testimony you said

13    officer -- did I say Kimble?

14              What I have down is Officer Collins asked

15    you have on two occasions at two separate locations

16    if you like hitting black people, both times he

17    responded by punching you in the face?

18        A.    Yes, sir.

19        Q.    Closed fist?

20        A.    Yes, sir.

21        Q.    Did he hit you a third time?

22        A.    I do not recall.

23        Q.    All right.  Kimble also according to your

24    sworn testimony punched you twice in the face?
                                                    195
```

1     A.   I said --  I swore to it?

2     Q.   Yeah.

3     A.   Because if I said that last time, then

4  that's the answer.

5     Q.   So your face was hit four times?

6     A.   Two and two would make four, so yes.

7     Q.   All right.  And there were photographs

8  taken at the Metra police station, right?

9     A.   I don't -- I do not recall.  We'll mark

10  that.

11     MR. KOEHLER:  Joe do you have a copy of that

12  photo?

13     MR. FITZSIMMONS:  I don't believe I do.

14     MS. ROSEN:  Here, this one.

15     MR. KOEHLER:  All right we're going to mark

16  that as Exhibit 2.

17                 (Whereupon, Granberg Deposition

18                 Exhibit No. 2 was marked for

19                 identification.)

20  BY MR. KOEHLER:

21     Q.   All right.  We've handed you what we

22  marked as Exhibit 2.  Do you recognize the guy in

23  that photograph?

24     A.   Yes, sir.

196

1      Q.   All right.  That's you, right?

2      A.   Yes, sir.

3      Q.   Your name is Matthew Granberg.  Date of

4  birth is accurate?

5      A.   No, sir.

6      Q.   The date of birth given here is off your

7  fake ID, correct?

8      A.   Correct.

9      Q.   All right.  So you tendered your face ID

10  to the Metra police officers?  Must have, right?

11      A.   Whatever was in my pockets, yes.

12      Q.   All right.  That's not your true birth

13  date, right?  You were born in '87, right?

14      A.   Yes.

15      Q.   And 85 puts you at 21?

16      A.   Well, the math, 85, 21, yes.  Yes, sir.

17      Q.   Okay.  The offense says battery and

18  resisting a peace officer, right?

19      A.   Yes, sir.

20      Q.   All right.  You'll agree with me there was

21  a point you were resisting Officer Kimble until the

22  point that he -- and you realized he was a police

23  officer, right?  We talked about that?

24      A.   Yes, but at the time --

                                          197

1    Q.    You didn't know?

2    A.    I didn't know.

3    Q.    I understand.

4          But in terms of resisting him whether you

5    knew it or not, he was a police officer and you

6    were resisting him, fair enough?

7    A.    Yes, sir.

8    Q.    The date's right.  22:44 hours comes out

9    to about 10:44, right?

10   A.    Yes, sir.

11   Q.    And this was taken back at the Metra

12   station, right?

13   A.    Yes, sir.

14   Q.    All right.  And at this point you had been

15   punched in the face according to your testimony at

16   least twice and up to four times?

17   A.    Yes, sir.

18   Q.    Okay.  Can you show me on your face where

19   you were hit?

20   A.    On both sides I was hit here, and I was

21   hit here.

22   Q.    Twice?

23   A.    The first time he hit me there and then I

24   was here.  Kimble hit me.  Collins hit me, boom,

                                              198

1    boom.

2        Q.    All right.  So this picture you agree

3    truly and accurately depicts your face as it looked

4    on the evening of August 30, 2007, and after both

5    Kimble and Collins had punched you?

6        A.    Yes, sir.

7        Q.    All right.  Very good.

8              Officer Geanes never struck you, correct?

9        A.    Yes, sir.

10       Q.    That's true?

11       A.    Correct.

12       Q.    All right.  He didn't handcuff you,

13   correct?

14       A.    Correct.

15       Q.    He didn't arrest you, correct?

16       A.    Correct.

17       Q.    All right.  He didn't cuff you in the

18   holding cell, correct?

19       A.    Correct.

20       Q.    And he never physically touched you,

21   correct?

22       A.    Correct.

23       Q.    And the reasons for your medical treatment

24   at Swedish Covenant Hospital was not the result of

199

1    any conduct of Officer Geanes, correct?  You

2    sought --

3         MR. FITZSIMMONS:  I'm going to object to that

4    question.  It calls for him to draw a legal

5    conclusion.  I'm going to direct him not to answer.

6         MR. KOEHLER:  I'm not asking for a legal

7    conclusion.

8    BY MR. KOEHLER:

9         Q.    You sought m medical treatment at Swedish

10   Covenant Hospital the next day, correct?

11        A.    Yes, sir.

12        Q.    And those were for injuries you sustained

13   on August 30, 2007, right?

14        A.    Yes, sir.

15        Q.    It's your testimony that those injuries

16   were sustained as a result of Officer Collins and

17   Officer Kimble, correct?

18        A.    Yes, sir.

19        Q.    They were not caused by Officer Geanes ?

20        A.    Yes, sir.

21        Q.    All right.  That's correct?

22        A.    Yes, sir.  Correct.

23        Q.    All right.  Debra Coleman was back at the

24   police station, also, correct?

                                                    200

1      A.   Yes, sir.

2      Q.   Okay.  And you could hear her voice

3  outside the holding cell you were in?

4      A.   Yes, sir.

5      Q.   Okay.  And at that time I think you

6  testified earlier, Matt, that the paramedics showed

7  up and were giving her treatment as best as you

8  could figure?

9      A.   Yes, sir.

10     Q.   At any point did you advise any of the

11 Metra police officers, either Officer Kimble,

12 Officer Collins or Officer Geanes, that your dad

13 was a member of the Chicago Police Department?

14     A.   No, sir.

15     Q.   Why not?

16     A.   Even if he was, what is that going to do?

17     Q.   Well, you're with police officers, right,

18 that according to your testimony are physically

19 hurting you, correct?

20     A.   Yes, sir.

21     Q.   All right.  Did you not think it would be

22 important to let them know that your father himself

23 is a police officer, and that they were, okay,

24 physically harming a police officer's son?

                                              201

1     A.   At the time I believed that they would hit

2  me harder.

3     Q.   Why?

4     A.   Because I was -- well, first they hit me

5  because I was white.  Second, I'm the son of a

6  police officer, so they probably be thinking I

7  could get away with anything and hit me harder.

8     Q.   Okay.  Let's back up.  Why do you think

9  they were hitting you because you were white versus

10  because you had resisted arrest?  How do you draw

11  that distinction?

12     A.   I said it in my last deposition.  They

13  said, you like hitting on black people, okay.  So

14  why wouldn't that matter then to me that . . .

15     Q.   I'm just trying to understand your side of

16  this, okay.  Based on your testimony Officer

17  Collins said, so you like hitting black people,

18  right?  How do you draw from that that the reason

19  he hit you according to your testimony is because

20  you were white and that had you been black he

21  wouldn't have hit you?

22     A.   Why would he say to a black person, you

23  like hitting on black people.  Why would he say

24  that?  That's like a white cop saying, you like

202

1    hitting on white people.  It's obvious.

2       Q.  Is it your testimony that had you been

3    black and had the same incident that

4    Officer Collins would not have hit you?

5       A.  He would not have said, do you like

6    hitting on black people.  I don't know if he would

7    have hit me.

8       Q.  But that's my question to you.  You

9    testified, you said, Jay, he hit me because I was

10    white.

11       A.  Yes.

12       Q.  And I felt that if I told him my father

13    was a police officer they would have hit me harder?

14       A.  Hit me more times, yes.

15       Q.  So I'm breaking that down.  If you were

16    black and the same incident happened, is it your

17    testimony that you believe Officer Collins would

18    not have hit you?

19       A.  Can I tell you what he --

20       Q.  You don't know?

21       A.  I was never in that position.  I know for

22    a fact that he would never have said that to a

23    black person, you like hitting on black people.

24       Q.  He may have not have said part about

                                                          203

1    hitting black people, but he still may have hit

2    you, fair enough?

3        A.    He's wrong for hitting.

4        Q.    No doubt.  But what you said was you said

5    he hit you because you were white, and I'm trying

6    to understand the bases for that.

7        A.    Yes, sir.

8        Q.    I understand that if you were black he may

9    have not said, do you like hitting black people;

10   but is it fair to say you don't know whether he hit

11   you because you were white, black or purple?

12       A.    He hit me because I was white.

13       Q.    How do you know that?

14       A.    He made the exact -- he made the comment,

15   you like hitting on black people, and I am white.

16   It's obvious that he was treating me like I was

17   racist.

18       Q.    You drew the conclusion that the reason

19   that he supposedly hit you was because you were

20   white.  That's your conclusion?

21       A.    And that's the right conclusion.

22       Q.    Well, that's for somebody else to decide,

23   not you and I.  That's your conclusion.  I

24   understand that.

                                          204

1          Officer Geanes did not hit you, right?

2     A.    As I answered before, yes, he never hit

3   me.

4     Q.    Did he not hit you because you were white?

5     A.    I don't -- maybe he's a nice guy.  Maybe

6   he's a soft guy and feels, this gentleman's cuffed

7   and already not doing anything, why would I hit

8   him.  Maybe he's not racist.

9     Q.    Okay.  All right.  The second part, Matt,

10  you said that you -- the reason you didn't tell any

11  of the officers that your dad was a member of the

12  police department, you believe they would have

13  concluded that you get away with anything and they

14  would have hit you more?

15    A.    Yes, sir.

16    Q.    You did not think that had you advised

17  them that, hey, you're hitting a fellow officer's

18  son that maybe the events would have changed?

19    A.    Even if -- it doesn't matter if I was the

20  president's son, why does me being a police

21  officer's son mean anything?  That has nothing to

22  do with it.  That has nothing to do with my saying

23  my dad's a cop.  Why would I say that?  What is

24  that going to do?

                                              205

1      Q.   I would think fellow police officers would

2   probably pull off knowing that your dad's a cop.   I

3   would hope so.

4      A.   Well, it was a little too late for that.

5   By the time they -- they didn't want to hear

6   anything I had to say.

7      Q.   When the Chicago police officers showed

8   up --

9      A.   Yes, sir.

10      Q.   I think you said in your deposition that

11   they were laughing while Officer Collins came in

12   and punched you one more time in the cell?

13      A.   He never punched me.

14      Q.   Officer Collins?

15      A.   I never said he punched me while I was in

16   the cell.  He threw me down.

17      Q.   He threw you down, right.  He threw you

18   when you asked to go to the washroom, right?

19      A.   Yes, sir.

20      Q.   Wasn't there a bathroom in the cell you

21   were in?

22      A.   I didn't ask him to use the washroom.   I

23   turned around and said -- kicked the door with my

24   one foot that was not cuffed and said, I want to

                                                    206

1    talk to the real police.  He said, this is my

2    house, bitch.  Threw me down.  The toilet was back

3    there.  My ankle was cuffed.  I fell back.  That's

4    when my pants ripped.  It's a wonder I didn't hit

5    my head on the toilet.  And that's what happened.

6    They closed door, and then I laid there.

7        Q.   Okay.  Are you critical of the Chicago

8    Police Department's inaction?  I think you

9    testified in your earlier dep they saw what

10   happened there?

11       A.   Yes.

12       Q.   Are you critical of those two police

13   officers for not doing anything?

14       A.   Yes, sir.

15       Q.   Okay.  Did you file a complaint with the

16   Chicago Police Department?

17       MR. FITZSIMMONS:  He's not allowed to discuss

18   anything about that aspect of it.  It goes into

19   attorney/client privilege.  Can't answer that

20   question.

21       MR. KOEHLER:  I'm not asking any communications

22   with you.  I'm just asking whether a complaint was

23   filed with the Chicago Police Department.

24       MR. FITZSIMMONS:  We'll stipulate that a

                                                   207

1    complaint was not filed, and anything further

2    intrudes on attorney/client privilege.

3        MR. KOEHLER:  Joe, I'm not asking anything

4    about your discussion with him at all, but I want

5    to know if that complaint was filed.  You're

6    stipulating there wasn't one.

7        MR. FITZSIMMONS:  We're stipulating there

8    wasn't one.

9    BY MR. KOEHLER:

10       Q.   Did you advise your dad that police

11   officers showed up during this event and didn't do

12   anything?

13       A.   I don't recall.

14       Q.   Why didn't you holler out to the Chicago

15   police officers, hey, my dad is a Chicago police

16   officer, help me here.  They've punched you four

17   times in the face.  They've jacked you.  I mean, at

18   this point why didn't you advise Chicago police

19   officers, hey, my dad is a police officer, they're

20   beating the hell out of me here, help me?

21       A.   I don't recall.  And once again that has

22   nothing -- being an Officer's son doesn't mean

23   anything.  I don't know where you get -- that

24   doesn't mean anything.

                                              208

1    Q.   For help, why not try it?

2    A.   I couldn't tell you.

3    Q.   Do you recall ever being either at the

4  Metra station or the Chicago Police Department's

5  station that evening and your dad showing up?

6    A.   At the Chicago police station, yes.

7    Q.   He showed up?

8    A.   It was not that evening.  It was the next

9  morning.

10    Q.   Okay.  Next morning.

11         Do you recall overhearing any of his

12  conversations at the Chicago Police Department?

13    A.   No, sir.

14    Q.   Okay.  It was District 3, right?

15    A.   No, sir.

16    Q.   District 1?

17    A.   Yes, sir.

18    Q.   Okay.  I mean, everything that had gone on

19  at this point, fair enough that you would have

20  wanted your father to know what was going on at

21  that point in time?

22    A.   I had no way of talking to him.

23    Q.   I understand that, but my point is you

24  would have wanted him to know if there was a way to

209

1    get ahold of your dad?

2      A.    I would let my mother know.  I would let

3    my grandmother know what happened to me.

4      Q.    No.  My question is, at that point in time

5    when you're now under arrest, you've been --

6    according to you you've been beaten, shoved, you've

7    been treated with a level of disrespect.  If you

8    had some avenue to let your dad know, you would

9    have wanted him to know things were out of hand

10   here, right?

11     A.    Yes, and once again I would let my mom

12   know.

13     Q.    I understand that, but I'm talking about

14   your dad.

15           The reason you'd want your dad to know

16   that is because he would respond to that, right?

17     A.    No, sir.

18     Q.    He would stay at home?

19     A.    Oh, you mean respond and come get me?

20     Q.    Stop what's going on?

21     A.    Yes.

22     Q.    I mean, you had no doubt that your father

23   if you could have gotten ahold of him through any

24   avenue would have been at that Metra police station

                                                    210

1    as soon as he could, and that would have been the

2    end of this, right?

3        A.   I could not tell you.  I don't know what

4    would have happened.

5        Q.   I'm asking what you believe would have

6    happened.  What would have been your expectations

7    of what your father would have done had he known

8    what was going on?

9        A.   I don't think that he could have done

10   anything.  I was already charged, so it was . . .

11       Q.   I'm talking about the physical interaction

12   you were having with the Metra police folks.  If

13   you could have said, hey, Dad, I'm down here, these

14   guys have punched me four times in the face, shoved

15   me sown, damn near hit my head on the toilet, do

16   you have any doubt that your dad would have been at

17   that Metra station knowing his son's in harm's way?

18       A.   And a bunch of other people would have

19   been at the Metra station.  It could have anyone.

20   If you were -- say, you were my uncle, you would

21   have been there, too.

22       Q.   I'm just asking about your dad.  Was it

23   your expectation your dad would have been there had

24   he known?

                                                    211

1      A.    Then I could say my mom would have been

2   there if she known.  My grandma would have been

3   there.  My sister would have been there.  I can go

4   down the line.

5      Q.    I'm just talking about your dad.

6      A.    Because what happened to me was wrong.  If

7   it happened to you, you would have wanted a bunch

8   of people there too.

9      Q.    I just want to know at that time and place

10  if you could have gotten a communication to your

11  father that things were out of control at the Metra

12  Police Department that you have any doubt your

13  expectation would be your dad would show up, and

14  this would have ended, fair enough?  Your dad --

15     A.    What would have ended?  What was --

16     Q.    What was going on to you?

17     A.    Like he would have got me out of there?

18     Q.    He would have showed up as your father,

19  and that conduct of the Metra police officers

20  you're talking about would have ended.  He would

21  have gotten you released.  It would have been done?

22     A.    He threw me down.  Collins threw me down.

23  That was the last time they ever attacked me.  So

24  the phone call -- like it was too late, you know.

212

1    Q.   Well, you didn't know they were done,

2  right?  I mean, they didn't say, this is --

3    A.   I'm assuming they were going to let me

4  call.  I would have called 911 first because they

5  would have been there quicker from where my dad

6  lives from up north.  I would have called 911.

7    Q.   Okay.  So if you had your choice the

8  number you would have called would have been 911?

9    A.   Yes, sir.

10    Q.   Okay.  Who did you speak to the next

11  morning?  Your dad got you out, right?

12    A.   Yes, sir.

13    Q.   Who did you speak to that day, Ryan Ames?

14    A.   I do not recall.

15    Q.   How about Ryan Miskowits?

16    A.   I do not recall.  Any names you're going

17  to say I do not recall who I talked to.  It was

18  hectic.  I don't recall the next day.  I remember

19  everything that happened that night.  The next day

20  I don't know how many times I went to the washroom.

21  I don't know how many times I brushed my teeth.  I

22  don't know anyone I talked to.

23    Q.   I'm not asking about that.  I'm asking you

24  pretty specifically about who you spoke to the next

213

1    day of the events, and I think we talked in the

2    other deposition that you spoke with Ryan Ames the

3    next day?

4         A.   If I said that, then yes, then I talked to

5    him.

6         Q.   Do you know that Ryan had spoken to your

7    mom and your father who were looking for you?  Do

8    you know that?

9         A.   If I answered that before, then yes, but

10   as of today --

11        Q.   I don't know if you did or not.  I don't

12   know if they got this far or not.  I want to know

13   if you know that both your mother and father called

14   Ryan Ames because they were looking for you?

15        A.   I don't recall.

16        Q.   Do you know that -- strike that.

17             Did you ever tell Ryan Ames the next day

18   that you were in big trouble over this?

19        A.   I do not recall.

20        Q.   Were there any repercussions from your dad

21   to you over this event?

22        A.   I do not recall.

23        Q.   Anything from the Bears game to the

24   incident on the street, to the incident with Metra

                                                    214

1    Police Department, did you receive any discipline

2    from either your mother or your father, any

3    reprimand, any discipline or repercussions at all

4    for the events of August 30, 2007?

5        A.   I do not recall, and I was the victim.

6        Q.   I understand.

7        A.   So I don't recall.

8        Q.   If you did get disciplined in some form or

9    fashion, is that something you think you would

10   recall?

11       A.   Couldn't tell you.

12       Q.   Do you recall talking with any of your

13   friends the next day or in the week that followed

14   in talking to them about the events of August 30,

15   2007?

16       A.   No, sir.

17       Q.   All right.  If your friend Ryan Miskowits

18   said he talked to you, would you have any reason to

19   disagree with that?

20       A.   It's his word.  I don't know.  I'm not

21   going to call him a liar if you talk to him or not.

22   I just don't recall if I talked to him.

23       Q.   When's the last time you spoke to Ryan

24   Ames about these events?

                                                215

1    A.   I cannot recall.

2    Q.   You said earlier in your dep that you knew

3  that we talked to Ryan Ames?

4    A.   Yes.

5    Q.   How did you know that?

6    A.   I do not recall.

7    Q.   But you recall in this deposition you

8  said --

9    A.   Yes.

10    Q.   -- I know you guys talked to him?

11    A.   Yes.

12    Q.   And you don't know how you know that?

13    A.   I know exactly how I know that.

14    Q.   Okay.  Good.

15    A.   Because a private investigator came to my

16  house looking for my dad and told me that -- I

17  knew.  I knew and then you guys -- you guys got

18  Denise Bilski, too.  I knew these things.  The

19  private investigator like, you know, he wasn't that

20  private about things, so . . .

21    Q.   Okay.  So he told you that he had talked

22  to your friend Ryan and your girlfriend Denise?

23    A.   He never told me he talked to Denise.  He

24  was asking where I could find Denise, and I found

216

1    out through her.

2        Q.   The next day when did you go to Swedish

3    Covenant for medical care?

4        A.   It's in the records.

5        Q.   I don't have the records.  That's my

6    problem?

7        A.   I don't recall.

8        Q.   Do you recall if it was later on in the

9    day, that evening?

10       A.   Afternoon maybe, I don't recall.

11       Q.   Who took you?

12       A.   My mother.

13       Q.   Okay.  Any reason your dad didn't take

14   you?

15       A.   I don't recall.

16       Q.   Did you show him your injuries when you

17   left the police station that day?

18       A.   Well, it was visible.  Yes, I showed him.

19       Q.   Okay.  What was his response to the

20   injuries that you showed him?

21       A.   I do not recall.

22       Q.   What was the nature of the injuries you

23   sought medical treatment for?

24       A.   My -- when I was urinating it was very

217

1   painful.  I had a huge bruise on my side.  And

2   before that when I urinated, it was never painful,

3   and all of a sudden it was.

4        Q.    What did they tell you was wrong with your

5   urination?

6        A.    I don't recall.

7        Q.    Did they give you -- other than the one

8   visit to Swedish Covenant Hospital, did you receive

9   any further medical treatment for any physical

10  injury that you're alleging you sustained on

11  August 30, 2007?

12       A.    I do not recall.

13       Q.    That's it?  That's all you recall is one

14  visit to Swedish Covenant?

15       A.    Yes.  I don't know if I went anywhere

16  else.

17       MR. KOEHLER:  For lack of not having the

18  records; is that your understanding?

19       MR. FITZSIMMONS:  It's my understanding.

20       MS. ROSEN:  I haven't seen anything else.

21  BY MR. KOEHLER:

22       Q.    Did they give you any prescription?

23       A.    I do not recall.

24       Q.    Okay.  Did you goat any stitches?

218

1      A.   I don't recall.

2      Q.   Did you get any x-rays or MRIs or any

3    diagnostic tests while you were at Swedish Covenant

4    Hospital?

5      A.   I do not recall.

6      Q.   Okay.   There were some photographs, do you

7    have those, that you produced or your lawyer Joe

8    here produced in discovery.

9      MR. KOEHLER:   All right.   Joe, there's 12.

10   Take a look at those.   You'll see, Joe, there's 12

11   photos there and this one's got 24, 4 by 6

12   glossies.   Take look at that and let us know.

13        All right.   For the record can we all

14   agree we'll call this Group Exhibit 3, and we'll

15   copy it and staple the cover.   You put that on

16   three, and that'll be Group Exhibit 3.

17                      (Whereupon, Granberg Deposition

18                      Exhibit No. 3 was marked for

19                      identification.)

20   MR. KOEHLER:   For the record, Group Exhibit 3

21   is a receipt for the processing of 24, 4 by 6

22   photos, and there are 12 attached photos that,

23   Matt, I think you'll agree with me are various

24   photographs taken of you?

                                                    219

1        THE WITNESS:  Yes, sir.

2    BY MR. KOEHLER:

3        Q.    First, were all those photos taken on the

4    same date?

5        A.    I do not recall.

6        Q.    Can you tell me when those photographs

7    were taken?

8        A.    I do not recall.  I know these pictures

9    are in the Swedish Covenant parking lot.  Another

10   thing about this, though, what's with this?

11   Another thing how it says there's only 24, this

12   could have been from an old, old thing and --

13       Q.    No worries.  Regardless --

14       A.    There might not just be 12 picture

15   missing.  You have the negatives, right?

16       MR. FITZSIMMONS:  No.  We have the negatives.

17   Matt, if there are negatives, we have the

18   negatives.  Those are pictures we supplied to

19   counsel.  If there's a problem with them, it's my

20   problem.

21       MR. KOEHLER:  No worries.

22   BY MR. KOEHLER:

23       Q.    Now, which photographs in Group Exhibit 3

24   are you saying were taken at Swedish Covenant, and

                                                    220

1    pull those out?

2       A.   See, I cannot recall now.  I know this is

3    a building there, but as far as what else goes, I

4    don't know.  This is the only thing I know that one

5    building, so I don't know.

6       Q.   So if I write SC on here?

7       A.   Yeah.

8       Q.   We all agree Swedish Covenant, this is a

9    photograph?

10      MR. FITZSIMMONS:  Uh-huh.

11   BY MR. KOEHLER:

12      Q.   Okay.  Where were the other photographs

13   taken, if you recall?

14      A.   I do not recall.

15      Q.   All right.  On the photograph we've marked

16   as SC, Swedish Covenant, who took those

17   photographs?

18      A.   My mother.

19      Q.   Okay.  And do you know the date as you sit

20   here today that those photographs were taken?

21      A.   Is there 31 days in August or no?

22      Q.   I presume.

23      A.   Then August 31, or if there wasn't, it

24   would be September 1.

                                                    221

1    Q.   Okay.  And do you know where -- I think I

2    asked you, you don't know where the other

3    photographs are taken, correct?

4    A.   It might have been Swedish Covenant.  I do

5    not know.

6    Q.   Do you recall having photographs taken at

7    a different location at a different time?

8    A.   I do not recall.

9    Q.   All right.  The date on the receipt is

10   what, Matt?

11   A.   There's no date there.  Oh, here it is.

12   9-7, but it doesn't say the year.

13   Q.   Presumably those were developed sometime

14   September 7, 2007, presumably, so they were taken

15   sometime before that?

16   A.   It could have been, but this might be from

17   a different film thing, so I do not know.

18   Q.   Okay.

19   MR. FITZSIMMONS:  Just let me interject here,

20   do you recognize that number there?  Is that a

21   house number.

22   THE WITNESS:  Yeah, I don't recall where that

23   is, though.        - -

24   MR. FITZSIMMONS:  Okay.

222

1    BY MR. KOEHLER:

2        Q.   All right.  Are you going through those,

3    Matt?  Let me take a quick look at this.

4            All right.  At any time on the evening of

5    August 30 from the time of the first incident you

6    were involved at Soldier's Field up until the time

7    you were released to your father's custody, did you

8    have access to a mirror?

9        A.   I do not recall.  That was on August 31.

10       Q.   When you were released.

11           Is it fair to say that --

12       A.   I was released the next day.  I was

13   attacked on August 30.

14       Q.   Okay.  The first time you saw all of these

15   markings in these photographs was after you were

16   released to your father's custody, and you went

17   home, fair enough?

18       A.   No.

19       Q.   Okay.

20       A.   No, sir.  I mean, it's quite obvious when

21   you see it on you, it's not like I need a mirror to

22   look at that wound.

23       Q.   Take, for example, the markings on your

24   back?

                                            223

1     A.   Yes.  I couldn't see that.

2     Q.   When did you first see that, after you got

3  home with your dad?

4     A.   I don't recall.

5     Q.   But it wasn't any time between Soldier's

6  Field and getting released to your father, this

7  would have been afterwards, right?

8     A.   Correct.

9     Q.   All right.  In this photograph that shows

10  a picture of your left arm, what are you trying to

11  depict in this photograph?

12     A.   Well, these lines right here that looks

13  awful strange, I mean that's not on there.

14     Q.   Is there a purpose for taking the photo,

15  and I'm asking what it is?

16     A.   Like cut marks.

17     Q.   Okay.  You had a Bears jersey on that

18  night, right?

19     A.   Yes, sir.

20     Q.   And you had a T-shirt underneath?

21     A.   I do not recall.

22     Q.   And you had khaki pants on?

23     A.   Yes, sir.

24     Q.   All right.  And that's showing a scrape on

224

1    your -- which knee?  Is that your right knee?

2        A.   I don't -- yes.  It looks like that.

3        Q.   Okay.  And then this photograph I think

4    you said is taken the next day at Swedish Covenant

5    Hospital, correct?

6        A.   Looks like a building right by Swedish

7    Covenant.

8        Q.   Okay.  We marked it SC for that reason.

9    And this is what your face would have looked like

10   after being punched in the face on four separate

11   occasions?

12       A.   If you got hit in the face four times, I

13   guess it would look like that.

14       Q.   But what I'm trying to say is, you've

15   said, I got struck in the face four times.  These

16   are photographs the next day that would accurately

17   depict what your face looked like following those

18   events?

19       A.   Yes, sir.

20       Q.   All right.  Again this last photograph is

21   a photograph of your back.  There seems to be a red

22   mark on your back, right?

23       A.   Yes, sir.

24       Q.   And that you wouldn't have seen until

                                                      225

1    sometime after you were released to custody from

2    your father, correct?

3        A.    Right.

4        Q.    And this photograph shows a picture of

5    your hip with red marks on it?

6        A.    Yes, sir.

7        Q.    Is that your hip?

8        A.    Yes, sir.

9        Q.    And this was bruising.  Is this something

10   you noticed on August 31, the bruising?

11       A.    Yes, sir.

12       Q.    Okay.  Who took all these photographs,

13   your mom?

14       A.    Yes, sir.

15       Q.    Did you then on August 31 spend some time

16   with your mother?

17       A.    Yes, sir.

18       Q.    Did she come in from Valpo or did you go

19   out to Valpo?

20       A.    She came in from Valpo.

21       Q.    Did you end up spending the night with

22   her?

23       A.    I don't recall.

24       Q.    Okay.  If you were downtown Chicago and

                                                         226

1   you wanted to get to your mom's place in Valpo,

2   would you take the South Shore?

3       A.   Yes, sir.

4       Q.   All right.  You picked the South Shore up

5   where?

6       A.   Well, before the incident or after the

7   incident?

8       Q.   I mean, the South Shore you've picked up

9   before downtown?

10      A.   Well, before the incident you could get on

11  at Millenium.  After the incident I get on all the

12  way on at 18th and Roosevelt -- or Roosevelt, not

13  18th.

14      Q.   But prior to August 30, 2007, you had

15  taken the South Shore out of Millennium Park to

16  your mom's place, right?

17      A.   Or the next stop after.

18      Q.   Okay.  All right.  Did you ever talk to

19  your father about the events of that night from the

20  Soldier's Field altercation to the altercation with

21  Debra Coleman to the altercation with the guy with

22  the board to the two officers; and did you have a

23  discussion and spell all this out to him?

24      A.   I don't recall.

                                                    227

1     Q.    Okay.  When did you first see Dr. Krupika

2  following this?

3     A.    I don't recall.

4     Q.    She's produced some records.  It looks

5  like you went and saw her on September 5, 2007.  Do

6  you recall that?

7     A.    I don't recall, but if that's . . .

8     Q.    That's what --

9     A.    If that's what the record shows, then yes.

10     Q.    Then it shows September 11, 2007, another

11  on September 18, 2007.  Does that sound about right

12  to you?

13     A.    Yes, sir.

14     Q.    Is that the only three times that you've

15  seen Dr. Krupika since this event?

16     A.    I don't recall.

17     Q.    All right.  She has down 9-25 and

18  October 2, both of those appointments were

19  cancelled.  Do you remember cancelling some

20  appointments with her?

21     A.    I don't recall.

22     Q.    All right.  Can you tell me if you've seen

23  Dr. Krupika since September 18, 2007?

24     A.    I don't recall.

                                                228

1  Q. When's the last time you recall seeing

2 her?

3  A. I couldn't tell you.

4  Q. This year, 2010?

5  A. No, sir.

6  Q. 2009?

7  A. I don't recall.

8  Q. Well, I'm going to presume that you

9 haven't seen her since this last entry because if

10 she's produced all the records, she's got records

11 of when you went, I'm going to presume --

12  A. Then that's the last time.

13  Q. I don't have any reason --

14  A. I could not tell you.  I don't recall.

15  Q. Is it possible that the last time you saw

16 her was September 18, 2007?

17  A. It's possible.  But then again I don't

18 know.

19  Q. Have you treated with anybody else for any

20 mental health concerns other than Dr. Krupika?

21  A. No, sir.

22  Q. All right.  You were seeing Dr. Krupika

23 for some issues or struggles you were having with

24 the events of August 30, 2007, right?

229

1      A.    Yes, sir.

2      Q.    Why don't you tell me what your struggling

3    with, what was going on at that point?

4      A.    What was going on at the point?

5      Q.    Yeah, the reason you sought treatment from

6    Dr. Krupika?

7      A.    I don't recall what the exact reasons

8    were, but if you want to recall what I did

9    different in my life after those events, you can

10   ask me that one.  I don't recall what I talked to

11   her about at all.

12     Q.    Did you seek treatment from Dr. Krupika as

13   a result of the events of August 30, 2007?

14     A.    Yes, sir.

15     Q.    All right.  And what was the nature of the

16   treatment you sought?

17     A.    I don't recall.

18     Q.    Did she prescribe any medicine for you?

19     A.    I answered earlier.  I've never taken

20   medication.

21     Q.    That's right.

22           You testified in your first deposition

23   that at the Bears stadium when this event happened

24   you feared for your safety because of this guy.  Do
                                                   230

1    you recall that?

2        A.    What guy?

3        Q.    The guy that attacked you at the --

4        A.    The Bears game.

5        Q.    Yeah.  Do you remember talking about that?

6        A.    Yes.

7        Q.    And you told us today that Debra Coleman

8    made you fear for your life, you thought she was

9    trying to kill you, correct?

10       A.    And two other individuals with her and

11   Officer Kimble made me fear for my life, yes.

12       Q.    I'm getting there.

13             So when you left the Bears stadium you had

14   feared for your safety from that guy, right?

15   That's what you told us in your first dep?

16       A.    Then it's already answered, yes.

17       Q.    Second, Debra Coleman and the person she

18   was with, you feared for your life, right?  Third

19   is the gentleman who --

20       A.    Fourth.

21       Q.    Fourth person who approached you with the

22   stick that you were able to avoid, you feared that

23   he was trying to kill you, right?

24       A.    Yes, sir.

231

1      Q.   And then Officer Kimble, before you knew

2  he was a police officer, you thought he was another

3  person trying to in on the murder attempt, right?

4      A.   Well, the guy at the Bears game, I don't

5  recall what -- I don't believe he was trying to

6  kill me; but four people, Debra Coleman, two people

7  she was with and Officer Kimble I believe they were

8  trying to kill me.

9      Q.   What you told us in your first dep, and

10  I'm -- you said you feared for your safety.  That

11  was the words you used; is that a fair assessment?

12      A.   Yeah.  If you were in an altercation, you

13  would fear, too.

14      Q.   All right.  So in that evening there was a

15  lot of traumatic events that happened to you?

16      A.   Yes, sir.

17      Q.   All right.  And did you believe

18  Officer Collins was going to kill you or was he

19  just being out of line in your opinion with the way

20  he was treating?

21      A.   He was out of line.

22      Q.   Same with Officer Kimble, once you

23  realized he was a police officer and wasn't a part

24  of this group?

232

1    A.   He was being out of line.

2    Q.   So in terms of the ranking of events, the

3 actual fear for your life came from Debra Coleman,

4 the guy with the board and Debra Coleman, those

5 three people you thought were going to kill you?

6    A.   And Officer Kimble.

7    Q.   For the period of time you didn't realize

8 he was an Officer, you thought he was trying to get

9 you and kill you?

10    A.   Yes.  Then once I was locked up, I had

11 some more fears.

12    Q.   Right.

13    A.   And do you want me to tell you the other

14 fears?

15    Q.   Yes.

16    A.   Fear that I was going to get raped.  I

17 don't know.  I was cuffed and, you know, they could

18 do anything to me.

19    Q.   Who?

20    A.   The police officers, Metra.

21    Q.   All right.  You weren't in the room with

22 anybody else?

23    A.   No, but I was down there by myself in a

24 small cell.

233

1      Q.   So your fears were that one of these

2   officers -- I take it Officer Collins or

3   Officer Kimble, you feared one them may rape you?

4      A.   Or you could go with Geanes is the name.

5      Q.   What did he do to think that he may be a

6   violent type?

7      A.   Well, he never attacked me, but he's also

8   with them.

9      Q.   How about the Chicago Police Department,

10  those two guys, they were with them, too?

11     A.   They were only there for a little bit.

12     Q.   What about the paramedics, they were

13  there?

14     A.   Yeah, but they never saw me.  The

15  paramedics never saw me.  So who knows if they even

16  knew I was sitting in there.

17     Q.   When did you find out Debra Coleman

18  actually filed a complaint against you?

19     A.   Once I was getting charged with battery --

20     Q.   And resisting arrest?

21     A.   Yes.

22     Q.   You appeared in court for that?

23     A.   Yes, sir.

24     Q.   All right.  And I read the transcript on

234

1  that.  What happened in court is Debra Coleman

2  didn't show up; is that right?

3      A.   Correct.

4      Q.   All right.  And because she didn't show

5  up, those charges were dismissed?

6      A.   Correct.

7      Q.   All right.  So whether or not those

8  charges could have been proven or disproved, either

9  way, we'll never know because Debra Coleman never

10  showed, right?

11     A.   Correct.

12     Q.   I think if I read the transcript correct,

13  the judge kind of told you that you should listen

14  to your dad more; and you'd be in the courtroom

15  less, he said something like that, right?

16     A.   I don't know.

17     Q.   It's in the transcript.

18          Your fear of being raped, what else, walk

19  me . . .

20     A.   They could do anything.  If not rape, they

21  could have put me in a car, taken me, you know, and

22  killed my.  Anything could happen.

23     Q.   Did you really believe that's what they

24  were going to do versus simply being out of line to

235

1    rough you up?

2        A.   Yes.

3        Q.   So you thought they were now going to take

4    you in a car, kill you and dump your body?

5        A.   They could do anything to me.

6        Q.   I understand.  I want to know what was the

7    reasonable belief you had.

8        A.   One reason I was white.  Another reason

9    they believed that I was -- the way I took it that

10   they treated me like I was a Ku Klux Clan member.

11   That's the way I took it, and . . .

12       Q.   Do you think they were prejudice?

13       A.   Absolutely.

14       Q.   Okay.

15       A.   Now, with Geanes, I don't know, he never

16   hit me, so I just, I don't know, I can't answer on

17   him; but the other two, absolutely, they were, yes.

18       Q.   What other fears that you had as a result

19   of all of this?

20       A.   Well, I just stated those were two of the,

21   you know . . .

22       Q.   Okay.  How about afterwards, after you got

23   out of the jail?

24       A.   After I got out of jail?

                                                  236

1    Q.   Uh-huh.

2    A.   I couldn't go -- I didn't go anywhere near

3  there.  I didn't even ride on a Metra train

4  anymore.

5    Q.   How often had you ridden on a Metra train

6  prior to this?

7    A.   A number of times.  I worked at UPS, so I

8  took the Metra from Edgebrook to Northbrook, so a

9  number of times.

10    Q.   What was your fear about riding a Metra

11  train as a result of the incident that happened on

12  August 30?

13    A.   Well, they're Metra police officers, and

14  they I've seen them on the train before.

15    Q.   Okay.

16    A.   So I was thinking what if I ran into them,

17  what could have happen now.

18    Q.   Okay.  And do you have fears about running

19  into Debra Coleman?

20    A.   I have fear on any person that's downtown

21  now.  I don't come down here a lot.

22    Q.   Okay.  But the reason on that is it in

23  part for your altercation with Debra Coleman, her

24  acquaintance and the gentleman with the board,

237

```
 1   right?

 2       A.   That I don't come downtown.

 3       Q.   Yeah, that's part of it?

 4       A.   And because of Officer Kimble and Collins.

 5       Q.   Right.

 6       A.   I don't come down here.  I try to stay

 7   away from here.

 8       Q.   There's a host of reasons you try to stay

 9   out of downtown, right?

10       A.   Yes.

11       Q.   Have you been to a Bears game since that

12   day?

13       A.   No, sir.

14       Q.   Okay.  Do you ever worry about running

15   into that guy that you had the altercation with at

16   the Bears game?

17       A.   No, sir.

18       Q.   Do you think he'd recognize you?

19       A.   Well, do I --

20       Q.   As of three days ago, maybe not.

21       A.   No.  I don't have long hair anymore.

22   That's like, you know, little high school, past

23   high school thing.  I don't do that anymore.

24       Q.   If you did have that same hairdo, do you
```

238

1    think that guy would recognize you, could?

2        A.    He might.  I don't know if he -- I don't

3    know if he could recognize me or not.

4        Q.    Okay.  Does at that bother you?

5        A.    That he would recognize me?

6        Q.    That there's a guy out there that could

7    that you had an altercation with?

8        A.    I don't think he's trying to kill me.  I

9    mean, I don't -- I doubt he -- I mean, once again,

10   I look very different from there.

11       Q.    Because you look different, you are not as

12   concerned with the guy from Soldier's Field because

13   you look different today.  You've shaved your hair,

14   fair enough?

15       A.    Yes, and I don't know anything about that

16   guy.  All right.  I mean, that was a very minor

17   thing, and so I doubt the guy even takes it

18   serious.  I couldn't tell you if he does take it

19   serious.

20       Q.    He's out there, though?

21       A.    He's out there.

22       Q.    And he attacked you unprovoked for no

23   reason?                    --

24       A.    Yes, sir.

                                              239

1      Q.   And he's probably out there somewhere?

2      A.   But once again this is also at a Bears

3   game.  I don't believe the guy was trying to kill

4   me at all.  He was not trying to kill me at a Bears

5   game.

6      Q.   Tried to rough you up a little bit?

7      A.   It's different than walking around the d

8   city streets.

9      Q.   When you see homeless people, does it

10  create anxiety for you?

11     A.   Absolutely.

12     Q.   Okay.  Do you have anxiety when you see

13  black people?

14     A.   No.

15     Q.   Okay.  When you see a police officer of

16  any sort do you have anxiety?

17     A.   Yes.

18     Q.   Okay.  Doesn't matter if they're white,

19  black or anything else?

20     A.   Only if they're Metra police officers.

21     Q.   The Metra police officers concern you?

22     A.   Absolutely.

23     Q.   Do you now understand the Metra police

24  officer to have full police authority, the same as

                                                240

1    a Chicago police officer?

2        A.    I don't know.

3        Q.    Don't know, okay.

4              Did Dr. Krupika ever give you a diagnosis

5    of anything of any sorts?

6        A.    I don't recall.

7        Q.    Okay.

8        A.    If it's out there, I don't know.

9        Q.    Okay.  You're certainly not treating today

10   for any of your ailments from August 30, 2007?

11       A.    I haven't been to treatment, no; but it

12   still affects me.

13       Q.    How does it still affect you?

14       A.    As I said earlier I don't come down here.

15   You know, I don't come down here unless I have to

16   come down here to do this.  I try to stay away from

17   downtown.

18       Q.    So downtown scares you?

19       A.    Yes.

20       Q.    Okay.  After the August 30, 2007, event

21   when was the next time that you ever saw Haven?

22       A.    I never saw her after that.

23       Q.    Okay.  Kind of unique name, Haven?

24       A.    Yes, sir.

241

1      Q.    Not a lot of Havens out there.

2            Okay.  What anxiety, if anything, do you

3   have with public transportation?  Is it just Metra

4   or all public transportation now?

5      A.    Well, I read in the '70s and '80s that

6   there was a ton of girls getting raped, and people

7   got murdered on the train and that's why they put a

8   lot of police officers on the train.  So it's a

9   dangerous thing to take the train.

10     Q.    What's dangerous about taking the train?

11     A.    You could get attacked.

12     Q.    Well, you were attacked?

13     A.    Robbed.

14     Q.    Well, you were attacked by Coleman and

15  those folks, and that wasn't on the train?

16     A.    Well, no, it wasn't on a train, so . . .

17     Q.    Okay.  So fair enough that those events

18  can happen almost everywhere?

19     A.    It's a bad world.  Anything can happen.

20     Q.    Sure, anywhere.

21     A.    Anything can happen anywhere.  You could

22  be in the nicest lowest crime area in the world,

23  and something can happen.

24     Q.    Have you ever talked with anybody at the

                                              242

1    Chicago Police Department about these events other

2    than your father?

3        A.   No, sir.

4        Q.   Other than this event with the Metra

5    Police Department, have you had any other bad

6    experience or improper experiences with people of

7    authority?

8        A.   No, sir.

9        Q.   Okay.  Your intent at this point is to get

10   your associate's degree, right, and go off to a

11   four-year college, right?

12       A.   Yes, sir.

13       Q.   Okay.  Do you have any specialized

14   interest of what you're trying to -- from a degree

15   standpoint?

16       A.   It's up for grabs.  I've got of a few

17   things I'd like to do.

18       Q.   What are you thinking?

19       A.   Sports announcer would be cool.

20       Q.   Okay?

21       A.   Maybe a fireman or a police officer.

22       Q.   Okay.  Are you a member of Facebook,

23   Myspace, any of those great things out there?

24       A.   No, sir.

                                            243

1    Q.   Okay.  I think I'm --

2    MR. FITZSIMMONS:  Are you going to use the

3  magic word done.

4    MR. KOEHLER:  Close.  The magic word is right.

5  That's why you don't do deps on Friday.  That's my

6  fault, my schedule.

7  BY MR. KOEHLER:

8    Q.   Is it fair to say you don't know what

9  Debra Coleman told the Metra police officers as to

10  what occurred between you and her that evening?

11    A.   Correct, but I assume she said I attacked

12  her if I got charged with that.

13    Q.   Okay.  You were charged that evening by

14  Officer Kimble?

15    A.   I do not recall.

16    Q.   Okay.  The arrest and placement in the

17  cell and the handcuffing was done by Officer Kimble

18  and Officer Collins, correct?

19    A.   I stayed -- once Officer Kimble cuffed me

20  from the time from Garland Court, I was cuffed the

21  whole time.

22    Q.   All right.  But my point is Officer Geanes

23  had nothing do with that?

24    A.   He had nothing do with that.

                                                    244

1     Q.   All right.

2     MR. KOEHLER:  Do you have questions?  I may

3  have stuff to follow up on.

4     MS. ROSEN:  Okay.  Yeah.

5                  EXAMINATION

6  BY MS. ROSEN:

7     Q.   Does your dad still have tickets to

8  Soldier'S Field to the Bears games?

9     A.   No.  No, ma'am.

10    Q.   When did he give them up?

11    A.   I do not recall.

12    Q.   Okay.  Is that why you don't go to the

13  Bears games anymore?

14    A.   Absolutely not.

15    Q.   I wanted to go back, Matthew.  You talked

16  about the time that you were handcuffed, you're in

17  the cell; and I think you said Collins pushed you

18  down on the ground.  Do you remember that?

19    A.   Yes.

20    Q.   You said your foot was -- or let me get

21  this straight.

22         Your foot was also chained, cuffed to --

23    A.   My ankle.

24    Q.   Your ankle?

245

1     A.    Yes, yes.

2     Q.    And then your hands were behind your back?

3     A.    Yes.

4     Q.    And you were cuffed?

5     A.    Yes.

6     Q.    And you said it was Collins who came and

7   pushed you?

8     A.    Yes.

9     Q.    The cuff that was around your ankle, was

10  it on top of your pants or under your pants?  Do

11  you remember?

12    A.    I believe on top of my pants, over my

13  khakis.

14    Q.    And then when he came to push you to the

15  ground, were you standing or sitting?

16    A.    I was standing.

17    Q.    You were standing facing him?

18    A.    Yes.

19    Q.    Why were you standing?

20    A.    Well, all right.  I was cuffed.  My back's

21  there.  There's the door.

22    Q.    Right.

23    A.    Here I move over, get up.  My one ankle is

24  cuffed, so I could still move around.  There's a

                                                    246

1  bar, so I can move a little bit.  I see the police

2  are there.  I kick the door.  It opens the door.  I

3  said, I want to talk to the real police; and then

4  he threw me down.

5       Q.   When you say, they you mean Collins?

6       A.   No, the Chicago Police Department.  I seen

7  them and Collins opened the door and I said, I want

8  to talk to the real police.  He threw me down.

9       Q.   When you hit the ground what part of your

10  body hit the ground first?

11       A.   Well, my back.  I fell back.  I don't

12  know.

13       Q.   Did your head hit the ground?

14       A.   I don't recall.

15       Q.   Did your back hit the ground?

16       A.   Yes.  I fell, I mean, I don't -- my back

17  obviously hit the ground.  I fell back.  I hit the

18  ground.

19       Q.   Hands cuffed behind your back?

20       A.   Yes.

21       Q.   Basically what happened is since your foot

22  was cuffed, you went straight down like that,

23  right?

24       A.   I fell back and pulled back, boom, ankle

247

1    was cuffed.

2        Q.   Did you say your head didn't hit the

3    ground?

4        A.   I don't know if it did or not.

5        Q.   Could have.

6        A.   Could have.

7        Q.   But you don't remember?

8        A.   I don't recall.

9        Q.   Ground was what, like concrete?

10       A.   Yes.

11       Q.   You said there was a toilet in the -- in

12   that little cell?

13       A.   Yes.

14       Q.   Did you ever use the toilet?

15       A.   I don't recall.  Whatever if I answered

16   this on the last deposition, so . . .

17       Q.   Do you remember one way or the other

18   whether you ever used the toilet?

19       A.   I don't recall.

20       Q.   Do you remember one way or the other

21   whether you ever had to use the toilet?

22       A.   Well, yes.  I was in there for quite some

23   time, so . . .

24       Q.   Okay.

                                              248

1     A.   Most likely it would fit, my bladder would

2   have filled up by then; and I probably would have

3   had to use the washroom.

4     Q.   Well, you didn't urinate on yourself, did

5   you?

6     A.   I answered this on the last deposition,

7   so . . .

8     Q.   You didn't --

9     A.   Whatever I said.

10    Q.   I just want to know what you remember

11  today because I don't remember seeing it in your

12  deposition.

13    A.   If I urinated on myself?

14    Q.   Did you or didn't you?

15    A.   I don't recall.

16    Q.   You don't remember whether you urinated on

17  yourself or urinated on the floor?

18    A.   I don't recall.

19    Q.   Okay.  When you arrived at the Chicago

20  police station, did you have any obvious pain?

21    A.   I don't recall.

22    Q.   When you arrived at the Chicago police

23  station, did you have any obvious injury?

24    A.   I couldn't see.  My pants were still on

249

1   me, so I couldn't see.  And I don't recall.

2       Q.   What if someone was looking at you, did

3   you have any of obvious injury?

4       A.   I don't recall.

5       Q.   When you got to the Chicago Police

6   Department, did you tell anyone there that -- what

7   happened to you with these Metra officers?

8       A.   I don't recall.

9       Q.   Let me just go back a little bit because

10  you talked a lot about Kimble and Collins, and it

11  sounds like Geanes was the least involved of the

12  three; is that a fair statement?

13      A.   Correct.

14      Q.   Is there anything else that you want to

15  tell me about that Geanes did that you think was

16  wrong?

17      A.   I couldn't tell you.

18      Q.   Okay.  Do you think that you have told me

19  everything about what Geanes did in the course of

20  this deposition or the last deposition?

21      A.   Yes.

22      Q.   Matthew, can I ask you whose idea was it

23  to file a lawsuit?  Was it yours or your parents'?

24      MR. FITZSIMMONS:  Objection.  I'm going to

                                                  250

1    instruct him not to answer.

2        MR. KOEHLER:  On what basis?

3        MR. FITZSIMMONS:  That is attorney/client

4    privilege.

5        MS. ROSEN:  It's not attorney/client privilege.

6    I want to know whether he decided --

7        MR. FITZSIMMONS:  I'm going to object and

8    direct him not to answer.  You can get the judge to

9    make a ruling.

10           I'm directing you not to answer that

11   question.

12   BY MS. ROSEN:

13       Q.   How about this, Matthew, prior to the time

14   that you ever had contact with Mr. FitzSimmons or

15   anybody from his firm, did you think you wanted to

16   file a lawsuit or was that something that you spoke

17   with your parents about?

18       MR. FITZSIMMONS:  I'm going to direct him not

19   to answer that question.

20           Do not answer that question.

21       MR. KOEHLER:  What's the basis?

22       MS. ROSEN:  What's the basis?

23       MR. FITZSIMMONS:  Basis is the same thing, goes

24   into attorney/client privilege.

                                                251

1      MS. ROSEN:  Well, I'm asking him to tell me

2    what -- when the decision was made and whether he

3    made any decision prior to seeing you.

4      MR. FITZSIMMONS:  And I'm going to direct him

5    not answer any questions that are in this line,

6    Sue-Ann.

7    BY MS. ROSEN:

8      Q.   Other than meeting with Mr. FitzSimmons on

9    this case did you talk to any other attorney with

10   respect to what happened to you?

11     MR. FITZSIMMONS:  And again --

12     MS. ROSEN:  On August 30, 2007.

13     MR. FITZSIMMONS:  That's classic

14   attorney/client privilege.

15     MR. KOEHLER:  Not the conversation, just the

16   fact of it.

17     MS. ROSEN:  Just whether he walked into an

18   office or got onto a phone.  I don't want you to

19   tell me what you said.  I just want to know if you

20   talked to any other attorney other than Mr.

21   FitzSimmons.

22     THE WITNESS:  I don't recall.

23   BY MS. ROSEN:

24     Q.   Now, I understand that Mr. FitzSimmons is

                                            252

1    a friend of your family; is that correct?

2        A.   Yes.

3        Q.   How long have you known him before this

4    incident of August 30, 2007?

5        MR. FITZSIMMONS:  This is -- yeah.  This is

6    going over board, Miss Rosen.  I'm going to direct

7    him not to answer that question as to his

8    relationship with his attorney.

9    BY MS. ROSEN:

10       Q.   Other than this incident, Matthew, it's my

11   understanding that you have not had any other legal

12   situations with respect to either criminal law or

13   civil law; is that right?

14       A.   When I was young the motorcycle blew up in

15   front of my face, it was a toy motorcycle blew up

16   in my face.  That's the only lawsuit that's ever

17   gone down.

18       Q.   Okay.  So you had a lawsuit with respect

19   to that?

20       A.   Yeah, but I was like 4 years old.

21       Q.   Okay.  You said that your father picked

22   you up from the police station, right?

23       A.   Correct.

24       Q.   And then where did you go?

                                              253

1    A.   Home.

2    Q.   To his home?

3    A.   To my home.

4    Q.   On Nottingham?

5    A.   Yes.

6    Q.   And was your mother there at the time?

7    A.   No, ma'am.

8    Q.   Okay.  Your mother came sometime later to

9  that house?

10    A.   Yes, ma'am.

11    Q.   Now, I think if I remember this correctly,

12  you didn't go to the hospital until late in the

13  afternoon maybe around 5:00 in the late afternoon

14  on August 31.  Does that sound right?

15    A.   I couldn't tell you.

16    Q.   Okay.  You would have to depend upon what

17  the records show, right?

18    A.   Yes.

19    Q.   Why didn't you go to the hospital before

20  then?

21    A.   Couldn't tell you.

22    Q.   Did you see any reason to go to the

23  hospital before then?

24    A.   I don't believe my -- the urinating really

254