CASE NO. _____08 cv 3131_____

ATTACHMENT NO. _9_____

EXHIBIT _____D_____

TAB (DESCRIPTION) _____

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MATTHEW GRANBERG,         )

            Plaintiff,    )   ORIGINAL

    -vs-                 ) No. 08 CV 3131

METRA POLICE OFFICER      )

DION KIMBLE, STAR #105,    )

SERGEANT ALFRED COLLINS, and )

POLICE OFFICER LARRY GEANES, )

           Defendants.    )

 

        The deposition of DEBORAH COLEMAN, called

for examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Raelene Stamm, a notary public within and

for the County of Cook and State of Illinois, at

547 West Jackson Boulevard, 15th Floor, Chicago,

Illinois, on the 12th day of June, 2009, at the

hour of 9:00 a.m.

 

Reported by:  RAELENE STAMM, CSR

License No.:  084-004445

1

```
 1      APPEARANCES:

 2           ROBERT D. KUZAS, LTD., by

 3           MR. JOSEPH T. FITZSIMMONS

 4           222 North LaSalle Street, Suite 200

 5           Chicago, Illinois  60601

 6           (312) 629-1400

 7               On behalf of the Plaintiff;

 8

 9           METRA LAW DEPARTMENT, by

10           MS. JENNIFER J. MAYHEW

11           MS. SUE ANN ROSEN

12           547 West Jackson Boulevard, 15th Floor

13           Chicago, Illinois  60661

14           (312) 322-7064

15               On behalf of the Defendant.

16

17      .

18

19

20

21

22

23

24
                                                    2
```

1                    I N D E X

2    WITNESS                          EXAMINATION

3    DEBORAH COLEMAN

4        By Ms. Mayhew                        4

5        By Mr. FitzSimmons                  37

6

7

8

9

10

11                E X H I B I T S

12   NUMBER                          MARKED FOR ID

13   Coleman Deposition Exhibit

14       No. 1                            32

15

16

17

18

19

20

21

22

23

24

                                            3

1                    (Whereupon, the witness was

2                         duly sworn.)

3                    DEBORAH COLEMAN,

4     called as a witness herein, having been first duly

5     sworn, was examined and testified as follows:

6                         EXAMINATION

7     BY MS. MAYHEW:

8        Q.    Could you please state and spell your name

9     for the record?

10       A.    Deborah Coleman, D-e-b-o-r-a-h,

11    C-o-l-e-m-a-n.

12       Q.    And, Deborah, have you ever given a

13    deposition before?

14       A.    No.

15       Q.    Okay.  There are a few ground rules that I

16    want to go over, okay?  We have a court reporter

17    taking down everything that's being said, so I ask

18    that all of your answers please be out loud verbal

19    responses?

20       A.    Okay.

21       Q.    Because the court reporter can't take down

22    nodding your head, shrugging your shoulders and

23    gestures, okay?

24       A.    Okay.

                                                      4

1     Q.   If at any time you don't understand a

2    question that I ask, please let me know.  I'll be

3    happy to rephrase that question, okay?

4     A.   Okay.

5     Q.   If you do answer a question that I ask,

6    I'm going to assume that you understood what that

7    question meant; is that all right?

8     A.   Okay.

9     Q.   If you need a break at any time, please

10   let us know.  All I ask is that if a question is

11   pending, answer the question before we take the

12   break.

13     A.   Okay.

14     Q.   Okay.  And one other thing, there may be

15   times where you know where I'm going with my

16   questions, you can kind of anticipate the question

17   before I get it all out there.  For the sake of the

18   court reporter because she can only take down one

19   person talking at a time, I ask that you please try

20   to wait until I've completed my question.

21   Likewise, all of this will go for Mr. FitzSimmons

22   as well, wait until we finish the question before

23   answering; and we'll do your best to wait until

24   you've completed your answer before asking another

5

```
 1    question.

 2        A.    Okay.

 3        Q.    All right.  Now, Deborah, where do you

 4    live?

 5        A.    11029 South Parnell.

 6        Q.    That's in Chicago?

 7        A.    Chicago, Illinois 60628.

 8        Q.    All right.  And how old are you, Deborah?

 9        A.    52.

10        Q.    How long have you lived at 11029 South

11    Parnell?

12        A.    About -- I've lived there about ten years.

13        Q.    Who lives there with you?

14        A.    My sister.

15        Q.    Anyone else?

16        A.    My brother-in-law, my nephew.

17        Q.    Do you have any children?

18        A.    Yes, I do.

19        Q.    How many children do you have?

20        A.    Three.

21        Q.    Okay.  Are they all grown-up?

22        A.    Two.

23        Q.    What are their ages your children's ages?

24        A.    33, 19 and 17.
```

6

1    Q.   Okay.  Did you graduate high school?

2    A.   No.

3    Q.   Did you ever get your GED?

4    A.   No.

5    Q.   Do you have any vocational training?

6    A.   I had it, but I forgot.

7    Q.   How long ago was that?

8    A.   Over 20 years.

9    Q.   Deborah, there's some questions that I ask

10  everyone at every deposition, so please don't be

11  offended by these questions, okay?

12        Have you ever been convicted of a felony?

13    A.   No.

14    Q.   Have you ever been convicted of a crime

15  involving deceit or dishonesty such as retail

16  theft?

17    A.   No.

18    Q.   Are you employed?

19    A.   Yes.

20    Q.   Who's your employer?

21    A.   Streetwise.

22    Q.   And what is Streetwise?

23    A.   It's a newspaper.

24    Q.   How long have you worked for Streetwise?

7

```
 1      A.    17 years.

 2      Q.    When you first started working for

 3   Streetwise, was there any sort of training or

 4   orientation that you went through?

 5      A.    Orientation.

 6      Q.    And what is it that you actually do for

 7   Streetwise?

 8      A.    Sell papers.

 9      Q.    Okay.  Are there any particular rules for

10   working with Streetwise?

11      A.    Yes.

12      Q.    What are some of those rules?

13      A.    We're not supposed to force people to buy

14   the paper.  We're not supposed to ask for money.

15   And that's about it.

16      Q.    When you say you're not supposed to ask

17   for money, I mean, obviously you're asking for the

18   money to buy the paper.  You mean -- what do you

19   mean you're not supposed to as people for money?

20      A.    We're not supposed to force them to buy

21   the paper or just come out and ask them, oh, can

22   you give me a dollar.

23      Q.    Okay.  What will happen if you do

24   something like that, if you try to force someone to
```

8

1    buy a paper or you ask them for money like a

2    dollar?

3        A.    If someone calls in on us, they'll take

4    our badge.

5        Q.    Okay.  So essentially you lose your job?

6        A.    Yes.

7        Q.    I want to take you back to August 30,

8    2007.  That was a Thursday night.  Do you remember

9    that date?

10       A.    Yes.

11       Q.    Okay.  What were you doing that evening?

12       A.    Selling papers.

13       Q.    Was that for Streetwise?

14       A.    Streetwise.

15       Q.    Where were you selling papers?

16       A.    In front of 7-Eleven.

17       Q.    What 7-Eleven, where at?

18       A.    On Michigan Avenue.

19       Q.    Where on Michigan Avenue, is that kind of

20   in the Loop area?

21       A.    In the Loop area.

22       Q.    Were you actually right out front of

23   7-Eleven or were you nearby, where were you

24   actually standing?

9

1     A.    I was standing over to the side.

2     Q.    Okay.  Why is it you weren't standing

3  right in front of the 7-Eleven?

4     A.    They don't allow you to stand directly in

5  front of the store.

6     Q.    By they, who's they?

7     A.    The owner.

8     Q.    The owner of the 7-Eleven?

9     A.    Yes.

10    Q.    And did you -- what did you have on you

11 that evening that indicated that you worked for

12 Streetwise?

13    A.    My badge.

14    Q.    Did you have the papers with you?

15    A.    Yes.

16    Q.    While you were selling Streetwise on

17 August 30, 2007, near the 7-Eleven, what happed?

18    A.    When I was selling the paper?

19    Q.    Yes.

20    A.    Can you repeat the question?

21    Q.    Sure.

22          That night August 30, 2007, when you were

23 selling the papers near the 7-Eleven, what

24 happened?  What occurred?

                                                    10

1      A.   Well, I was standing hollering,

2  Streetwise, Streetwise, the newspaper, Streetwise.

3  Guy come up, ask me for 50 cent or a quarter, told

4  him I didn't have it.  He went into the store, came

5  out the store, went across the street.  Then he

6  come back with a stick, hit me with the stick.

7  Because he told me I wasn't homeless, bitch, you

8  not homeless.  Look at you dressed, you're not

9  homeless.  Never did I say I was homeless.

10     Q.   Well, let me ask you this.  This guy who

11  came up, where did he come from?

12     A.   Across the street.

13     Q.   So the 7-Eleven that you were near, was

14  that on the east or the west side of the street?

15     A.   It's on the west side of the street.

16     Q.   Okay.  So when you say this guy came from

17  across the street, he came from the east side?

18     A.   Yes.

19     Q.   Okay.  And you said he asked you for

20  money?

21     A.   Yes.

22     Q.   Okay.  Did he ask you for a specific

23  amount?

24     A.   It was either a quarter or 50 cents.

                                                    11

1    Q.   Okay.  What did you say to him at that

2  point?

3    A.   I told him I didn't have it.

4    Q.   Did he say anything else to you at that

5  time?

6    A.   Not right at that time, no more than,

7  bitch, you're not homeless.

8    Q.   You said he went into the store, would

9  that be the 7-Eleven?

10   A.   Yes.

11   Q.   Okay.  And then you said he came out of

12  the store?

13   A.   Yes.

14   Q.   When he came out of the store did he have

15  anything with him?

16   A.   No.

17   Q.   And did he say anything to you when he

18  came out of the store?

19   A.   He didn't say anything when he came out

20  the store.

21   Q.   And when he came out of the store you said

22  he went across the street, would that be back over

23  to the east side?

24   A.   Back to the east side.

                                              12

1    Q.    Did you see what he was doing when he went

2    over to the east side of the street?

3    A.    No.

4    Q.    Okay.  And what were you doing when he

5    walked back over to the east side of the street?

6    A.    Still selling my papers.

7    Q.    Was it dark outside?

8    A.    Yes.

9    Q.    All right.  Can you tell me -- this is

10   Michigan Avenue.  Were there other pedestrians,

11   people walking by in the area?

12   A.    Yes.

13   Q.    Okay.  Did you at any time ask this

14   gentleman who had approached you, did you at any

15   time ask him for money?

16   A.    No.

17   Q.    Okay.  Did you try to force him to buy

18   Streetwise?

19   A.    No.

20   Q.    Okay.  So he went back over to the street

21   after he came out of the 7-Eleven, and then you

22   said he approached you again?

23   A.    Yes.

24   Q.    What happened then?

13

1     A.    When he approached me again, that's when

2   he told me, bitch, you're not homeless.  Look at

3   how you're dressed, look at how you're dressed.

4   You're not homeless.

5     Q.    How were you dressed that evening?

6     A.    Casual.

7     Q.    Okay.

8     A.    Clean.

9     Q.    When he came back from across the east

10  side of the street that second time after he had

11  come out of the store, did he have anything?

12     A.    A stick.

13     Q.    Did you see where he got that from?

14     A.    No.

15     Q.    So he says, bitch, you're not homeless,

16  what happens then?

17     A.    An I said, I didn't tell you I was

18  homeless.

19     Q.    Did he say anything after that?

20     A.    Not that I recall.

21     Q.    Okay.  Well, did he do anything after you

22  told him that you never said you were homeless?

23     A.    He raised the stick, and I asked him what

24  are you raising the stick for.  And one word led to

                                             14

```
 1    another.

 2        Q.    What do you mean by one word led to

 3    another?

 4        A.    We started to arguing.

 5        Q.    Okay.  What were you saying to him?  What

 6    was he saying to you?

 7        A.    I was telling him, you don't scare me.

 8        Q.    What was he saying to you?

 9        A.    I'll hit you upside your head with this

10    stick.

11        Q.    And then what happened?

12        A.    I told him, come on with it.

13        Q.    Why did you do that?

14        A.    Because I wasn't scared of him.

15        Q.    So what did he do?

16        A.    Popped me on my wrist with the stick.

17        Q.    Which wrist?

18        A.    My left wrist.

19        Q.    What happened after he hit you on the

20    wrist with the stick?

21        A.    My watch fell off.

22        Q.    Anything else?

23        A.    No.

24        Q.    What did he do --
```

15

1    A.    Started to running.

2    Q.    Let me ask that full question.

3          What did he do after he hit you on the

4    wrist?

5    A.    Started to running.

6    Q.    When he hit you on the wrist, did you say

7    anything?

8    A.    I just broke and went to running behind

9    him.

10   Q.    Why did you start running behind him?

11   A.    Because I was going to get him back.

12   Q.    What do you mean, get him back?

13   A.    Hit him.

14   Q.    With what?

15   A.    My fist.

16   Q.    You didn't have anything with you?

17   A.    No.

18   Q.    Did he -- when he hit you with the stick,

19   he took off running.  What way did he run?

20   A.    South.

21   Q.    South on Michigan Avenue?

22   A.    Yes.

23   Q.    Okay.  And what happened --

24   A.    South and then east.  What is that?  West,

                                                          16

1    south, I'm just trying to -- back to State is west.

2    Southwest.

3        Q.    Okay.  So he began to run southwest and

4    you were going after him.  Was anyone else going

5    after him?

6        A.    An officer, I seen him, and then started

7    running behind him.

8        Q.    And where was the officer when you first

9    saw him?

10       A.    Down by the building on the corner.

11       Q.    Okay.  The corner of Michigan and

12   Randolph?

13       A.    Yes.

14       Q.    All right.  Were you yelling or shouting

15   anything when you were running?

16       A.    Not that I recall.

17       Q.    Was anyone else?

18       A.    Just people coming behind trying to see

19   what was going on.

20       Q.    Okay.  You said you saw the officer who

21   was at the corner of Randolph and Michigan.  He

22   started to run after the person who hit you with

23   the stick?

24       A.    Yes.

                                                    17

1    Q.   And did the officer stay anything to the

2    person who had hit you with the stick?

3    A.   Told him to stop.

4    Q.   Okay.   The person who hit you with a

5    stick, did he stop?

6    A.   No.

7    Q.   Okay.   So then what happened?   The officer

8    told him to stop, what happened next?

9    A.   He kept on chasing him, and then he caught

10   up with him because he stopped for his breath and

11   he asked him to put his hands behind his back.   He

12   wouldn't put his hands behind his back.   He asked

13   him again.   He still wouldn't.   So the officer

14   reached for his hand.   He snatched it back.   And

15   then I looked off.   And next thing I saw they was

16   over in the grass.

17   Q.   Okay.   And the grass, let me go back a

18   minute.

19        You said you looked off.   So there was a

20   brief period of time where they were out of your

21   view?

22   A.   Yeah.

23   Q.   And when you looked back you said they

24   were off in the grass.   What grass is this?   Where

                                                        18

1    is this?

2        A.    The grass in front of the building about

3    right behind the Art Institute.  I think that's the

4    Art Institute.

5        Q.    Let me ask you this.  There's just west of

6    Michigan on Randolph there's kind of a little

7    street that runs south, kind of that runs into

8    Randolph.  Is that the street you're talking about?

9        A.    Yes.

10       Q.    Okay.  It's the Cultural Center actually

11   is on the corner of Michigan and Randolph.  Is that

12   the building that this street is behind?

13       A.    The same building that Metra's in.

14       Q.    Okay.  There's like some steps that go

15   down into the Metra station.  It's the building on

16   that corner?

17       MR. FITZSIMMONS:  I'm going to object to this

18   entire line of questioning for the record.  It's

19   her testimony, not yours Miss Mayhew.

20   BY MS. MAYHEW:

21       Q.    I just want to be clear.  You said the

22   same building that's by the Metra station.  The

23   Metra station you're talking about, is that the

24   Metra station that's right at Randolph and

                                                    19

1    Michigan?

2        A.    Okay.  When they fell into the grass it

3    was right across the street from the Metra station

4    building.

5        Q.    Okay.  And the street, that's the street

6    that's just west -- is that the street that's just

7    west of Michigan Avenue?

8        A.    West of Michigan.

9        Q.    Okay.  And they fell into the grass.  Did

10   you actually see them fall?

11       A.    No.  When I looked around they was in the

12   grass.

13       Q.    Okay.  And what happened then while they

14   were in the grass?  What did you observe?

15       A.    They was tussling.  He was trying to get

16   the handcuffs on him.

17       Q.    When you say he, you mean the officer?

18       A.    The officer.

19       Q.    And the person who hit you with the stick,

20   what was he doing while the officer was trying to

21   put handcuffs on him?

22       A.    Trying to resist.

23       Q.    What do you mean by that?

24       A.    Didn't let him put them on right off.

                                              20

```
1      Q.   Okay.  And while this was going on did you

2   observe the officer hit this person with a baton

3   during the time that you saw this while they were

4   on the ground?

5      A.   No.

6      Q.   All right.  So they're tussling.  They're

7   often the ground.  The officer is trying to put the

8   cuffs on him.  What happened next?

9      A.   Well, he got the cuffs on him.

10      Q.   Okay.  And where were you standing when he

11   managed to get the cuffs on him?

12      A.   Right outside the little fence, standing

13   like in the street.

14      Q.   When you say the little fence, what little

15   fence are you talking about?

16      A.   There was a little iron fence that they

17   fell off into the grass.

18      Q.   There's an iron fence that goes around the

19   area where they fell?

20      A.   Yes.

21      Q.   Okay.  Did you see them fall over this

22   iron fence?

23      A.   No.

24      Q.   But they were in the area where this fence
```
                                                    21

1     is?

2          A.    Yes.

3          Q.    Okay.  So you were standing there, and

4     then what happened?  He got the cuffs on, and then

5     what happened?

6          A.    Then he lifted him up and started walking

7     back towards the station.  I followed him.

8          Q.    Let me ask, while the officer was trying

9     to put the cuffs on him, this guy who hit you with

10    a stick, was he saying anything?

11         A.    He was calling him out his name and

12    cursing.

13         Q.    He was calling him a what name, sorry?

14         A.    He called him a nigger.

15         Q.    This guy who hit you with the stick, did

16    he ever call you that?  Did he ever call you a

17    nigger?

18         A.    I don't recall.

19         Q.    Okay.  The guy who hit you with the stick,

20    do you know who he was?

21         A.    No.

22         Q.    Had you ever seen him before?

23         A.    No.

24         Q.    Have you seen him since?

                                                    22

```
 1      A.    No.

 2      Q.    All right.  The officer who had chased

 3   after him and ultimately got the cuffs on him, did

 4   you know that officer?

 5      A.    No.

 6      Q.    Had you ever seen that officer before?

 7      A.    No.

 8      Q.    You indicated the officer was taking him

 9   somewhere and you were walking behind.  Do you know

10   where the officer was taking him?

11      A.    At the time, no.

12      Q.    And why were you following?

13      A.    To give my statement because I told him I

14   wanted him arrested.

15      Q.    And the officer, did you recognize him to

16   be a police officer when you saw him?

17      A.    Well, I recognized the uniform.

18      Q.    Okay.  So what this officer was wearing

19   told you that he was an officer?

20      A.    Yes.

21      Q.    What did the uniform look like?

22      A.    It was black.

23      Q.    Did he have a badge?

24      A.    Yes.
```

23

1    Q.    When you're following behind this officer,

2  was the person who hit you with a stick, did he say

3  anything at this point?

4    A.    He was telling him to get a real police.

5    Q.    Did he say anything else?

6    A.    He just kept hollering, get a real police,

7  get a real police, cursing.

8    Q.    Did the officer say anything?

9    A.    I am a real police.

10   Q.    You said the person who hit you with the

11 stick was cursing?

12   A.    Yes.

13   Q.    Okay.  What was he saying?

14   A.    Get your damn hands off of me.  Get a real

15 police.  Get your damn hands off me.  You're not a

16 damn police.

17   Q.    Okay.  And while the officer had the man

18 who hit you handcuffed and was walking him

19 somewhere, you were following behind.  At some

20 point did you realize where you were going?

21   A.    Well, I figured he was taking him

22 downstairs somewhere to call Chicago police.

23   Q.    Okay.  Were you joined by any other police

24 officers while this officer who put the handcuffs

                                                    24

1    on the man was taking him?

2        A.    One.

3        Q.    Okay.  What happened?  Where did this

4    officer come from?

5        A.    From out the building.

6        Q.    And did you recognize this person as a

7    police officer?

8        A.    Yes.

9        Q.    How did you recognize him as an officer?

10       A.    His uniform.

11       Q.    Do you know who he worked for, who he was

12   an officer for?

13       A.    Well, you could see the black uniform as

14   we was going down the stairs, the Metra uniform.

15       Q.    Okay.  And when this other officer joined

16   you had you ever seen that officer before?

17       A.    No.

18       Q.    Do you know who that officer is?

19       A.    No.

20       Q.    Have you seen that officer since?

21       A.    No.

22       Q.    This officer who joined you, what did he

23   do?

24       A.    He was just walking.

25

1    Q.   Did he say --

2    A.   Beside him.

3    Q.   I'm sorry, I didn't mean to interrupt.

4         He was just walking beside who?

5    A.   The guy and the other officer.

6    Q.   When you were joined by this second

7    officer, did he say anything to you?

8    A.   No.

9    Q.   Did he say anything to the man who was in

10   handcuffs?

11   A.   Not that I recall.

12   Q.   Okay.  Did he say anything to the officer

13   who made the arrest?

14   A.   They was -- at first they talked on the

15   walkie-talkie.  That's how he got up there.

16   Q.   So the officer who ultimately put the

17   handcuffs on the man who hit you with a stick, you

18   saw him use his walkie-talkie or radio or

19   something?

20   A.   Yes.

21   Q.   Were you able to hear him say something?

22   A.   I don't know what he said, though.

23   Q.   Okay.  You just saw him use it?

24   A.   Yes.

26

1    Q.   And then this other officer actually

2    joined you?

3    A.   Yes.

4    Q.   All right.  And so the other officer, did

5    he do anything as you continued to walk and as you

6    walked down the stairs?

7    A.   No.

8    Q.   The man, the officer who made the arrest,

9    how was he holding the man who hit you with a

10   stick?

11   A.   By his arm.

12   Q.   Was he behind him, in front of him, to the

13   side?  Where was he standing?

14   A.   Over to the side holding his arm.

15   Q.   Okay.  And the second officer who joined

16   you, did he ever also grab on to the man who hit

17   you with a stick on the arm?

18   A.   No.  He mostly was walking with me.

19   Q.   Okay.  And did you proceed down the

20   stairs?

21   A.   Yes, I did.

22   Q.   Okay.  And as you were walking down the

23   stairs, where were you in relation to the officer

24   who made the arrest and the man who hit you with

27

```
 1   the stick?

 2        A.   Right behind him.

 3        Q.   What did you observe as you were walking

 4   down the stairs?

 5        A.   He dropped his ID.

 6        Q.   He who?

 7        A.   The guy that the officer had.

 8        Q.   How did he do that?

 9        A.   He had it in his hand handcuffed behind

10   him, and he just dropped his ID.  I saw it.

11        Q.   Did you say anything?

12        A.   Yes.

13        Q.   What did you say?

14        A.   There's his ID on the ground.  He just

15   threw it down.

16        Q.   What happened there?

17        A.   The officer stopped to pick it up.

18        Q.   Which officer, was it the second officer

19   who joined you or was it the first officer?

20        A.   The first officer.

21        Q.   Okay.  And this time while you're walking

22   down the stairs, the man who hit you with the

23   stick, was he saying anything?

24        A.   Just was saying, get your damn hands off
```

28

1    me, call a real police officer.

2        Q.   Was he being dragged down the stairs or

3    how was he walking?  How was he making it down the

4    stairs?

5        A.   Walking, he was walking.

6        Q.   All right.  And you then followed down the

7    stairs as well?

8        A.   Yes.

9        Q.   Okay.  Then what happened when got

10   downstairs?  Where did you go?

11       A.   In a room.

12       Q.   What did the room look like?

13       A.   It had desks around the wall.  All I saw

14   was the desks around the walls because he told me

15   to have a seat right there.

16       Q.   When you say he told you to have a seat --

17       A.   The officer.

18       Q.   Let me get my whole question out.

19            When he told you to have a seat, who do

20   you mean?

21       A.   The officer.

22       Q.   Which officer told you to have the seat,

23   the second one who joined you or the first one?

24       A.   The first one.

                                              29

1    Q.   Okay.  And did you have a seat?

2    A.   Yes.

3    Q.   All right.  What happened with the man who

4  had hit you with a stick when you all went into

5  this room and you were asked to have a seat?

6    A.   He took him to a room.

7    Q.   Okay.  He being the officer?

8    A.   The officer.

9    Q.   Okay.  And would that be the same officer

10  who put the handcuffs on him?

11    A.   Yes.

12    Q.   And what did he -- did you see what he did

13  when he took him to this room?

14    A.   No.

15    Q.   Did you ever see the man who hit you with

16  the stick again?

17    A.   No.

18    Q.   Were you able to hear the man who hit you

19  with the stick?

20    A.   Yes.

21    Q.   What were you hearing while you took a

22  seat?

23    A.   He was cursing.

24    Q.   What was he saying?

30

1      A.    Get a real damn police.  You not a real

2   police.  Get a fucking real police.  You're not a

3   police.  And beating on the wall.

4      Q.    Okay.  Beating on the wall, beating on

5   what wall?

6      A.    Where he was at inside a room or whatever

7   that was.

8      Q.    The officer who put the handcuffs on him

9   and took him into that room, what happened to that

10  officer after he took the man who hit you into this

11  room?

12     A.    Came over and took my statement.

13     Q.    Okay.  So he didn't stay in the room with

14  the man who had hit you?

15     A.    No.

16     Q.    Okay.  What happened to that second

17  officer who had joined you, what did he do?

18     A.    He left out the little area.

19     Q.    Okay.  Did he go into the room where they

20  put the man who hit you with the stick?

21     A.    No.

22     Q.    So the officer who had made the arrest, he

23  came over and took your statement you said?

24     A.    Yes.

                                                      31

1      Q.    What statement did you provide?

2      A.    That he had hit me with the stick.

3      Q.    Okay.  Did you sign a complaint?

4      A.    Yes, I did.

5      Q.    I'm going to show you -- we'll go ahead

6   and mark it as Coleman Exhibit Number 1.

7   (Whereupon, Coleman Deposition Exhibit No. 1 was

8   marked for identification.)

9   BY MS. MAYHEW:

10     Q.    All right.  So we have this which has been

11  marked as Coleman Deposition Exhibit Number 1.  I

12  want you to take a look at that, okay?

13     A.    Yes.

14     Q.    Let me know when you're done looking at

15  it.

16     A.    I've looked at it.

17     Q.    Do you recognize that document?

18     A.    Yes.

19     Q.    What is that document?

20     A.    Where I was telling the police officer he

21  hit me with a stick.

22     Q.    So is that document the complaint that you

23  signed?

24     A.    Yes.

                                              32

1      Q.   Okay.  Is that a true, fair and accurate

2   copy of the complaint that you signed?

3      A.   Yes.

4      Q.   All right.  You see maybe about a little

5   over halfway down the page there's a place where

6   there's a signature and your address, 11029 South

7   Parnell, that signature, is that your signature?

8      A.   The name is my signature.

9      Q.   Okay.  When you signed this complaint, did

10   anyone force you to sign it?

11      A.   No.

12      Q.   Were you threatened to sign?

13      A.   No.

14      Q.   How did you come about signing this

15   complaint?

16      A.   I asked to sign it.

17      Q.   I want to take you back a minute to when

18   you were on Michigan Avenue selling this

19   Streetwise.

20          Was this a 7-Eleven that was between Lake

21   and Randolph?

22      A.   Yes.

23      Q.   Okay.  And --

24      A.   Wait a minute, wait a minute.  I have to

33

1    think where Lake is. This is Randolph. Yes, it

2    was between Lake and Randolph.

3        Q.    And was there anyone outside with you

4    selling the Streetwise?

5        A.    No.

6        Q.    Were you -- you were on your own by

7    yourself at the time?

8        A.    Yes.

9        Q.    All right. At any time after you had been

10    hit with the stick did you hear anyone in the

11    streets or anyone shouting that someone had been

12    hit with a stick?

13        A.    Yes.

14        Q.    Okay. When did you hear that?

15        A.    When I was chasing him.

16        Q.    Do you know who made that comment?

17        A.    It was a female.

18        Q.    Do you know where the female was?

19        A.    Standing right by the bus stop.

20        Q.    Did she ever come up to you, give you her

21    name or anything like that?

22        A.    No.

23        Q.    While you were down in the police office

24    you were signing the complaint. Did anyone else

34

1   join you in the police office?

2       A.   Two Chicago police officers came down.

3       Q.   Okay.  And what happened when the Chicago

4   police officers came down?

5       A.   They told the Metra officer, you got him,

6   you all might as well do the paperwork.

7       Q.   Okay.  And when the Chicago police

8   officers were down there, the man who had hit you

9   with a stick, were you able to hear him?

10      A.   When the Chicago police officers were down

11  there?

12      Q.   Yes.

13      A.   Yes.

14      Q.   What was he doing?  What was he saying?

15      A.   I want a real police.  You're not a

16  fucking police officer.  I want a real police

17  officer.

18      Q.   Did the Chicago police say anything at

19  that time?

20      A.   No.

21      Q.   What about the Metra police officers, did

22  they say anything at that time?

23      A.   They didn't say anything to the guy.

24      Q.   At any time did you ever see any Metra

                                                    35

1    police officer hit the man who hit you with a

2    stick?

3        A.    No.

4        Q.    What happened then after you signed the

5    complaint after the Chicago police came down?

6        A.    They called the ambulance and I left, went

7    to the hospital.

8        Q.    Did you ever get a copy of this complaint

9    to keep yourself?

10       A.    Not that I recall.

11       Q.    After you went to the hospital did you

12   ever see any of the officers again?

13       A.    No.

14       Q.    There was a court date where the man who

15   hit you with the stick was going to appear, and he

16   was being charged with the complaint that you

17   signed as well as another issue.  You were not

18   present in court that day to testify?

19       MR. FITZSIMMONS:  I'm going to object to this.

20   Are you testifying for her?

21       MS. MAYHEW:  No.  I'm setting the stage so I

22   can ask the question.

23       MR. FITZSIMMONS:  Note the objection.

24       MS. MAYHEW:  Sure.

                                                36

1   BY MS. MAYHEW:

2       Q.   Why didn't you go to court?

3       A.   I wasn't notified.

4       MS. MAYHEW:   I think that's all I have at this

5   time.  I'm sure Mr. FitzSimmons has some for you.

6                        EXAMINATION

7   BY MR. FITZSIMMONS:

8       Q.   All right.  Miss Coleman, my name is Joe

9   FitzSimmons.  I'm the attorney for Matthew

10  Granberg.  We need some information from.  First of

11  all, you've said your age is 52.

12           What is your birth date?

13      A.   1-23-57.

14      Q.   So it'll be the 23rd day of January 1957?

15      A.   Yes.

16      Q.   Where were you born?

17      A.   Chicago, Illinois.

18      Q.   Do you know what hospital you were born

19  at?

20      A.   A housewife baby.

21      Q.   Pardon me?

22      A.   Housewife baby, midwife, whatever you call

23  it.

24      Q.   Are you married?

                                                    37

1     A.   No.

2     Q.   Have you ever been married?

3     A.   Yes.

4     Q.   When were you married for the first time?

5     A.   19 -- I think 1991.

6     Q.   And what was the name of your husband?

7     A.   Hollis.

8     Q.   Hollis?

9     A.   Hollis Johnson.

10     Q.   The name you have now, Coleman, is that

11   your birth name?

12     A.   Yes.

13     Q.   You were married to Hollis Johnson in

14   1991.  Where did that marriage take place at?

15     A.   Cook County, city hall.

16     Q.   Are you divorced from Hollis Johnson?

17     A.   He's deceased.

18     Q.   When did he die?

19     A.   In -- what's this, 2009?  I think he

20   passed in 2005.

21     Q.   Have you ever been married to anyone else?

22     A.   No.

23     Q.   Okay.  You've indicated you have three

24   children; is that correct?

                                          38

```
1       A.    Yes.

2       Q.    You have a child that's 33 years old?

3       A.    Yes.

4       Q.    What is the name of that child?

5       A.    Anthony Coleman.

6       Q.    You have a child who's 19 years?

7       A.    Tanika Leonard.

8       Q.    How do you spell that?

9       A.    T-a-n-i-k-a.

10      Q.    Leonard?

11      A.    Yes.

12      Q.    That's a girl I take it?

13      A.    Yes.

14      Q.    You have a child that's 17 years old?

15      A.    Terrence Coleman.

16      Q.    Terrence?

17      A.    Yes.

18      Q.    And was Terrence a child born into your

19   marriage with Hollis Johnson?

20      A.    Yes.

21      Q.    Where does Anthony Coleman live now?

22      A.    He live by his self.

23      Q.    In the state of Illinois, in Cook County,

24   in another state, another country?
```

39

```
 1      A.   In Illinois.

 2      Q.   Specifically does he live at 11029 South

 3  Parnell?

 4      A.   No.

 5      Q.   Tanika Leonard, where does Tanika live?

 6      A.   12245 South Parnell.

 7      Q.   1225?

 8      A.   45.

 9      Q.   45, South Parnell?

10      A.   Yes.

11      Q.   And who does she live there with?

12      A.   My sister.

13      Q.   Terrence Coleman, where does Terrence live

14  at?

15      A.   Same place as Tanika.

16      Q.   12245?

17      A.   Yes.

18      Q.   So neither one of your children live with

19  you; is that correct?

20      A.   Right.

21      Q.   Does Terrence Coleman still go to school?

22      A.   Yes, he do.

23      Q.   What school does he go to?

24      A.   Crane.
```

                                                    40

1    Q.    Crane?

2    A.    Corliss.

3    Q.    Is that in the city of Chicago?

4    A.    Yes, it is.

5    Q.    Okay.  You've indicated you live at

6    11029 South Parnell for the last ten years; is that

7    correct?

8    A.    Yes.

9    Q.    Okay.  Do you own that house?

10    A.    No.

11    Q.    What is the nature of that building that's

12    located there?  Is it a single-family residence or

13    is it a multi-unit building like an apartment

14    building?

15    A.    It's a single-family residence.

16    Q.    Okay.  Who owns the building there, if you

17    know?

18    A.    My sister and her husband.

19    Q.    What is your sister and her husband's

20    name?

21    A.    Annette White and Alfred White.

22    Q.    Do you pay rent to them?

23    A.    Yes.

24    Q.    How much rent do you pay a month?

                                                    41

```
1       A.    400.

2       Q.    $400 a month?

3       A.    Yes.

4       Q.    At any time in the ten years you've lived

5   at 11029 South Parnell have any of your children

6   resided at that address with you?

7       A.    No.

8       Q.    Are any of your children or have -- repeat

9   the whole question.

10            Have any of your children ever been wards

11  of the state of the department of children and

12  family services?

13      MS. MAYHEW:  Object to relevance.

14      THE WITNESS:  I don't feel like I should answer

15  that.

16  BY MR. FITZSIMMONS:

17      Q.    Are you refusing to answer?

18      A.    Yes.

19      Q.    Okay.  Well, I'm going to go into the

20  federal court to Judge Shadur sometime in the next

21  two weeks, and I'm going to get Judge Shadur to

22  give me an order to answer that question.  Do you

23  understand?

24      MS. ROSEN:  If Judge Shadur agrees with you.
```

42

```
1    We think that she's on good footing not to go into
2    her entire personal life.
3    BY MR. FITZSIMMONS:
4         Q.   Let me ask you something.
5              Do either of these two attorneys represent
6    you?
7         A.   No.
8         Q.   Okay.  When is the first time you met
9    either one of these attorneys?
10        A.   A few months back.
11        Q.   Okay.  Well, let's talk about that for a
12   minute.
13             Which attorney did you meet first?
14        A.   I met both of them, both of them.
15        Q.   Where did you meet them at?
16        A.   At lunch.
17        Q.   At lunch.
18             Did they buy lunch?
19        A.   Yes.
20        Q.   Okay.  Where was that lunch at?
21        A.   On Madison.
22        Q.   Do you know where --
23        A.   And Clark.
24        Q.   Madison and Clark.
```

43

1          So they paid for your lunch, correct?

2     A.   Yes.

3     Q.   Have they given you any other kind of

4  money or compensation?  Did they pay you to come

5  here today?  Yes or no?

6     MS. MAYHEW:  Other than the mandatory federal

7  subpoena mileage required.

8  BY MR. FITZSIMMONS:

9     Q.   Well, let's find out.  Did they pay you

10 the mandatory federal subpoena mileage requirement?

11    A.   $58.

12    Q.   $58?

13    A.   To get here.

14    Q.   Okay.  And they bought you lunch two

15 months ago, right?

16    A.   Yes.

17    Q.   Okay.  And where was that lunch at?

18    A.   Maxie's on Madison and Clark.

19    Q.   What time of day did you meet them?

20    A.   About 11.

21    Q.   Okay.  And how long did that meeting last?

22    A.   About 40 minutes.

23    Q.   Okay.  Now, did either one of these

24 attorneys, Miss Mayhew or Miss Rosen tell you about

                                                  44

1    this case?

2        A.   They told me that I would have to give a

3    statement.

4        Q.   Did they discuss what their clients

5    positions are in this statement?  In other words,

6    did they discuss the facts with you?

7        A.   I'm not understanding the question.

8        Q.   Okay.  Did they tell you what happened in

9    this incident?

10       A.   Did they tell me?

11       Q.   Did they talk about the events of

12   August 30, 2007?

13       A.   Yes.

14       Q.   Did they talk about the nature of the

15   lawsuit that my client has brought against the

16   Metra police officers?

17       A.   Yes.

18       Q.   Okay.  And did they tell you, in fact,

19   that my client has made a claim before a federal

20   court judge that the Metra police officers violated

21   his constitutional rights because he is a White man

22   and they are African American police officers?  Did

23   they let you know that?

24       A.   Not that I recall.

                                                    45

1  Q. What did they tell you about the nature of

2 the lawsuit?

3  A. They just told me that the guy was trying

4 to sue Metra police.

5  Q. Did they identify the Metra police

6 officers by name?

7  A. I don't even recall because it's been a

8 while.

9  Q. Okay.  It's been two months, right?

10  A. Yes, but I've been sick, too.

11  Q. But in the two months that have passed,

12 that's been enough time for you to have forgotten

13 what was the conversation at lunch that day; is

14 that correct?

15  MS. MAYHEW:  I'm just going to object for a

16 second because I think it's a mischaracterization

17 of the testimony.  I think she said a few months

18 back, not two.

19 BY MR. FITZSIMMONS:

20  Q. How many months back was it?

21  A. It was a few.

22  Q. Okay.  Can you point to a particular month

23 that you met with them?

24  A. I can't recall what month it was.

46

1    Q.   Okay.  So it's been so long you can't even

2  recall when it was; is that correct?  Yes or no,

3  ma'am, is that correct?

4    A.   Yes.

5    Q.   You indicated you went to a hospital on

6  the night of August 30 after this incident

7  occurred; is that correct?

8    A.   Yes.

9    Q.   Did you pay that hospital bill?

10    A.   No.

11    Q.   Who paid for that hospital bill?

12    A.   No one.

13    Q.   How about the Illinois Department of

14  Public Aid?

15    A.   No.

16    Q.   Are you on public aid?

17    A.   Now I am.

18    Q.   Okay.  Have you ever -- when you say now,

19  how long have you been on public aid this time?

20    MS. MAYHEW:  I'm just going to object to

21  relevance.

22    THE WITNESS:  Does that have anything to do

23  with this case?

24  BY MR. FITZSIMMONS:

                                                      47

1      Q.  Yeah, it does.  It has a lot to do with

2   your credibility, and that's why I'm asking the

3   question.  You come in here.  You made certain

4   statements that accuse my client of misconduct.  I

5   have a right to know your mental background, your

6   physical background, your health background and

7   what kind of a person you are.

8      MS. ROSEN:  I'm going object to that.  You

9   don't have the right to go into certain things.  If

10  she's going to tell you --

11     MR. FITZSIMMONS:  Does this attorney represent

12  you?

13     MS. ROSEN:  I'm an officer of the court.  You

14  know very well that I can -- that neither of us

15  represent her.

16     MR. FITZSIMMONS:  I'm fighting with two

17  attorneys now.  Generally the protocol in a

18  deposition is for one attorney to represent the

19  party and one attorney to represent the other

20  party.

21     MS. MAYHEW:  That's fine.  I made my objection

22  as to relevance, and I made that objection because

23  I don't feel that it is relevant to this particular

24  case.  I don't think that the judge is going to

48

1    agree that you do have a right to go into every

2    little detail about her life.  I thinks it's just

3    going to have to be what the judge believes is

4    germane to her ability to answer questions here

5    today.  And so, you know, I made my objection.  I

6    don't represent her.  I cannot direct her what to

7    do as you know, and I've not done so.

8        MS. ROSEN:  But I will say that if she doesn't

9    want to answer the question, I do not believe any

10   court is going to force her to answer whether or

11   not she's on public aid or when she was on public

12   aid.

13   BY MR. FITZSIMMONS:

14       Q.   Okay.  You indicated you're employed by

15   Streetwise.  Were you employed by Streetwise on

16   August 30, 2007?

17       A.   Yes.

18       Q.   Are you employed by Streetwise today?

19       A.   Yes.

20       Q.   Okay.  Have you been employed by

21   Streetwise continuously between August 30, 2007,

22   and today, June 12, 2009?

23       A.   Well, I haven't worked since January

24   because I've been sick.

                                                     49

1    Q.   Are you still considered an employee?

2    A.   Yes, yes.

3    Q.   Okay.  Now, at any time during your

4  employment by Streetwise have you received Illinois

5  Department of Public Aid funds?

6    MS. MAYHEW:  Object as to relevance.  Again I

7  don't think that it has anything to do with this

8  case.

9  BY MR. FITZSIMMONS:

10    Q.   Well, let me make the question a little

11  more clearer.

12        At any time in the 17 years you've been an

13  employee and receiving employment compensation by

14  Streetwise have you also received compensation from

15  the Illinois Department of public aid as a public

16  aid recipient?  Yes or no?

17    MS. MAYHEW:  Objection as to relevance.

18    THE WITNESS:  I don't feel I should to answer

19  those questions.

20  BY MR. FITZSIMMONS:

21    Q.   Okay.

22    A.   They have nothing to do with this.

23    Q.   What is the extent of your education?

24    A.   11th grade.

                                                    50

1    Q.    Where did you go to school?

2    A.    Wendell Phillips.

3    Q.    Is that in the City of Chicago?

4    A.    Yes.

5    Q.    You indicated you had vocational training

6    when Miss Mayhew asked you that question.  What

7    vocational training have you had after the 11th

8    grade?

9    A.    I went to -- I forgot what school it was.

10   Q.    Pardon me?

11   A.    I forgot what school it was.

12   Q.    Can you tell us when it was?

13   A.    It was in early '80s.

14   Q.    And what was the nature of the vocational

15   training that you undertook?

16   A.    I took up cooking.

17   Q.    It was a cooking school?

18   A.    Yes.

19   Q.    Was it a school that would have given you

20   vocation as a commercial chef or a commercial

21   kitchen staff?

22   A.    Staff.

23   Q.    Okay.  Now, have you ever been employed in

24   that field after that vocational training?

51

1     A.   Yes.

2     MS. MAYHEW:  Object to relevance.

3   BY MR. FITZSIMMONS:

4     Q.   Okay.  Let's talk about your employment

5   background then.  After you got out of Wendell

6   Phillips High School what's the first job you had?

7     MS. MAYHEW:  Objection, relevance.  You can

8   answer.  Go ahead.  I just need to state my

9   objections for the record.

10    THE WITNESS:  I worked at Service System.

11  BY MR. FITZSIMMONS:

12    Q.   And what is Service System?

13    A.   It's a restaurant.

14    Q.   What did you do there?

15    A.   Serve people food.

16    MS. MAYHEW:  Can I have a standing objection so

17  I don't have to have object to every question?

18    MR. FITZSIMMONS:  That's fine.  That's what I

19  would suggest.

20  BY MR. FITZSIMMONS:

21    Q.   For how long did you hold that position?

22    A.   About a year.

23    Q.   What was your next job after that?

24    A.   Gift Pack.

                                          52

```
 1      Q.   Gift Pack?

 2      A.   Yes.

 3      Q.   Where is that located?

 4      A.   It was on 45th and Troop.

 5      Q.   How long did you work there?

 6      A.   I only worked during the summers.

 7      Q.   During the summers?

 8      A.   Yes.

 9      Q.   Okay.  What years did you work for the

10  summers for gift Pack?

11      A.   I don't recall.

12      Q.   Do you recall about how old you were?

13      A.   20.

14      Q.   Okay.  Did you have any jobs after Gift

15  Pack?

16      A.   One I think.

17      Q.   And what was that?

18      A.   What job was that?  I don't even remember

19  the name because I only worked a few days.  Instant

20  Printing.

21      Q.   Instant Printing, where were they located

22  at?

23      A.   They used to be in the Board of Education

24  building.
```

53

1    Q.    And you worked there for only a few days

2    you say?

3    A.    Yes.

4    Q.    Okay.  How old were you when you worked at

5    Instant Printing?

6    A.    I was about 23, 22, 23.

7    Q.    Have you had any jobs other than

8    Streetwise since the Instant Printing job?

9    A.    No.

10    Q.    Have you ever been in the military?

11    A.    No.

12    Q.    How many times have you been arrested in

13    your life?

14    MS. MAYHEW:  Objection, relevance.  Just let me

15    state not calculating to lead to admissible or the

16    discoverable testimony evidence especially since we

17    already covered convictions, and certainly anything

18    more than ten years would not be admissible even if

19    it were a conviction.

20    MR. FITZSIMMONS:  She said she wasn't

21    convicted.  I have a right to look into it.  I have

22    a right to look into every jurisdiction that's

23    she's been arrested in to see if she was lying or

24    telling the truth.

54

1    MS. MAYHEW:  I understand that, but at the same

2    time certainly even if this were in trial right now

3    in court, if she had a conviction, anything over

4    ten years would not be admissible regardless.  So

5    I'm just stating my objection.

6    MR. FITZSIMMONS:  But if she lied when you

7    asked a question, her lie would be admissible to

8    show deception.  So I'm going to repeat it again.

9    MS. ROSEN:  Actually that's not true.  That's

10   not true.  And that's going to be a ruling from the

11   court.

12   MS. MAYHEW:  I'm stating my objection and the

13   reason for it.  Obviously you're going to ask

14   whatever you want to ask, and I'm just going to

15   maintain my objections.  And may I have a standing

16   objection as to this issue as well.

17   MR. FITZSIMMONS:  That's fine.

18   BY MR. FITZSIMMONS:

19       Q.    Have you ever been arrested?

20       A.    Yes.

21       Q.    How many times have you been arrested?

22       A.    Two.

23       Q.    And what police agencies if you recall

24   have arrested you?

                                                    55

```
 1        A.    51st Street District.

 2        Q.    And that would be the Chicago Police

 3   Department; is that correct?

 4        A.    Yes, yes.

 5        Q.    What have you been arrested for?

 6        A.    I don't feel I need to answer that.

 7        Q.    Okay.  Have you ever used illegal drugs?

 8        MS. MAYHEW:  Objection, relevance.

 9   BY MR. FITZSIMMONS:

10        Q.    Have you ever used illegal drugs?

11        A.    I don't think I should answer that.

12        Q.    Okay.  Have you used any illegal drugs

13   before you came here today?

14        A.    No.

15        Q.    Have you used any kind of drugs or

16   medication within the last 24 hours?

17        A.    Medication.

18        Q.    What kind of medication are you on?

19        A.    Blood pressure.

20        Q.    Can you -- do you know the name of the

21   medication?

22        A.    Not right off.

23        Q.    Is it a prescription medication?

24        A.    A prescription medication from the Cook
```

56

1     County Hospital.

2         MS. MAYHEW:  Again, I'll just make if I can a

3     standing objection as to relevance, unless she's on

4     some sort of medication that there's some

5     foundation that it affects her ability to

6     understand or answer questions.

7         MR. FITZSIMMONS:  We haven't gone through all

8     her medication yet.  She's only named the first

9     one.

10        MS. MAYHEW:  If I can go ahead, I mean, I'm

11    obviously not a doctor.  I don't know what every

12    medication is.  I'm just going to make that

13    objection if I could.

14        MR. FITZSIMMONS:  All right.

15    BY MR. FITZSIMMONS:

16        Q.   You have high blood pressure medication

17    prescribed by Cook County hospital; is that

18    correct?

19        A.   Yes.

20        Q.   Who is your doctor there?

21        A.   Dr. Nellop (phonetic).

22        Q.   How do you spell that?

23        A.   I don't know.

24        Q.   Okay.  What other medication are you on?

                                                          57

```
 1      A.    For diabetic.

 2      Q.    And what medication is that?

 3      A.    I don't even know the name of it.

 4      Q.    How long have you been a diabetic?

 5      A.    They diagnosed me in January.

 6      Q.    What other medication are you taking

 7  besides high blood pressure and diabetic

 8  medication?

 9      A.    That was prescribed by the County?

10      Q.    No, for anything.

11      A.    Well, I take methadone.

12      Q.    Methadone?

13      A.    Yes.

14      Q.    How long have you taken methadone?

15      A.    Since -- I forgot when I got on the

16  program.

17      Q.    Where do you get your methadone from?

18      A.    75th and Langley.

19      Q.    And what is the name of the --

20      A.    Nu Way.

21      Q.    Nu Way?

22      A.    Yes.

23      Q.    At 75th and Langley; is that right?

24      A.    Yes.
                                                    58
```

1    Q.   Okay.  What is Nu Way?

2    A.   It's a methadone clinic.

3    Q.   How many years have you been going to Nu

4 Way methadone clinic?

5    MS. MAYHEW:  I'm going to object again as to

6 relevance.

7    MR. FITZSIMMONS:  Let me back up.

8 BY MR. FITZSIMMONS:

9    Q.   When is the last time you had methadone?

10 When is the last time you used methadone?

11    A.   Yesterday.

12    Q.   How long have you been going there?

13    MS. ROSEN:  What is the relevance of it, Joe?

14    MR. FITZSIMMONS:  What is the relevance?

15    MS. MAYHEW:  In terms of --

16    MS. ROSEN:  Hold on.  I want to hear the

17 relevance.

18    MR. FITZSIMMONS:  I believe that I would be

19 able to get an expert to say that the methadone

20 that she takes, and I'm going to ask if she took it

21 within 72 hours of August 30, that it impairs her

22 judgment and her memory.  What we're getting at now

23 is this witness is a recovering heroin addict.

24 That's the only way you get methadone.  Yeah,

59